John **SOLOSKI**, Plaintiff,

v.

Michael **ADAMS**, et al., Defendants.

Civil Action No. 1:06–CV–3043–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 2, 2009.

D. Brandon Hornsby, Office of Brandon Hornsby, Atlanta, GA, for Plaintiff.

Bryan K. Webb, Law Offices of Bryan K. Webb, P.C., Athens, GA, Annette Marie Cowart, Office of State Attorney General, Atlanta, GA, for Defendants.

## *ORDER*

MARVIN H. SHOOB, Senior District Judge.

The matter before the Court is the Magistrate Judge's Report & Recommendation (R & R) and plaintiff's and defendants' objections to the R & R.

*Background*

The Court adopts the following undisputed facts as stated in the R & R:

> This case arises out of allegations that Plaintiff made comments to a female subordinate that she considered to constitute sexual harassment. While Plaintiff acknowledges having made the alleged comments, he contends that they did not violate the University's Nondiscrimination and Anti–Harassment (NDAH) Policy and that he should not have been forced to resign from his deanship and formally sanctioned as a result of those comments.

> Plaintiff is a current tenured professor at, and former Dean of, the University of Georgia's Grady College of Journalism and Mass Communications. Plaintiff was hired by the University of Georgia ("UGA" or "the University") to serve as the Dean of Grady College in the Spring of 2001. During the time period, Defendant Michael F. Adams was the President of UGA. Arnett Mace was the Senior Vice President for Academic Affairs and Provost at UGA....

On May 18, 2005, Janet Jones Kendall ("Kendall"), an employee of Grady College in external affairs, presented Plaintiff with a letter complaining that he had made two comments which she contended (1) were offensive to her and (2) created a hostile work environment. Upon receiving the letter, Plaintiff immediately forwarded it to the UGA Office of Legal Affairs ("OLA"), which then began an investigation of Kendall's allegations.... The allegations mentioned in Kendall's letter became the sole basis for an eventual finding by the OLA that Plaintiff violated UGA's NDAH Policy. The two comments were made, respectively, seven months and one month before Kendall wrote the letter complaining about them, but shortly after her supervisor had complained of Kendall's work. There is no evidence that Kendall objected to the comments or asked Plaintiff to refrain from such comments prior to writing. There is no evidence of other comments made by Plaintiff to Kendall that she thought constituted acts of sexual harassment during the four years they worked together.

Plaintiff admits making the comments referenced in Kendall's letter, but claims that they were not intended to be sexual in nature. The first comment was made on October 14, 2004, at an off-campus University dinner function. Plaintiff stated to Kendall: "You have brown eyes. I don't believe I've ever noticed that before. What color are my eyes." (The Court will refer to this as [the] "eyes" comment.) Plaintiff explained to Washington during the investigation that he made the "eyes" comment in the context of a discussion about his recent Lasik eye surgery, and did not intend it to be a sexual advance.

The second comment was made six months later at a large, off-campus event in Atlanta, the "Capital Campaign Kickoff," on April 14, 2005. Plaintiff said to Kendall: "That is a nice dress. It really shows off your assets." (The Court will refer to this as the "assets" comment.) Plaintiff contends that he did not mean the "assets" comment in a sexual way. Just before making the comment, Plaintiff had been talking about assets disputed in his pending divorce.

From May 18, 2005 to June 29, 2005, the UGA OLA conducted a sexual harassment investigation into the allegations made by Kendall against Plaintiff. The complaint was assigned for investigation to Kimberly Ballard–Washington ("Washington"), the former Associate Director for the UGA OLA.... Washington made the finding that Plaintiff violated the NDAH policy by committing sexual harassment as defined by the policy.

The parties have included facts in their filings regarding several other incidents that Washington uncovered in her investigation, even though as noted above, the finding of a violation of the NDAH policy relied only on the "eyes" and "assets" comments. First, it was alleged that Plaintiff made comments to others about Kendall being pictured in a magazine published in Athens, "Athens Magazine," and that Plaintiff had a copy of the magazine in his office. In the magazine, Kendall wore only a bathing suit. She was working for the UGA College of Journalism at the time she posed for the magazine. Second, Washington was informed that Plaintiff requested that Kendall hand out awards at the Peabody Awards event, an annual function of the Grady School of Journal-

ism. Kendall told Washington that she believed the request that she present the awards was based on her appearance, and that she had refused to do as requested. Third, Kendall told Washington that she had been told that, at a Christmas party, Plaintiff said to a group that, "if [Kendall] was here, all this food would be gone." According to Kendall, as reported by her to Washington, she had also been told that Plaintiff went on to say, "I don't know how she does that [eat so much] and keep that figure or keep that body or something of that nature, she must purge."

On May 12, 2005, six days before she gave Plaintiff the letter containing her sexual harassment complaint, Kendall was reprimanded by her supervisor, Sherrie Whaley, for sending inappropriate emails to various people outside of the University and for her tone in dealing with Plaintiff and Whaley.... It was Washington's perception that prior to Kendall's making her complaint, Kendall and other employees in her department had become frustrated because supervision of them had recently increased. According to Whaley, Kendall had a "poor attitude" and was "not doing her job" around the time she made the complaint against Plaintiff. One employee interviewed by Washington, Sandy Mayfield, stated to Washington that Kendall had a "pattern" of filing complaints against employers in response to supervision....

According to Plaintiff, on June 16, 2005, Washington told him in a telephone conversation that "they were going to find him in violation of the sexual harassment policy." Plaintiff assumed that Washington was referring to Mace and Adams.... Plaintiff claims that this telephone conversation was the first time he had any indication that he would not be exonerated of the charges of sexual harassment.

Also on June 16, 2005, Plaintiff received a call from Kelly Simmons, a reporter for the *Atlanta Journal Constitution* ("AJC"). Plaintiff contends that Simmons had "a considerable amount of the details" regarding the investigation. On June 17, 2005, during the time that the UGA OLA was still investigating the sexual harassment complaint against Plaintiff, the AJC ran an article that revealed that UGA was investigating Plaintiff for sexual harassment. The article quoted Mace as confirming the existence of the investigation. According to Washington, UGA's NDAH policy requires that a sexual harassment allegation remain confidential until an official finding is made, and that information about an investigation not be released to the press until ten days after the official finding. It is undisputed that information about the sexual harassment complaint against Plaintiff was leaked to the press before that time, but the source of the information is unknown.

After hearing from Washington and AJC Reporter Kelly Simmons, Plaintiff contacted Mace via email; in that email, he asked whether Mace wanted him to resign his position as Dean.... Plaintiff contends that this email was not an offer to resign, but a means for Plaintiff to try to determine how serious Mace considered the situation. At 11:36 p.m. on June 16, 2005 ... Plaintiff received a voicemail message from Mace, telling Plaintiff that Adams doubted his effectiveness as a dean. Plaintiff called Mace the next morning, June 17, 2005, at which time Mace told Plaintiff that he had to consider the option of resigning.

Washington was in contact with Provost Mace and President Adams during

the course of the investigation. Mace's involvement with the OLA investigation began within a few days following the opening of the investigation, and he was updated on the facts of the investigation when he called Washington. While Plaintiff infers that this contact was improper, he asked Mace to find out what was happening. Further, Defendants contend that this communication conformed with common practice, because Mace served as Plaintiff's immediate supervisor. The NDAH Policy, in fact, requires the NDAH Officer to "keep the supervisor/administrator informed of the status of the complaint and [to] seek input from the appropriate supervisor/administrator when implementing corrective action." The NDAH Officer is the Executive Director of the OLA, Mr. Stephen Shewmaker, and/or his designee. In this case, Washington was his designee.

Nevertheless, Mace acknowledged that the Provost is not to have any role in the investigation of a potential violation of the NDAH policy; rather, the Provost's role is to act upon findings made by the OLA. Mace testified that expressing his opinion to the UGA OLA could compromise a sexual harassment investigation, and that if he were to make a statement to the UGA OLA about what should occur in such an investigation, it would put the OLA in a difficult position because he is the number two officer at UGA....

Following a June 20, 2005 meeting involving the matter between Plaintiff, his attorneys, and Mace and OLA attorneys, on or around June 21, 2005, Adams, Mace, Washington, and Steve Shewmaker, the University Director of OLA and Washington's supervisor, participated in a telephone conversation pertaining to the status of the investigation into Kendall's complaint about Plaintiff.... Provost Mace told Adams during the investigation that the allegation against Plaintiff was "serious and that there was likely to be a finding of guilt." ... Adams testified at his deposition that, "[w]hen he made me aware of the language, it sounded to me to be a violation of the policy."

Between June 20 and 21, 2005, three meetings were held involving Provost Mace, attorneys from the University OLA and Plaintiff and his attorneys. The sexual harassment investigation was not completed at the time of these meetings. Over the course of the meetings, Mace made four points to Plaintiff. The content of Mace's points is undisputed. His first point was that deans serve at the pleasure of the Provost and President. His second point was that he had already disclosed to President Adams that there was a potential violation of the University's NDAH Policy. Mace's third point was that Mace believed that there was a "definite violation" based on witnesses to the "eyes" comment. His fourth point was that, based on his opinion, there had been sexual harassment as defined within UGA's policy. In these meetings, there was no chance for Plaintiff to discuss the facts related to Kendall or her charge against him.

Present at the first meeting were Provost Mace, Washington, Shewmaker, Plaintiff, and Plaintiff's attorneys Thomas Rogers and Thomas F. Hollingsworth III. Mace began the meeting by stating that it was a preliminary meeting and that there would be a meeting later the same day at 2:30 p.m., at which time Mace would provide Plaintiff with a letter regarding what actions Provost Mace would take in connection with the sexual

harassment allegations made against Plaintiff. Mace described his options for disciplining Plaintiff were there to be a finding against him. Mace told Plaintiff that he had determined that the complaint of sexual harassment was valid. Mace then told Plaintiff that if Plaintiff resigned both his faculty position and his deanship, the case would not go forward, and no finding of sexual harassment would be made. Mace asked for Plaintiff's resignation, and Plaintiff responded that he was not guilty of sexual harassment and had no intention of resigning from his position.

A second meeting was held later the same day, at 2:30 p.m. Present were Mace, Washington, Shewmaker, Plaintiff, and Plaintiff's attorney Thomas Rogers. Mace began the meeting by stating that he had met with President Adams about Plaintiff, and that it needed to be clearly understood by everyone in the room that deans serve at the pleasure of the President. Mace told Plaintiff that he had disclosed to President Adams that there was a potential violation of the University's NDAH policy. Mace told Plaintiff that if he were to resign his Dean position, he would be able to retain his faculty position. Also at the second meeting, Mace read from a letter from former Provost Karen Holbrook to Plaintiff at the time he was hired as Dean. The letter contained an agreement to provide a year of paid time off after Plaintiff resigned from his deanship and before he returned to the classroom. It also addressed Plaintiff's compensation upon return to the faculty after he resigned his deanship. Mace told Plaintiff that the benefits promised in the Holbrook letter were only operative if he resigned as Dean and that the letter had no applicability if he were

terminated as Dean. Plaintiff did not agree to resign his deanship at the second meeting. Instead, he asked that he have time to think about his options and to discuss the situation with his attorneys. Mace and Plaintiff agreed that the same group would reconvene the next day at 1:00 p.m.

On June 21, 2005, the third meeting took place in Provost Mace's office. Present were Mace, Shewmaker, Washington, Plaintiff, and Plaintiff's counsel. . . . Mace told Plaintiff that if he were to resign immediately as Dean effective June 30, 2005, the provisions of the letter from Dr. Holbrook would be honored.

Plaintiff contends that at this time, because Mace had expressed an opinion on his guilt, because Mace and Adams were involved in the investigation, and because information about the investigation had been released to the media, Plaintiff had concluded that his working conditions had become so intolerable that he had no choice but to resign or be falsely labeled a sexual harasser. Plaintiff further contends that, before he verbally resigned, Mace threatened to fire him as a faculty member without the protection of the tenure process, and that he threatened to ruin Plaintiff's reputation and academic career. On June 21, 2005, Plaintiff agreed to resign his position as Dean, under the condition that the terms of the resignation would be as set out in the Holbrook letter. Plaintiff submitted his letter of resignation on June 27, 2005.

Plaintiff claims that during the third meeting with Mace, it was agreed that the University would not find Plaintiff in violation of the NDAH policy, and that everything OLA was to write about Plaintiff would be positive.

On June 29, 2005, Washington made an official finding that Plaintiff had violated the NDAH policy and issued a letter to Plaintiff to that effect. UGA found that Plaintiff's comments (the "eyes" comment and the "assets" comment) created a hostile work environment for Kendall. In determining that Plaintiff engaged in sexual harassment, Washington applied a subjective test; she asked what effect the comments had on Kendall, and found that the comments made Kendall feel uncomfortable. Defendants point out that in addition to Kendall's subjective feelings, Washington relied on Plaintiff's admission that he made the statements alleged, and also took into account the magazine statement, the Christmas Party statement, the Peabody Award issue, and the fact that Plaintiff regarded Kendall as attractive. The purpose of referencing this additional information was to give foundation to the finding and to the effect the comments had on Kendall.

While the University's NDAH policy defines sexual harassment in the same way that Title VII defines sexual harassment, Defendants contend that "sexual harassment" as defined by the NDAH policy is not a legal term of art, and that there can be a finding of sexual harassment under the NDAH policy on facts insufficient to support such a finding under Title VII. Plaintiff disputes this, as do UGA's in-house lawyers. According to Washington, the University must apply the standards of Title VII; UGA is bound by Supreme Court and Eleventh Circuit precedent in interpreting Title VII as it relates to sexual harassment, and she applied Eleventh Circuit precedent when finding Soloski violated the University's sexual harassment policy. James Burns Newsome, Vice Chancellor for Legal Affairs at the Board of Regents of the University System of Georgia ("BOR"), "would expect" Eleventh Circuit case law interpreting Title VII to apply in Plaintiff's case. Plaintiff claims that during the three meetings held in Mace's office, there was no discussion about the law governing whether Plaintiff had committed sexual harassment. Plaintiff contends that the NDAH sexual harassment policy references Title VII and must be applied consistently with Title VII precedents.

On June 29, 2005, Plaintiff was reprimanded and sanctioned by Mace by a formal letter of reprimand and an order for Plaintiff to attend sexual harassment training. This letter went into Plaintiff's permanent personnel file.

On July 13, 2005, pursuant to the NDAH policy ... Plaintiff appealed the finding that he committed sexual harassment to Adams. On July 21, 2005, Adams denied Plaintiff's appeal. It is undisputed that Adams did not examine the OLA's witness statements or investigative notes when conducting his review of Plaintiff's appeal. He recalled reviewing a letter from Plaintiff's counsel, Thomas Rogers, in which Plaintiff admits to having made the comments at issue. Adams could not specifically remember what else he reviewed, but upon considering the "eyes" and "assets" comments, Adams "saw no basis to set aside the conclusion that had been reached."

Additionally, Adams had discussed Plaintiff's potential resignation with Mace prior to Plaintiff's appeal, and Adams was under the impression that Plaintiff and Mace had negotiated an arrangement surrounding Plaintiff's resignation. In making his decision on

Plaintiff's appeal, Adams believed he was upholding "the agreement that seemed to have been worked out between [Plaintiff] and Dr. Mace." Because of this belief, Adams only took a "cursory look" at Plaintiff's appeal file. Adams wrote Plaintiff a letter denying his appeal which states, "The record indicates that there were inappropriate comments made by you." Adams concluded that those comments, the "eyes" and "assets" comments, constituted sexual harassment under UGA's policy.

On August 19, 2005, Plaintiff filed an application for review with the BOR.... The Office of Legal Affairs at the BOR ("BOR OLA") is responsible for presenting applications for review in sexual harassment cases to the Organization and Law Committee for the BOR. Upon receipt of an application for review, the committee ... can either grant a hearing or deny the application.

Elizabeth Neely is the former Associate Vice Chancellor for the BOR OLA. Neely testified that within the OLA, there were differences of opinion as to whether Plaintiff should have been granted a name-clearing hearing, and that she "considered very seriously trying to give him a name-clearing hearing." Other OLA employees believed that Plaintiff was not entitled to a hearing on the basis that he had resigned from his position as Dean rather than being removed, and that a name-clearing hearing would be an unnecessary media circus. Ultimately, the BOR declined to review UGA's finding and Adams' decision to deny his appeal, as requested by Plaintiff....

In March 2005, as Dean of Grady College, Plaintiff sent a letter to Leonard Reid, offering him a higher salary in order to keep him at Grady.... The offer to Reid was that should he stay at Grady College, he would [receive his salary over a twelve-month period but only work nine months out of the year]....

Provost Mace set Plaintiff's salary at $130,015 for the 2006–2007 academic year, the year Plaintiff returned to teaching. Professor Reid's salary for the 2006–2007 academic year was $190,000. Plaintiff argues that his agreement with then-Provost Holbrook did not limit Plaintiff's salary upon return to teaching to professors on academic appointments, but included all professors in the Grady College. Further, Plaintiff contends that he did not choose to be appointed on an academic year basis, but that Provost Mace insisted that Plaintiff's letter of resignation include that language, under threat of a finding of sexual harassment.

Plaintiff also alleges that UGA treated him differently from the manner in which it treated Dwight Keith Parker, another UGA employee who was investigated for sexual harassment. According to Plaintiff, Parker is African–American, and Plaintiff is white. Both Plaintiff and Parker were charged with engaging in sexual harassment pursuant to UGA's NDAH policy in 2005. Parker, however, was found not to have violated the sexual harassment provision of the NDAH policy.... Both investigations were conducted by Kimberly Ballard–Washington for the UGA OLA. Parker and Plaintiff each have a Ph. D., and each holds the rank of Full Professor. During 2005, Parker was Associate Vice President of Academic Affairs and Associate Provost. Plaintiff was Dean of UGA's Grady College of Journalism. During Mace's tenure as Provost, Par-

ker and Plaintiff are the only two administrators at UGA who were ever investigated for sexual harassment under the NDAH policy.

The allegation against Parker involved a trip he took with a female UGA graduate student to attend a conference in Washington, D.C. The student alleged that during the trip, Parker first engaged in "footsies" with her, rubbing his feet against hers. Later, he invited the student to sleep in his hotel suite. It is undisputed that both did sleep in the same suite and that this was a violation of UGA's travel policy. The student explained to Washington that Parker again physically touched her by massaging her feet with his hand. He told her that she "looked like she was the type of girl who liked to have fun." On August 23, 2005, Washington concluded that Parker's conduct did not constitute sexual harassment. Washington explained that she made this finding because Parker denied any sexual misconduct, making this incident a "he-said-she-said" scenario....

Both Parker and Plaintiff were alleged to have made sexually inappropriate comments, and to have made them off-campus. Both Parker and Plaintiff denied any sexual intent toward the respective complainants. The OLA finding for the Parker incident was made on August 23, 2005. The finding for the Soloski incident was made on June 29, 2005. Plaintiff resigned following the OLA investigation against him, and Parker was terminated after tendering, and then withdrawing, his resignation.

Plaintiff complained to Mace and the UGA OLA during his meetings with Mace of June 20, 2005 that he was being treated more harshly than Parker had

been because he was not African American. A June 24, 2004 UGA memo alleges that a number of sexual harassment complaints had been made against Parker.... Parker, however, was not found in violation of UGA's sexual harassment policy....

On November 3, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he had been discriminated against by his employer, Defendant BOR, because of his race (White) in violation of Title VII. Plaintiff filed an Amended Charge of Discrimination with the EEOC on July 19, 2006, alleging that he had been retaliated against by the BOR for having opposed unlawful employment practices, in violation of Title VII. On August 28, 2006, Plaintiff received a Notice of his right to sue from the EEOC with regard to his Charge and Amended Charge.

According to Plaintiff, Defendants' finding against Plaintiff caused him intense feelings of embarrassment and humiliation. He testified that in academia, "being found a sexual harasser is akin to being a pedophile." Plaintiff claims that during the June 20 and 21, 2005 meetings ..., Defendants bullied and intimidated him into resignation with threats to label him a sexual harasser.

Plaintiff also contends that Defendants represented to him that if he resigned, there would not be a finding that he committed sexual harassment, and that upon his resignation they would write a positive letter for him and he would not receive a formal reprimand. Plaintiff claims that he made the decision to resign in reliance on Defendants' representation that if he did, there would not be a finding of sexual harass-

ment. Subsequently, the OLA made the finding that he had violated the NDAH policy.

R & R, pp. 1324–34 (internal citations and footnotes omitted).

*Standard*

The District Court conducts a *de novo* review of the R & R prepared by the Magistrate Judge. Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.*

*Discussion*

I. Plaintiff's Mandamus Claim

■ In Count I of plaintiff's fourth amended complaint, plaintiff asks for a Writ of Mandamus pursuant to O.C.G.A. § 9-6-20 [1] to compel defendants to rescind, recant, and expunge UGA's official finding that he violated the University's NDAH policy. "Mandamus provides extraordinary relief to compel the performance of an official duty. It does not issue

to direct a public official to do a discretionary act *unless such discretion has been grossly abused.*" *Tamaroff v. Cowen*, 270 Ga. 415, 511 S.E.2d 159, 160 (1999)(emphasis added). Under applicable Georgia law, mandamus will issue against a public officer: (1) when there is a clear legal right to the relief sought; or (2) when there has been a gross abuse of discretion. *Jackson County v. Earth Res., Inc.*, 280 Ga. 389, 627 S.E.2d 569, 571 (2006).

■ The Magistrate Judge made the recommendation to grant plaintiff's request for a writ of mandamus under the "gross abuse of discretion" standard. (R & R, p. 1344.) After finding that defendants' decision to find plaintiff in violation of the NDAH policy was discretionary, the Magistrate Judge sought to determine whether defendants' actions should be overturned through mandamus as "arbitrary, capricious, and unreasonable." *Pruitt v. Meeks*, 226 Ga. 661, 177 S.E.2d 41, 43 (1970). One such example of a gross abuse of discretion occurs where there has been "[a] clear error in judgment or the application of an incorrect legal standard." *Cotton v. Jackson*, 216 F.3d 1328, 1332 (11th Cir.2000). The Magistrate Judge determined that because defendants did not adhere to the legal standard laid out in the NDAH policy, they had committed a gross abuse of discretion and the OLA's finding was subject to reversal through a writ of mandamus. Specifically, the Magistrate Judge concluded:

> While [plaintiff] was told that he was being charged with violating the NDAH policy, which references Title VII, he was in fact investigated and found guilty

---

**1.** "All legal duties should be faithfully performed; and whenever, from any cause, a defect of legal justice would ensure from a failure to perform or from improper influ-

ence, the writ of mandamus may issue to compel a due performance, if there is no other specific legal remedy for the legal rights."

under a standard completely different from the Title VII standard. The NDAH policy gave Plaintiff notice of the charges against him by defining sexual harassment as it is defined under Title VII. Because OLA (and those who reviewed its decision) did not apply the policy in any way remotely consistent with Title VII, its decision was the result of a gross abuse of discretion leading to a defect of legal justice under O.C.G.A. § 9–6–20 and authorizing the issuance of a writ of mandamus to correct it.

R & R, p. 1338.

In response to the Magistrate Judge's findings, defendants argue that there was neither a clear error in judgment nor an incorrect application of the applicable legal standard by the NDAH Officer. Specifically, defendants argue that the NDAH policy includes both the definition of sexual harassment found within Title VII as well as further specific examples enumerated within the policy. Defendants argue that because the NDAH Officer made her determination consistent with the examples included within the policy, she did not apply an incorrect legal standard or abuse her discretion.

■ After reviewing the University's NDAH policy and the UGA OLA's application of the policy during its investigation of plaintiff, the Court agrees with the Magistrate Judge that the University applied the incorrect standard for evaluating whether plaintiff had engaged in sexual harassment. Defendants claim that plaintiff engaged in sexual harassment based on one of the "[e]xamples of sexual harassment" listed within the NDAH policy. (Def.'s Ex. 12, p. 2.) The specific example cited by defendants includes "remarks of a sexual nature about one's clothing and/or body" as one possible instance of "[s]exual advances, physical or implied, or direct propositions of a sexual nature." (Id.) Even though plaintiff's conduct arguably falls within this example, the Court agrees with the Magistrate Judge that the example cannot be read independently of the policy's entire definition of sexual harassment. The policy's definition of sexual harassment is defined "[p]ursuant to Title VII of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972." (Id.) Under a plain reading of the first sentence of the policy's definition of "sexual harassment" and because defendants fail to present another explanation for the policy's reference to Title VII and Title XI, the Court finds that the only reasonable conclusion to reach is that the NDAH policy intended to incorporate the definition of "sexual harassment" under Title VII of the Civil Rights Act of 1964, including any interpretations applied by the United States Supreme Court and the Eleventh Circuit Court of Appeals. Further, because the policy does not suggest that its definition of "sexual harassment" extends beyond the definition under Title VII, the provided examples of sexual harassment cannot be considered independent of the way in which "sexual harassment" is defined under Title VII. Rather, the examples only provide a clarification of the types of behaviors that would be prohibited so long as they violate Title VII.

The Court's and the Magistrate Judge's conclusion is supported by the testimony of lawyers at the OLA and the BOR. In his deposition, James Burns Newsome, Vice Chancellor for Legal Affairs with the BOR, agreed with the statements that he "would expect Eleventh Circuit case law to apply to any interpretations of sexual harassment in the context of a sexual

harassment case in Georgia," (Newsome Depo. p. 58), that all sexual harassment cases at Georgia universities "have to be considered against the backdrop of Title VII and the federal case law, (Id. p. 98), and that "the University of Georgia has to apply Title VII to any allegation of sexual harassment." (Id. p. 99.) Similarly, Kimberly Ballard–Washington, the attorney who conducted the investigation of plaintiff at the OLA, agreed with the statement that "the University has to apply the standards of Title VII," (Ballard–Washington Depo. p. 118), and that she needed "to be aware of how the 11th Circuit construes Title VII in applying the University's policy." (Id. at 120.) Thus, the testimony of Newsome and Ballard–Washington establishes that it was reasonable for members of the University's legal team as well as employees of the University acting in reliance on the NDAH policy to believe that under the policy, "sexual harassment" was defined consistent with its interpretation under Title VII.

Even though the Court recognizes the role of the NDAH policy in "plac[ing] individuals on notice that harassment of any sort, by any person whether employee, student, or visitor will not be tolerated on the campus and will be met with disciplinary action where found and when appropriate" (Def.'s Objections to R & R, p. 10), the Court also recognizes the necessity of providing those who rely on the policy with guidance as to what constitutes "harassment." As such, the Court agrees with the Magistrate Judge that "those charged under the [NDAH] policy have a right to notice of the standard under which they will be judged." (R & R, p. 1339.) Therefore, were the Court to accept defendants' argument and permit the University to use its own uninhibited discretion, the NDAH policy, as currently written, would

allow for a wide range of behavior that is not actionable under Title VII to be classified as sexual harassment. By punishing anything the University considers to be "remarks of a sexual nature about one's clothing and/or body" without any further limitation or any requirement that a complaint be objectively reasonable, the University would effectively be operating without any limiting standard on its discretion and "those subject to the policy would be unable to govern their conduct in accordance with the expectations set by it, and would be subject to arbitrary enforcement." (R & R, p. 1340.)

While wide discretion would not necessarily be prohibited and, based on the policy reasons laid out by defendants in their objections to the R & R, may even be advantageous in many circumstances, the Court finds that the current NDAH policy must be read according to its plain meaning, which limits disciplinary conduct to that which would impose liability under Title VII. If defendants desire to encompass more behavior under their definition of sexual harassment, they must not explicitly state that their definition is derived from Title VII. Accordingly, in determining whether defendants abused their discretion in the course of their investigation, the Court will apply a definition of sexual harassment consistent with Supreme Court and Eleventh Circuit Title VII jurisprudence.

■ In order to establish a prima facie case of a Title VII claim for a hostile work environment based on sexual harassment, an employee must show: "(1) the employee belongs to a protected group ...; (2) the employee was subject to unwelcome sexual harassment ...; (3) the harassment complained of was based upon sex ...; [and] (4) the harassment complained of affected

a 'term, condition, or privilege' of employment." *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982)(quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1972)).

▮▮▮ Under the fourth element, a plaintiff in a Title VII action must show that his or her work environment was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Whether discrimination has rendered a work environment hostile or abusive is determined by the totality of the circumstances, including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Finally, when determining whether the harassing conduct was sufficiently severe or pervasive, courts must review the factors enumerated in *Harris* from a subjective and an objective perspective. Under the latter analysis, the court must find that the work environment was hostile or abusive from the perspective of a reasonable person. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir.1999).

In his analysis of whether plaintiff's conduct was sufficiently severe or pervasive to affect a term, condition, or privilege of employment, the Magistrate Judge concluded:

> [T]here is no judicial authority that this Court is aware of that would suggest that Plaintiff's conduct came anywhere near creating a hostile work environment for Kendall. In fact, Defendants cited no evidence in their finding of sexual harassment or in Adams' letter denying Plaintiff's appeal that could possibly amount to sexual harassment under any legal standard.

R & R, p. 1341. The Magistrate Judge added that the UGA OLA incorrectly omitted any analysis of whether Kendall's complaints were objectively reasonable.

Defendants counter by asserting that under factors established by the U.S. EEOC *Policy Guidance on Current Issues of Sexual Harassment*,[2] it was not unreasonable for the OLA to determine that the comments by plaintiff resulted in a hostile or offensive work environment.

In determining whether the OLA's determination constituted an abuse of discretion, this Court uses the factors laid out by the Supreme Court in *Harris*. Defendants' reliance on the factors established by the EEOC in its 1990 policy guide are not persuasive for several reasons. First, the EEOC Manual itself acknowledges the limits of a hostile environment Title VII claim. The EEOC Manual notes that "[i]n determining whether unwelcome sexual conduct rises to the level of a 'hostile environment' in violation of Title VII, the central inquiry is whether the conduct 'unreasonably interfer[es] with an individual's work performance' or

---

**2.** *See generally* U.S. EEOC *Policy Guidance on Current Issues of Sexual Harassment*, Number N–915–050, March 19, 1990, *available at*

*http://www.eeoc.gov/policy/docs/currentissues. html* [hereinafter "EEOC Manual"].

creates 'an intimidating, hostile, or offensive working environment.' " The manual goes on to note that "sexual flirtation or innuendo, even vulgar language that is trivial or merely annoying, would probably not establish a hostile environment." Finally, in discussing the standard for evaluating harassment, the manual notes that "if the challenged conduct would not substantially affect the work environment of a *reasonable person*, no violation should be found."

Aside from the language within the EEOC Manual, the version of the manual quoted by defendants was written three years before the Supreme Court elaborated on hostile work environment claims under Title VII in *Harris*. Thus, the Supreme Court's decision in *Harris* would supercede any agency interpretation of existing Title VII law created prior to the Supreme Court's decision. However, as in the EEOC Manual, the Court in *Harris* noted the difficulty of establishing a hostile work environment claim, stating that the " 'mere utterance of an ... epithet which engenders offensive feelings in a employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (quoting *Vinson*, 477 U.S. at 67, 106 S.Ct. 2399).

■ Applying the *Harris* factors, this Court finds that the OLA abused its discretion by finding that plaintiff had engaged in sexual harassment. Under the first factor, "frequency of the discriminatory conduct," *id.* at 23, 114 S.Ct. 367, Kendall's complaint was based on two separate comments that occurred six months apart from each other. As such, the Court agrees that "the paucity of the comments here precludes a finding that the workplace was 'permeated with discriminatory intimidation, ridicule, and insult.' " (R &

R, p. 1341.) Under the second factor, the severity of the discriminatory conduct, plaintiff's actions do not appear to be severe under an objective analysis. Even though the "assets" comment could conceivably be in reference to Kendall's physical appearance under an objective analysis, plaintiff's "eyes" comment would not be characterized as severe by any objectively reasonable person.

Even though the OLA also considered plaintiff's possession of a magazine with Kendall posing in a swimsuit and plaintiff's accompanying statement that "that is why we hired her," plaintiff's comments about Kendall's body at a holiday function insinuating that she was bulimic, and plaintiff's request for Kendall to be a presenter at the Peabody Awards, the first two additional incidents cannot be characterized as severe because they did not involve direct confrontations between plaintiff and Kendall, but rather were comments supposedly made by plaintiff to third parties. Further, even Ballard–Washington agreed with the statement that "it would be reasonable for people to comment on" plaintiff's picture in a swimsuit, (Ballard–Washington Depo., p. 74). Similarly, the third additional incident, in which Kendall was requested to be a presenter at the Peabody Awards, was only subjectively interpreted by Kendall to reference her appearance, was actually made to Kendall by an individual other than plaintiff, and would not, in itself, be considered "severe" under any objectively reasonable analysis. Further, the subjective "severity" of these additional incidents is called into question by the fact that Kendall did not even reference them in her complaint regarding plaintiff's behavior.

Under the third *Harris* factor, "whether [plaintiff's conduct] is physically threaten-

ing or humiliating, or a mere offensive utterance," *id.*, all of plaintiff's alleged behavior would be properly classified as, at most, "offensive utterances." At no time did plaintiff act in a manner that was physically threatening or humiliating.

Finally, under the fourth *Harris* factor, "whether [plaintiff's conduct] unreasonably interferes with an employee's work performance," *id.*, the OLA presented no evidence that Kendall's work performance was impaired by plaintiff's conduct.

Based on a review of these factors, the Court concludes that an objectively reasonable person would not conclude that plaintiff's conduct created a hostile work environment for Kendall. OLA's finding to the contrary is explained by the fact that it is not clear that the Office conducted a full objective inquiry. Even though in its Letter of Determination the OLA stated "it was reasonable ... for the complainant to believe that sexual advances were being directed towards her," (P. Appx. C.66), the OLA reached this determination in a conclusory manner, merely stating that "the evidence suggest[ed]" (Id.) such a finding without any further analysis. Moreover, Ballard–Washington's use of any objective analysis is called into question by the fact that she "believe[d] that the determination of whether a sexual advance was being made or not made should be viewed from the perspective of the complainant." (Ballard–Washington Depo., p. 46.)

In the final portion of its discussion regarding plaintiff's request for a writ of mandamus, the R & R determines that the OLA's failure to apply the appropriate legal standard during its investigation was arbitrary, capricious and unreasonable and, accordingly, constituted an abuse of discretion. Specifically, the Magistrate Judge notes that "it is a gross abuse of discretion to find one guilty of sexual harassment under a policy that incorporates Title VII without at least going through the motions of applying the facts of a case to the well understood Title VII law." (R & R, p. 1341.) Citing *Campbell v. Fulton County Bd. of Regist. & Elec.*, 249 Ga. 845, 295 S.E.2d 80 (1982), the Magistrate Judge determined that the OLA's failure to comply with the NDAH standard justified granting plaintiff's request for a writ of mandamus requiring defendants to rescind their findings and to expunge their records of all findings that plaintiff violated defendants' sexual harassment policy.

In response, defendants list a series of reasons why the OLA's interpretation of the NDAH policy was not an abuse of discretion, none of which this Court finds persuasive. Defendants first argue that "the [Magistrate] Judge does not provide any law or authority which would establish or address what language is required to [put] Plaintiff on notice that UGA intends to and would find Plaintiff's admitted actions violative of the policy." (Def.'s Resp. to R & R, p. 11.) However, the Court need not instruct defendant on how to rewrite their policy to cover the conduct at issue. It is only necessary for the Court to determine whether it was an abuse of discretion to find that the conduct was covered by the current policy as written by the University.

Defendants next argue that it is impossible to find a gross abuse of discretion where "there is no case law cited which explains what might be required [within the policy] beyond the inclusion of specific examples of conduct." (Def.'s Resp. to R & R, p. 12.) However, defendants' claimed lack of guidance concerning the appropri-

ate standard to follow is undermined by the fact that Ballard–Washington believed that, as an investigator for the OLA, she was required to apply interpretations of Title VII from the Supreme Court and the Eleventh Circuit Court of Appeals. *See supra* pp. 1299–1300. These self-imposed guidelines provided a limit to the OLA's discretion.

Defendants next contend that the R & R, if upheld, would require the University to find behavior that was sufficiently severe and pervasive to establish liability under Title VII before the University could subject any employee to discipline for sexual harassment. Defendants argue that this undermines the preventative purpose of sexual harassment policies, as understood by the Supreme Court and the EEOC. (Def.'s Resp. to R & R, pp. 12–13.) Once again, the Magistrate Judge correctly reached his conclusion based on a reasonable reading of the language of the University's policy that was chosen *by the University*. The University is under no legal obligation to define sexual harassment consistent with Title VII. However, the University must clearly express the scope of behavior that would subject an individual to discipline or else it risks violating that individual's right to procedural due process. Accordingly, the Magistrate Judge's ruling is merely a determination that once the University sets a standard for its sexual harassment policy, whatever that may be, the University is then required to abide by that standard.

Lastly, defendants argue that the Court should not solely base its decision on the NDAH policy's one-sentence reference to Title VII and Title IX because that decision runs contrary to the rationale behind the NDAH policy. However, it would be fundamentally unfair to permit the University to discipline an employee for behavior that falls outside the scope of the University's written sexual harassment policy. Because a plain reading of the policy would only put employees on notice that they were subject to discipline for behaviors that would result in liability "[p]ursuant to Title VII" (Def.'s Ex. No. 12, p. 2), disciplinary action for any behavior that would not result in Title VII liability is beyond the scope of the University's discretion under the current policy.

Because the NDAH Officer conducted its review of plaintiff's sexual harassment allegation using an improper standard and UGA subsequently disciplined plaintiff based upon that improper investigation, this Court adopts the R & R's finding that defendants have abused their discretion. Accordingly, this Court adopts the R & R's recommendation to grant plaintiff's request for a writ of mandamus rescinding defendants' findings and expunging from defendants' records any indication that plaintiff violated the University's sexual harassment policy. However, the Court also adopts the R & R's recommendation that affirmative publicity of the writ of mandamus should not be ordered at this time.

**II. Breach of Contract**

In Count II of plaintiff's fourth amended complaint, plaintiff alleges that defendants deprived him of his rights to procedural due process by terminating his deanship and by finding that he was in violation of the University's NDAH policy without granting him a name-clearing hearing. Plaintiff alleges that his right to procedural due process arises under both the United States Constitution and under the contractual terms of his "Contract for Faculty Ranked Administra-

tors." In his R & R, the Magistrate Judge recommended that summary judgment be granted for defendants on Count II because plaintiff's contractual right to due process was terminated at the time he resigned from his position as Dean of Grady College, because he lacked a protected property interest in his deanship position, and because there was no "deprivation" of a property interest where he resigned from his position as dean.

## A. Contractual Due Process

The Magistrate Judge first addressed plaintiff's claim for denial of contractual due process. In his claim, plaintiff asserts that his deanship contract "is made expressly subject to the applicable ... bylaws and policies of the Board of Regents." (Def.'s Ex. 1.) In turn, § 802.17 of the BOR Policy Manual provides that "[s]exual harassment of employees or students in the University System is prohibited and shall subject the offender to dismissal or other sanctions *after compliance with procedural due process requirements.*" (Pl.'s Br. in Supp. of Pl.'s First Mot. for Summ. J., App. C.5.) Plaintiff contends that when defendants threatened him with termination as dean, placed a formal letter of reprimand in his personnel file, and required him to attend sexual harassment training, they violated the procedural due process requirements guaranteed to him by the BOR Policy Manual.

The Magistrate Judge's R & R recommended against finding a breach of contract or a deprivation of due process because plaintiff had resigned his position as dean prior to the imposition of any sanction. The Magistrate Judge determined that, because plaintiff had made the decision to resign as dean in order to retain his position as a faculty member at

Grady College and to receive financial benefits promised to him by former Provost Karen Holbrook, plaintiff had made a voluntary decision to terminate his rights under the terms of his deanship contract with the University. Therefore, the Magistrate Judge determined that all of his remaining "contractual rights were as agreed upon in his settlement, not his deanship contract." (R & R, p. 1345.)

Plaintiff objects to the Magistrate Judge's findings by asserting that jury questions exist regarding (1) whether defendants breached their contract by denying plaintiff due process prior to his resignation; (2) whether plaintiff's resignation was involuntary and, as a consequence, whether plaintiff's contractual guarantee of due process remained operative; and (3) whether a voluntary resignation would necessarily terminate plaintiff's contractual right to due process.

Under plaintiff's first objection, plaintiff claims that the decision to sanction plaintiff and dismiss him from his deanship position occurred prior to his resignation as dean. Plaintiff specifically alleges that Ballard–Washington, the investigator of plaintiff's alleged violation of the NDAH policy, commented to plaintiff while the investigation was ongoing that she would likely find him in violation of the policy. Further, plaintiff alleges that on June 20, 2005, seven days prior to plaintiff's formal resignation as dean, Mace told plaintiff that he would provide him with a letter that day "finding that Plaintiff had committed sexual harassment and setting forth the disciplinary action to which Plaintiff would be subject." (Pl.'s Second Statement of Material Facts Not in Genuine Dispute, ¶ 103.) As a result of this premature determination, plaintiff claims that the purpose of the meetings with Mace

and members of the OLA on June 20–21, 2005, concerned the terms of his possible resignation or termination as dean. Based on these facts, plaintiff asserts that the decision to sanction and dismiss him preceded his resignation as dean and, therefore, he should have been afforded all of the procedural due process protections guaranteed to him under his deanship contract.

This Court does not find plaintiff's objection persuasive. According to the BOR Policy Manual, plaintiff, as dean, was afforded the requirements of due process for "dismissal" or "other sanctions." (Pl.'s Br. in Supp. of Pl.'s First Mot. for Summ. J., App. C.5.) Accordingly, plaintiff would only be entitled to due process if he were dismissed or sanctioned prior to his resignation.

None of plaintiff's allegations establishes that he was subject to either dismissal or sanction prior to his June 27, 2005 resignation as Dean of Grady College. Ballard–Washington's early statement that plaintiff likely would be found in violation of the NDAH policy can not be reasonably construed as either a dismissal or a sanction, but rather as a prediction. Similarly, Mace's letter on June 20, 2005, detailing likely punishments for plaintiff in connection with the sexual harassment allegations was still conditioned on a final finding by the OLA. Such a prediction of possible punishments pending a final report is neither a dismissal nor a sanction. Rather, Mace's statements were made as part of a process of negotiation in which plaintiff was enticed to resign so that a dismissal or other serious sanction could be avoided, alleviating the need to provide plaintiff with his contractually guaranteed rights to procedural due process. Plaintiff even admitted during his deposition to the non-conclusive status of the investigation against him at the time of his resignation, noting that "the investigation wasn't complete." (Soloski Depo., pp. 63–64.)

Because no official finding had been made regarding whether plaintiff had violated the NDAH policy and because plaintiff had not yet been subject to dismissal or sanction, it is irrelevant that "it was a certainty that Plaintiff would be terminated for sexual harassment if he did not resign his deanship." (Pl.'s Objections to R & R, p. 7.) Without any formal dismissal or sanction, plaintiff cannot establish that he was deprived of a property interest on June 20 and June 21, 2005. Accordingly, it was impossible for defendants to have any liability for breaching plaintiff's contractual rights during that time period. Rather, it was the mere fact that plaintiff resigned prior to any dismissal or sanction, not the reason behind the resignation, that is determinative of the fact that plaintiff waived any due process protections to which he would have otherwise been entitled under his deanship contract.

Because plaintiff's resignation occurred prior to his sanction by the University, plaintiff would have to establish that the resignation was somehow involuntary in order to show that his contractual rights to procedural due process were not waived. Plaintiff has attempted to do this by claiming that his resignation was, in fact, a "constructive discharge" from his position as dean.

■■■■■ To prove constructive discharge in the context of Title VII, a plaintiff must show that his "working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign." *Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th

Cir.1996)(quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989)). For a constructive discharge to be shown, there must be a "high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.' " *Hill v. Winn–Dixie Stores, Inc.,* 934 F.2d 1518, 1527 (11th Cir.1991). In the Eleventh Circuit it is extremely difficult to establish a constructive discharge. A resignation will be considered voluntary even where the only alternative to resignation is possible termination for cause, criminal charges, or other unpleasant alternatives "because the fact remains that [the] plaintiff had a choice ... [to] stand pat and fight." *Hargray v. City of Hallandale,* 57 F.3d 1560, 1568 (11th Cir.1995)(quoting *Christie v. U.S.,* 207 Ct. Cl. 333, 518 F.2d 584, 587 (1975)).

■ When assessing whether a constructive discharge has occurred, the Court must determine whether a reasonable person in the plaintiff's position would feel compelled to resign under the circumstances. *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1450 (11th Cir.1998)(quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1317 (11th Cir.1989)). In *Hargray,* the Eleventh Circuit established five factors to consider when determining whether a resignation was obtained by coercion or duress. These factors are:

(1) whether the employee was given some alternative to resignation;

(2) whether the employee understood the nature of the choice he was given;

(3) whether the employee was given a reasonable time in which to choose;

(4) whether the employee was permitted to select the effective date of the resignation; and

(5) whether the employee had the advice of counsel.

*Hargray,* 57 F.3d at 1568. When assessing these factors, courts are instructed to consider the totality of the circumstances. *Id.*

■ In the Magistrate Judge's R & R, he failed to find a constructive discharge of plaintiff from his position as Dean of Grady College. The Magistrate Judge determined that plaintiff resigned his position by choice and that "[h]is available alternative was to wait until the investigation findings were made, contest them with the Provost if adverse, and invoke his contractual due process rights if sanctions were imposed." (R & R, p. 1346.) The Magistrate Judge noted that by resigning, plaintiff benefitted by guaranteeing his continued employment as a faculty member at Grady College and by receiving certain salary guarantees promised to him by former Provost Karen Holbrook in the event he stepped down from his administrative position.

Applying the *Hargray* factors, the Magistrate Judge determined that plaintiff's resignation was voluntary because of his alternative option to remain in his position and contest the charges against him under his contractual due process protections, the fact that he understood the nature of the choice before him, the one day period plaintiff was granted to consider his available options, his ability to make the effective date of the resignation several days after the agreement was reached, and his ability to receive the advice of counsel concerning his resignation decision. In tandem, the Magistrate Judge found, these factors established that plaintiff "was not 'constructively discharged' as a matter of law, and his resignation terminated his deanship contract." (R & R, p. 1347.)

■ Plaintiff objected to the R & R's recommendation by putting forth evidence

that plaintiff believes establishes that he was coerced into resigning by Provost Mace. This Court finds that none of plaintiff's objections support a finding that a genuine issue of material fact exists concerning whether plaintiff's resignation was voluntary.

Plaintiff first argues that it was an absolute certainty that he would be terminated and would not receive the salary benefits promised to him in the letter from Provost Holbrook if he did not resign as dean. This Court, however, agrees with the Magistrate Judge that any finding by the University that would result in plaintiff's sanction or termination would trigger his contractual due process rights in the event he did not resign as dean. As such, his ability to "stand pat and fight," *Hargray*, 57 F.3d at 1568 (quoting *Christie*, 518 F.2d at 587), provided an alternative to his resignation, making his resignation a choice. Further, the fact that the University would not award him the salary benefits promised by former Provost Holbrook if plaintiff was terminated did not constitute an intimidation tactic by the University, but rather was consistent with the language within Holbook's letter, which only promised plaintiff certain salary concessions in the event he "wish[ed] to step out of [his] administrative role and return to [his faculty position]." (Def.'s Ex. 7.) Holbrook's use of the term "step out" implies a voluntary recusal and does not contemplate plaintiff's forced removal from his position.

Plaintiff next argues that the Magistrate Judge incorrectly accepted defendants' argument that the financial incentive of the Holbrook letter was determinative of the fact that plaintiff's resignation was voluntary. Rather, plaintiff argues that viewing all undisputed facts in the light most favorable to plaintiff, the evidence establishes that plaintiff resigned due to the threat of being terminated from his position and being labeled as a sexual harasser. Even if this Court accepts that plaintiff resigned from his position as dean because of fear of being removed and becoming known as a sexual harasser, plaintiff's resignation would still be "voluntary" under Eleventh Circuit precedent because "the mere fact that [plaintiff] was forced to choose between two inherently unpleasant alternatives does not in itself mean that his resignation was submitted under duress." *Hargray*, 57 F.3d at 1569.

Plaintiff's third argument for a constructive discharge is that he did not have the option of "waiting for the findings to be made and contesting them with the Provost if adverse," (R & R, p. 1346), or "invoking his contractual due process rights if sanctions were imposed," (id.), because an adverse finding in the sexual harassment investigation by the OLA was a stated certainty. Because the sanctions were not imposed prior to plaintiff's resignation, however, plaintiff's statement that he would have been unable to invoke his contractual due process rights if sanctions were imposed is merely a hypothetical assertion that is based on speculation and not fact. Further, even though plaintiff may have felt that he would not be able to contest the findings of the OLA investigation with Provost Mace because Mace was under the impression that plaintiff had engaged in sexual harassment, Mace's potential bias does not mitigate the voluntariness of plaintiff's decision because plaintiff still had the option of invoking his contractual due process rights by appealing the disciplinary decision to President Adams and, failing that, to the Board of Regents. *See* R & R, pp. 1331–32 (outlining plain-

tiff's appeals process following adverse determination in NDAH investigation).

Plaintiff's fourth objection regarding a constructive discharge is that Mace's statement on June 21, 2005, that "if Dr. Soloski did not immediately resign as dean, the University would not honor Dr. Soloski's employment contract as outlined in the letter from Dr. Holbrook," (Pl.'s Objections to R & R, p. 11), was an attempt to coerce plaintiff and mitigated the voluntariness of his decision to resign. Mace's demand that plaintiff resign "immediately," however, is insufficient to create a constructive discharge in the Eleventh Circuit. Notwithstanding Mace's statement, immediately following their meeting plaintiff's "attorneys and [plaintiff] met in a separate room for a while," (Soloski Depo., p. 63), before plaintiff made the decision to resign. This Court finds that the interaction between Mace and Soloski involved substantially less coercion than the types of cases that the Eleventh Circuit has cited as examples of constructive discharges. For example, the D.C. Circuit Court of Appeals only found a constructive discharge "where the employee was told he had to sign a resignation letter before he left the supervisor's room." *Hargray*, 57 F.3d at 1570 (citing *Paroczay v. Hodges*, 297 F.2d 439 (D.C.Cir.1961)). Similarly, the Eighth Circuit Court of Appeals only found a constructive discharge where the employee was "not permitted to leave the interrogation room without first signing a resignation form." *Id.* (citing *Angarita v. St. Louis County*, 981 F.2d 1537 (8th Cir. 1992)). Because Mace's behavior was much more accommodating than that of the employers in *Paroczay* and *Angarita,* this Court finds that Mace's efforts to encourage plaintiff to resign did not amount to coercion sufficient to create a constructive discharge.

Plaintiff next argues that he resigned due to defendants' threats to falsely label him a sexual harasser if he continued his employment with the University. Notwithstanding plaintiff's allegation, none of the defendants openly promised to "falsely" label plaintiff a sexual harasser. Accordingly, plaintiff could only establish a constructive discharge under this statement if defendants' efforts to find plaintiff guilty of sexual harassment were part of an effort to procure plaintiff's resignation through misrepresentation or, alternatively, Mace's threat was found to be sufficiently coercive.

To establish that Mace was attempting to make a deliberate misrepresentation, plaintiff would have to establish that defendants reasonably should have known that there was no prospect that plaintiff had violated the University's NDAH policy. *See Hargray,* 57 F.3d at 1570 (outlining analysis for resignations obtained by misrepresentation). Plaintiff cannot establish that it was unreasonable for Mace to believe that plaintiff was in violation of the NDAH policy. As the Provost, Mace was not supposed to have any role in the investigation of a potential NDAH policy violation. Rather, Mace's role was limited to "act[ing] upon the findings of the investigation." (Mace Depo., p. 27.) Accordingly, Mace acted reasonably by relying upon the statements by members of the OLA concerning the investigation and in conveying OLA's likely findings to plaintiff. Even though the OLA may have abused its discretion during the course of the investigation, *see supra* pp. 1298–1304, Mace was entitled to rely on the OLA's determination without further inquiry. Therefore, it was objectively reasonable for Mace to believe that plaintiff had engaged in sexual harassment and his attempts to provide plaintiff with a realistic assessment of the

outcome of the OLA investigation did not constitute an effort to procure plaintiff's resignation by misrepresentation.

Just as Mace's comment did not constitute a misrepresentation, the Court also finds that Mace's comment did not constitute sufficient coercion to create a constructive discharge. Rather, Mace's "threat" was an acknowledgment of the reality that an OLA finding that plaintiff had violated the NDAH policy would necessarily become public knowledge due to the state's open records laws, a point that was conceded by plaintiff during his deposition. *See* Soloski Depo., p. 59 (admitting that "if there was an allegation and there was an investigation and if ... [the University] was asked for it, they would be bound by law to release the information").

Plaintiff next contends that a constructive discharge occurred because plaintiff was unable to consult with his attorneys about his decision due to the fact that "[t]here was nothing [his] legal counsel could do in the June 20–21 meetings because the final decision had already been made and Mace said he did not need any additional information." (Pl.'s Statement of Additional Material Facts, ¶ 17.) Plaintiff adds that his offer to resign the deanship after a year was not a proposal, but rather an attempt to salvage his employment in light of defendants' efforts to "unlawfully force Plaintiff out of his deanship on false grounds." (Id. ¶ 21.) According to plaintiff, Mace then attempted to expedite plaintiff's resignation so that it could be resolved prior to his vacation. Finally, after plaintiff agreed to resign, plaintiff alleges that Mace insisted on controlling the language of plaintiff's letter of resignation.

Even in combination, Mace's behavior was not sufficiently coercive to constitute a constructive discharge. Plaintiff had unlimited access to his attorneys during his discussions with Mace concerning the sexual harassment charge and, in fact, plaintiff's attorneys attended all of the meetings between Mace and plaintiff, consulted with plaintiff following the meetings on June 20, 2005, and met privately with plaintiff prior to his ultimate decision to resign on June 21, 2005. Plaintiff's interactions with his attorneys satisfy the fifth *Hargray* factor, "whether the employee had the advice of counsel," *Hargray*, 57 F.3d at 1568. *Hargray* only requires that the employee "have an opportunity to consult an attorney" in deciding whether to resign, *id.*; it does not support plaintiff's argument that his attorneys must have had the ability to impact the options presented by the employer or that they must have been provided an opportunity to present plaintiff's side of the sexual harassment dispute. Further, as discussed *supra* p. 1309, the timetable Mace offered to plaintiff to decide whether to resign would not establish a constructive discharge in the Eleventh Circuit. Finally, Mace's efforts to control the language in plaintiff's letter of resignation were consistent with Mace's ability to set the terms of the options available to plaintiff as long as plaintiff had the alternative of choosing to remain at the University and fighting the charges against him through the appropriate procedural mechanisms.

In plaintiff's final objection, he contends that the R & R did not accept as undisputed fact that Mace threatened to fire plaintiff before he resigned and that plaintiff was promised no adverse finding against him in the NDAH investigation if he chose to resign. Even accepting these statements as true, the Court still finds no genuine issue of material fact concerning

the voluntariness of plaintiff's resignation. The threat of termination does not in itself make a resignation involuntary. *Hargray,* 57 F.3d at 1568. Further, the Magistrate Judge correctly determined that plaintiff did not resign his position as dean in reliance upon the University's alleged promise not to find plaintiff in violation of the sexual harassment policy. *See infra* p. 1321.

Because none of plaintiff's objections create a genuine issue of material fact concerning whether plaintiff's resignation was voluntary, this Court agrees with the recommendation of the Magistrate Judge that there is no basis for finding that a constructive discharge occurred.

Plaintiff's final argument supporting his contention that defendants breached the terms of his employment contract by denying him procedural due process is that his resignation, even if voluntary, constituted only a "mutual departure" from some of the terms of the employment contract. Plaintiff argues that, under Georgia law, all terms within the original employment contract that were not addressed in the letter of resignation remained in effect. *Wright Carriage Co. v. Bus. Dev. Corp. of Ga., Inc.,* 221 Ga.App. 49, 471 S.E.2d 218, 220 n. 1 (1996). According to plaintiff, because plaintiff's employment contract encompassed his employment as both Dean of Grady College and as a tenured faculty member, the contract remained in effect to govern his employment as a faculty member of Grady College. Therefore, plaintiff believes that the terms of the employment contract incorporating BOR Policy Manual § 802.17 remained in effect, affording plaintiff a guarantee of procedural due process. Plaintiff argues that his course of dealing with the University suggests that defendants agreed with this in-

terpretation of his employment contract because Adams accepted plaintiff's appeal of the OLA's finding.

The Court agrees with the determination of the Magistrate Judge that plaintiff's employment contract governing his employment as a tenured faculty member would not provide any basis for relief under Count II of plaintiff's fourth amended complaint. First, the Magistrate Judge noted that this argument was not raised in any of plaintiff's pleadings. Indeed, a review of plaintiff's fourth amended complaint shows that plaintiff made no reference to his right to procedural due process as a tenured faculty member in relation to Count II. Accordingly, this Court agrees with the Magistrate Judge that the argument was not properly raised.

■ The Court also agrees with the determination of the Magistrate Judge that plaintiff's contractual procedural due process protections arising from his status as a tenured faculty member at the University would not entitle him to recovery for anything other than nominal damages. Plaintiff's contractual due process protections for his tenured faculty position only entitle him to procedural safeguards in the event of a deprivation of a property interest relating to his status as a tenured faculty member and not as a dean. Accordingly, because plaintiff retained his job as a tenured faculty member, he could only allege that the adverse finding against him in the sexual harassment investigation would impact his future employment opportunities. However, "[c]onsequential damages are not recoverable unless they can be traced solely to the breach of the contract or unless they are capable of exact computation." O.C.G.A. § 13–6–8. Plaintiff cannot provide an exact computation of his

consequential damages and has not provided specific consequential damages in any pleading or brief showing a loss that could be traced *solely* to defendants' failure to provide him with his contractual guarantee of procedural due process. Therefore, because defendants' alleged breach of plaintiff's employment contract did not result in any cognizable loss relating to his status as a tenured faculty member, this Court finds that there is no genuine issue of material fact concerning whether plaintiff was still entitled to the due process protections afforded by his employment contract.

### B. Constitutional Due Process

In the second portion of his analysis of Count II of plaintiff's fourth amended complaint, the Magistrate Judge assessed plaintiff's argument that his breach of contract claim could proceed based solely on his rights to due process under the Fourteenth Amendment of the United States Constitution, independent of any procedural guarantees provided by his employment contract. Specifically, plaintiff argues that as a public employee, he possessed a property right in his continued employment as dean with the University and that his property right could only be taken away from him consistent with the constitutional requirements for procedural due process.

 The Magistrate Judge determined that plaintiff did not possess a property right in his position as dean and, even if he did, his property right was waived by his voluntary resignation. The R & R noted that government employees are only afforded a property right in their employment where they may be dismissed only for cause. *See, e.g., DeClue v. City of Clayton,* 246 Ga.App. 487, 540 S.E.2d 675, 677 (2000)("Under Georgia law . . . a pub-

lic employee has a property interest in his job if his employment allows dismissal only for cause.") Plaintiff's deanship contract, however, explicitly stated that plaintiff held his "administrative title and position at the pleasure of the President." (Def.'s Ex. 1.) Further, the Magistrate Judge found that under the terms of plaintiff's employment contract, any property right afforded by plaintiff's status as a tenured member of the faculty "applie[d] only to [his] appointment as a faculty member and not to [his] appointed position as an administrator." (Id.) Because plaintiff lacked a property interest in his continued employment as dean, plaintiff could be removed as dean for any reason and it was irrelevant that his contract guaranteed additional due process protections in the event of a dismissal or sanction based on a finding that plaintiff had engaged in sexual harassment.

The Magistrate Judge also addressed plaintiff's contention that he was denied a liberty interest in his reputation because he was not afforded a hearing prior to the OLA's finding that he violated the University's NDAH policy. The Magistrate Judge, in his R & R, made the determination that plaintiff could not make out one of the requisite elements of a deprivation of a liberty interest in his reputation because he could not establish that there had been "(1) a false statement (2) of a stigmatizing nature (3) *attending a governmental employee's discharge.*" *Buxton v. City of Plant City, Fla.,* 871 F.2d 1037, 1042 (11th Cir.1989)(emphasis added). Because there was no basis for finding that plaintiff had been "constructively discharged," *see supra* pp. 1306–07, and there is no allegation by plaintiff that he was actually discharged, plaintiff cannot establish a necessary element for showing a deprivation of a liberty interest in his reputation. Be-

cause plaintiff was unable to show the deprivation of either a property or liberty interest, the Magistrate Judge determined that plaintiff had created no genuine issue of material fact regarding whether he had been deprived of his constitutional right to due process as a government employee. Accordingly, the Magistrate Judge recommended granting defendant's motion for summary judgment on Count II and denying plaintiff's motion for summary judgment on Count II.

In his objection, plaintiff first asserts that the Magistrate Judge erred by finding that plaintiff did not plead his claim to a constitutional right to due process in his fourth amended complaint. This Court agrees with plaintiff that the Magistrate Judge erred in his determination. Plaintiff's fourth amended complaint repeatedly references his constitutional right to due process in connection with Count II of his complaint. Plaintiff notes that at the meetings held on June 20–21, 2005, he "was not afforded his ... Constitutional rights to due process." (Pl.'s Compl., ¶ 60.) Further, the complaint alleges that "[a]s a result of Defendants' failure to afford Plaintiff his ... constitutional rights to due process, Plaintiff was found to have violated the UGA policy regarding sexual harassment." (Pl.'s Compl., ¶ 63.) The complaint goes on to state that "Defendants ... ha[d] the duty to provide a hearing satisfying the requirements of ... Constitutional due process in order to deprive Plaintiff of his liberty interest in his reputation plus his property interest in his higher salary, continued employment as dean and future job opportunities." (Pl.'s Compl., ¶ 71.) Finally, the complaint alleges that "Defendants ... have failed to provide Plaintiff a hearing satisfying the requirements of ... Constitutional proce-

dural due process." (Pl.'s Compl., ¶ 73.) Accordingly, this Court finds that plaintiff did allege his claim for breach of contract under a theory of constitutional due process and rejects the Magistrate Judge's finding to the contrary.

Notwithstanding the fact that plaintiff alleged violations of constitutional procedural due process in his complaint, plaintiff is not persuasive in his second objection— that the Magistrate Judge erred by determining that plaintiff's resignation was voluntary as a matter of law. This Court has already adopted that finding by the Magistrate Judge. See supra pp. 1310–11. Accordingly, because plaintiff's resignation was voluntary and because plaintiff does not object to the R & R's finding that plaintiff could be removed from his position as dean at will, there is no basis for finding that plaintiff was deprived of his constitutional due process protections.

This Court determines that plaintiff has failed to show a triable issue concerning whether defendants breached plaintiff's employment contract by denying plaintiff due process protections guaranteed under either his employment contract or the United States Constitution. Consequently, this Court adopts the Magistrate Judge's recommendations concerning Count II of plaintiff's fourth amended complaint.

III. Equitable Injunction

Because plaintiff has entered no objection to the Magistrate Judge's recommendation to deny plaintiff's motion for summary judgment on his request for a permanent injunction against defendants enjoining and restraining them from denying plaintiff a name-clearing hearing in the future that complies with UGA poli-

cies and constitutional due process, this Court adopts the recommendation of the Magistrate Judge concerning Count IV of plaintiff's fourth amended complaint.

## IV. Section 1983

In Court VIII of plaintiff's fourth amended complaint, plaintiff alleges that defendant Michael Adams, in his individual capacity, violated 42 U.S.C. § 1983 by depriving plaintiff of his liberty interest in his reputation and his property interest in continued employment without providing the due process of law guaranteed to plaintiff by the Fourteenth Amendment to the United States Constitution. Specifically, plaintiff alleges that Adams failed to provide plaintiff with an impartial and disinterested de novo review of the findings of the NDAH investigation conducted by the OLA.

 For § 1983 claims alleging a denial of procedural due process, a plaintiff must demonstrate: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir.2003). Accordingly, the first inquiry for a due process challenge is "whether the injury claimed by the plaintiff is within the scope of the Due Process Clause." *Smith ex rel. Smith v. Siegelman,* 322 F.3d 1290, 1296 (11th Cir.2003).

The Magistrate Judge made the determination that plaintiff failed to establish the first element of his due process challenge. Specifically, the R & R made the recommendation that this Court find that "Plaintiff did not suffer a deprivation of a constitutionally-protected property interest without procedural due process because he did not have a property interest

in his deanship position, and because he resigned that position in the context of a negotiated settlement." (R & R, p. 1351.) Further, the Magistrate Judge recommended this Court not find a deprivation of a constitutionally protected liberty interest "because his deanship was not terminated." (Id.) This determination precluded the finding of a liberty interest because the Eleventh Circuit has established that damage to one's reputation must occur "in connection with a termination of employment" to create liability under 42 U.S.C. § 1983. *See Cotton v. Jackson,* 216 F.3d 1328, 1330 (11th Cir. 2000). Accordingly, because plaintiff lacked a liberty or property interest, as a matter of law it was impossible for Adams to unconstitutionally deprive plaintiff of those interests without affording plaintiff procedural due process. Therefore, the Magistrate Judge recommended granting defendants' motion for summary judgment on Count VIII and denying plaintiff's motion for summary judgment on Count VIII.

In his objections to the Magistrate Judge's R & R, plaintiff argues that the Magistrate Judge erroneously determined that plaintiff's resignation was voluntary. According to plaintiff, because plaintiff's resignation was not voluntary, the district court could not make a determination that plaintiff was not unconstitutionally deprived of his liberty or property interests as a matter of law. Based on plaintiff's first contention, plaintiff alleges that Adams did violate his due process rights by failing to conduct a full de novo review of the OLA's investigation. Specifically, plaintiff alleges that Adams never read plaintiff's investigative file compiled by the OLA but rather only reviewed a letter in relation to plaintiff's appeal, engaging in only a "cursory look" at plaintiff's file.

(Pl.'s Objections to R & R, p. 19.) Plaintiff contends that Adams' actions fell short of his legal requirement to "review the file and render a decision as to whether or not [he thought] the process and decision ha[d] been fair," (Adams Depo., p. 19.), and therefore deprived plaintiff of his procedural due process protections.

■ This Court agrees with the Magistrate Judge's finding that plaintiff's resignation was voluntary as a matter of law. *See supra* pp. 1306–11. Therefore, there is no basis for finding that plaintiff had either a protected property interest in his employment as Dean of Grady College or a protected liberty interest in his reputation. *See supra* pp. 1312–13. Indeed, the fact that plaintiff resigned from his position rather than being terminated justified Adams' decision not to afford plaintiff the full procedural protections plaintiff would have otherwise been entitled to had he been terminated. Rather, Adams only provided a cursory review of the NDAH investigation because he correctly believed that he was merely "uph[o]ld[ing] the agreement that seemed to have been worked out between [plaintiff] and Dr. Mace." (Adams Depo., p. 64.) Accordingly, plaintiff fails to establish the first element of his claim alleging that Adams has deprived him of a constitutional right under color of state law. For this reason, the Court adopts the Magistrate Judge's recommendation to grant defendants' motion for summary judgment and to deny plaintiff's motion for summary judgment on Count VIII of plaintiff's fourth amended complaint.[3]

### V. Title VII and 42 U.S.C. § 1981

Because plaintiff has entered no objection to the Magistrate Judge's recommendation to grant defendants' motions for summary judgment on plaintiff's Count V (discrimination on the basis of race in violation of Title VII), Count VI (discrimination on the basis of race in violation of 42 U.S.C. § 1981), and Count VII (unlawful retaliation in violation of Title VII), this Court adopts the recommendation of the Magistrate Judge concerning Counts V, VI, and VII of plaintiff's fourth amended complaint.

### VI. Breach of Contract (Salary)

In his R & R, the Magistrate Judge recommended denial of defendants' motion for summary judgment on Count III of plaintiff's fourth amended complaint. Count III alleges that defendants breached their contract with plaintiff by failing to pay him his proper contractual salary. Plaintiff specifically alleges that upon returning to the faculty in 2006, he was entitled to receive a salary no less than the salary of the highest paid full professor in the Grady College in accordance with the letter from former Provost Karen Holbrook specifying his employment terms in the event of his voluntary resignation. Plaintiff argues that, according to the Holbrook letter, he was entitled to a salary equal to the highest paid professor, regardless of whether that professor served under a nine-month appointment (academic year appointment) or a twelve-month appointment (fiscal year appointment). The highest paid academic or fiscal year appointee in 2006 was Leonard Reid, who received a salary of $190,000.

Defendants argue that plaintiff was only entitled to a salary equal to the highest paid professor on an academic year ap-

---

**3.** The Court does not discuss defendants' qualified immunity defense because plaintiff has failed to make out a prima facie case for a claim arising under 42 U.S.C. § 1983.

pointment. That professor was Conrad Fink, who received an annual salary of $130,015. Defendants argue that plaintiff's resignation letter specified that plaintiff was only to receive a salary equal to the highest paid academic year professor. Plaintiff counters that his resignation letter was written under duress, making any terms within that letter voidable. Alternatively, plaintiff argues that Reid is really an academic year appointee who was classified as a fiscal year appointee only because Reid was promised an academic year appointment with his salary paid over a twelve-month period but UGA's personnel payroll system is unable to pay an academic year appointee over a fiscal year period.

In his R & R, the Magistrate Judge determined that plaintiff had failed to establish that his resignation letter was written under duress. Therefore, to read his resignation letter in conjunction with the Holbrook letter would require limiting plaintiff's salary to that of the highest paid academic year appointee to avoid rendering the terms of the resignation letter meaningless. The Magistrate Judge then determined that there was a material question of fact concerning whether Reid was an academic year appointee or a fiscal year appointee. Based on this determination, the Magistrate Judge recommended denying defendants' motion for summary judgment.

■ In defendants' objections to the Magistrate Judge's R & R, defendants argue that the distinction between plaintiff and Reid is that plaintiff holds a nine-month teaching contract and is only paid for nine months of work, whereas Reid holds a twelve-month contract. Defendants argue that, according to the terms of plaintiff's resignation letter, plaintiff is only entitled to be paid a salary equal to the salary of the highest paid professor on an academic year appointment. Therefore, plaintiff is entitled only to a salary of $130,015.

■ The construction of a written contract is a question of law for the trial court, based on the intent of the parties as set forth in the contract. *Bickerstaff Real Estate Mgmt. v. Hanners*, 292 Ga.App. 554, 665 S.E.2d 705, 708 (2008). "The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13–2–2(4).

This Court rejects the Magistrate Judge's recommendation and finds that no material question of fact exists concerning whether defendants' breached their contract with plaintiff by awarding him a salary of $130,015 for the 2007 academic year. Based on the language of plaintiff's resignation letter, the 2001 letter from former Provost Holbrook to plaintiff sets the terms of his post-resignation compensation as a tenured faculty member. That letter states that plaintiff's salary one year following his resignation "would be renegotiated to a level that would be no less than the highest paid full professor within the department of the Grady College." (Def.'s Ex. 7.) While the Holbrook letter does not clarify the meaning of "full professor," plaintiff's resignation letter does. In Plaintiff's resignation letter, plaintiff states that his resignation "initiates the exit agreement that then-Provost Karen Holbrook provided me when I agreed to become dean. . . . My salary in the 2007 academic year will be no less than the highest salary earned by any of the college's full professors on an *academic year appointment*." (Def.'s Ex. 8)(emphasis

added). Plaintiff contends that his resignation letter should not be used to construe Holbrook's letter because it was signed under duress. This Court, however, has made the determination that plaintiff's resignation was voluntary as a matter of law. *See supra* pp. 1306–11. Accordingly, this Court must give consideration to the plain meaning of plaintiff's letter of resignation, which clearly establishes that the term "full professor" referred to in the Holbrook letter was intended to mean a full professor on an academic year appointment. Therefore, the final issue this Court must decide is whether Reid or Fink was the highest paid full professor on an academic year appointment.

■ This Court finds that no material question of fact exists concerning whether Reid served under an academic year appointment. In the March 30, 2005 letter from plaintiff to Professor Reid in which plaintiff attempted to prevent Reid from leaving UGA to become dean of the journalism school at the University of Tennessee, plaintiff set the terms of Reid's future employment at UGA. In that letter, plaintiff stated that Grady College would "offer [Reid] a salary of $170,000 on a *12–month appointment*." (Pl.'s Second Decl. of John Soloski, Ex. A.)(Emphasis added.) The letter continued by asserting that Reid's "work load [would] be that expected of a faculty member on a nine-month appointment." (Id.) According to plaintiff, the intention of the letter was to create a nine-month appointment in which the salary was paid over a twelve month period. However, plaintiff's interpretation of the letter goes against its plain meaning. The letter clearly states that Reid was offered a "12–month appointment." (Id.) Further, the fact that plaintiff specified that Reid's

workload would be comparable to that of "a faculty member on a nine-month appointment," (id.), demonstrates that Reid himself was not a faculty member on a nine-month appointment. Finally, plaintiff's only explanation for why he believed that his letter designated Reid as an academic year appointee was the conclusory assertion that "that is what he was." (Pl.'s Second Decl. of John Soloski, ¶ 34.) Based on the plain meaning of the letter between plaintiff and Reid and plaintiff's inability to articulate a plausible alternative reading of the letter, this Court finds that there is no dispute that Reid served as a professor with a fiscal year appointment with the Grady College and, therefore, his salary could not serve as a basis for determining plaintiff's salary for the 2007 academic year. Thus, this Court determines as a matter of law that the University was not in breach of its contract with plaintiff by setting his salary for the 2007 academic year at $130,015 and grants defendants' motion for summary judgment on Count III of plaintiff's first amended complaint.

## VII. Fraud

In the final contested count that was addressed by the Magistrate Judge in his R & R, plaintiff alleged that defendants engaged in fraudulent misrepresentation when they promised plaintiff that, in exchange for his voluntary resignation, the University would not reach a finding that plaintiff violated the NDAH policy, defendants would write a positive letter for him, and plaintiff would not receive a formal reprimand. Plaintiff alleges that he relied detrimentally upon this representation in making his decision to resign as Dean of Grady College. Defendants deny that any such representation was made to plaintiff but argue that, even if it was, plaintiff's fraud claim must fail.

For a plaintiff to prove fraud in Georgia, he must establish five elements: (1) a false representation made by the defendant; (2) scienter; (3) an intention to induce plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Johnson v. GAPVT Motors, Inc.*, 292 Ga.App. 79, 663 S.E.2d 779, 783 (2008). Because fraud is seldom susceptible to direct proof, circumstantial evidence is usually sufficient to establish a prima facie case. *McNeil v. Cowart*, 186 Ga.App. 411, 367 S.E.2d 291, 293 (1988).

In his R & R, the Magistrate Judge made the finding that plaintiff's claim, if construed as a claim for breach of contract, failed because the State of Georgia has not waived sovereign immunity for claims alleging the breach of an oral contract. The Magistrate Judge further found that if plaintiff's claim was construed as a fraud claim, then it also failed because it was based on an oral promise. The Magistrate Judge found that oral promises are not enforceable by an "at will" employee. Accordingly, because plaintiff, in his capacity as Dean, was an at-will employee at the time of his voluntary resignation, any oral promise made by defendants concerning that resignation was not binding.

The Magistrate Judge also found that plaintiff was unable to make out a prima facie case of fraud. Specifically, the Magistrate Judge determined that plaintiff could not point to evidence that defendants' alleged promise not to find him in violation of the NDAH policy was a false representation at the time it was made, that defendants knew of the statement's falsity at the time it was made, that plaintiff relied on defendants' promise when deciding whether to resign his deanship,

and that he was damaged by his reliance on defendants' promise. Based on these findings, the Magistrate Judge recommended granting defendants' motion for summary judgment on plaintiff's Count X.

Plaintiff makes several objections to the findings in the R & R. First, plaintiff argues that the Magistrate Judge's likening of plaintiff's fraud claim to a breach of oral contract claim was incorrect because plaintiff was merely responding to the threats of defendants concerning his termination as dean rather than engaging in "negotiations" over his continued employment status at the University. Rather, plaintiff argues that he was forced to resign his deanship through threats and misrepresentations. This objection is without merit. This Court has already found that plaintiff's resignation was voluntary as a matter of law and that defendants' conduct leading up to plaintiff's decision to resign did not constitute coercion. *See supra* pp. 1306–11.

Plaintiff next argues that defendants intended to find him guilty of sexual harassment regardless of whether he resigned. Accordingly, defendants' statements concerning the result of the NDAH investigation "were not promises made as a part of a business deal, but threats." (Pl.'s Objections to R & R, p. 21.) In support of this contention, plaintiff states that in his meetings with Mace on June 20–21, 2005, Mace commented, "[e]ither resign or we will find you in violation of the sexual harassment policy." (Pl.'s Statement of Additional Material Facts, ¶ 14.) This Court does not agree with plaintiff's objection. Mace's alleged statement was indicative of the ongoing negotiations between plaintiff and defendants. Here, Mace presented plaintiff with his two options, either of which he was free to

choose. It is noteworthy that, pursuant to BOR Policy Manual § 802.17, if plaintiff had chosen the latter option, he would have been entitled to the procedural due process protections guaranteed by his employment contract. Accordingly, any threat by defendants was mitigated by the fact that plaintiff would have been able to appeal the determination of the OLA to both President Adams and the Board of Regents. "[T]he mere fact that [plaintiff] was forced to choose between two inherently unpleasant alternatives does not in itself mean that his resignation was submitted under duress." *Hargray*, 57 F.3d at 1569.

■ Because this Court agrees with the finding of the Magistrate Judge that defendants' alleged statements were made in the context of negotiations between plaintiff and defendants concerning plaintiff's resignation, this Court also agrees with the Magistrate Judge's finding that plaintiff's Count X cannot succeed if construed as a claim for the breach of an oral contract. The Georgia Constitution provides governmental defendants with sovereign immunity unless it has been specifically waived. Ga. Const., art. I, § II, ¶ IX(e)("The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver."). Even though sovereign immunity has been waived "for the breach of any *written* contract," O.C.G.A. § 50–21–1 (emphasis added), there has been no such waiver for oral contracts. *Accord Fedorov v. Bd. of Regents*, 194 F.Supp.2d 1378, 1393–94 (S.D.Ga.2002)(finding no liability as matter of law for Board of Regents on claim for breach of implied contract because "[t]he

State is only subject to a lawsuit for breach of contract if the contract is in writing"). Accordingly, because the State has not waived sovereign immunity for oral contracts, this Court agrees with the finding of the Magistrate Judge that if plaintiff's claim under Count X is construed as the breach of an oral contract, then it must fail as a matter of law.

■ Plaintiff next claims that the Magistrate Judge made the erroneous determination that defendants' promise was unenforceable because oral promises are not enforceable by "at will" employees. Plaintiff specifically contests the finding that he was an "at will" employee by pointing to BOR Policy Manual § 802.17, which entitles plaintiff to due process when accusations of sexual harassment are involved and "only allows termination of an employee for sexual harassment after his due process rights have been protected." (Pl.'s Objections to R & R, p. 22.)

Again, the Court does not agree with plaintiff's objection. Plaintiff's due process protections were limited to instances where plaintiff was subject to "dismissal" or "other sanctions." (Pl.'s Br. in Supp. of Pl.'s First Mot. for Summ. J., App. C.5.). At the time plaintiff allegedly reached an agreement with defendants concerning the University's finding in its NDAH investigation, the investigation was still on-going and plaintiff had not yet been sanctioned or dismissed for a violation of the NDAH policy. Accordingly, BOR Policy Manual § 802.17 was inapplicable and the terms of plaintiff's employment were entirely governed by plaintiff's employment contract. That contract with the University stated explicitly that plaintiff held his "administrative title and position at the pleasure of the President." (Def.'s Ex. 1.) Because the University was "free to discharge

[plaintiff] either with or without cause," *Balmer v. Elan Corp.*, 278 Ga. 227, 599 S.E.2d 158, 161 (2004), plaintiff is considered an at-will employee under Georgia law.

■ "Although fraud can be predicated on a misrepresentation as to a future event where the defendant knows that the future event will not take place, fraud cannot be predicated on a promise which is *unenforceable at the time it is made.*" *Studdard v. George D. Warthen Bank*, 207 Ga.App. 80, 427 S.E.2d 58, 58 (1993)(quoting *Beasley v. Ponder*, 143 Ga.App. 810, 240 S.E.2d 111 (1977))(emphasis in original). Additionally, under Georgia's at-will employment doctrine, "[t]he employer, with or without cause and regardless of its motives may discharge the [at will] employee without liability." *Id.* at 160–61. In combination, these doctrines establish that oral promises by employers are not enforceable by at-will employees. *Id.* at 161. Therefore, because defendants, as plaintiff's employer, could terminate plaintiff's employment as dean for any reason at any time, any terms of the agreement reached between plaintiff and defendants not reduced to writing were unenforceable at the time they were made. Thus, just as the employer in *Balmer* was not liable for the breach of an oral promise not to fire certain at-will employees for their cooperation with the FDA during its inspection of the employer's facility, defendants are not liable for their alleged promise not to find plaintiff in violation of the NDAH policy because defendants' promise "does not modify the terms of [plaintiff's] at-will employment relationship and does not create an enforceable contract." *Id.* at 162. Therefore, plaintiff is unable to prevail on Count X of his fourth amended complaint as a matter of law.

■ Plaintiff's next objection is that the Magistrate Judge erred by determining that plaintiff had failed to make out a prima facie case of fraud. Specifically, plaintiff claims sufficient evidence existed to create a jury question that defendants knew they would find plaintiff in violation of the NDAH policy even if he resigned his deanship. Plaintiff states that defendants had already made a determination to find plaintiff in violation of the University's sexual harassment policy and falsely represented that they would not make such a finding in exchange for plaintiff's resignation only after plaintiff initially refused to resign.

■ Construing plaintiff's factual allegations as true, plaintiff still fails to create a genuine issue of material fact regarding whether defendants were aware that their promise not to make an adverse finding against plaintiff was false at the time it was made. Plaintiff's objection only establishes that defendants' allegedly made a promise not to make an adverse finding against plaintiff and not to sanction plaintiff and then failed to keep that promise after plaintiff's resignation. While this would constitute a breach of defendants' promise, a claim alleging fraud also requires scienter, or knowledge of the falsity of defendants' statement at the time the statement was made to plaintiff. Even though plaintiff is correct that "[e]xcept in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination," *Farmers State Bank v. Huguenin*, 220 Ga.App. 657, 469 S.E.2d 34, 37 (1996), here plaintiff has presented no evidence of scienter. Prior statements by Mace and Adams regarding their subjective belief that plaintiff had violated the NDAH policy are not inconsistent with their subsequent promise not to

find plaintiff in violation of that policy in the University's formal finding. Accordingly, without evidence that defendants' knew their alleged promise would not be fulfilled at the time it was made to plaintiff, plaintiff is unable to establish a necessary element in his fraud claim.

■ In plaintiff's final objection to the Magistrate Judge's R & R, plaintiff argues that he suffered significant damages in reliance on defendants' false representation. Plaintiff states that he made the decision to resign to preserve his reputation and that his reliance on defendants' promise "permanently scarred his impeccable academic career." (Pl.'s Objections to R & R, p. 24.)

This Court does not believe that plaintiff has created a jury question concerning either his reliance on defendants' statement or whether that reliance was detrimental. Plaintiff's own testimony establishes that he resigned in reliance on the terms of his future compensation outlined in the letter drafted by former Provost Holbrook in 2001. Prior to his resignation, plaintiff identified his two options: (1) to not resign, be removed as dean, and not receive his future compensation guaranteed by the Holbrook letter; or (2) to resign and receive his future compensation guaranteed by the Holbrook letter. (Soloski Depo., pp. 62–63.) Accordingly, plaintiff agreed to resign as long as "the terms of the resignation [were] the letter from Holbrook." (Soloski Depo., p. 64.) Even though plaintiff references the University's promise not to make an adverse finding or to sanction plaintiff, these considerations appeared secondary to the compensation plaintiff received pursuant to the Holbrook letter. The insignificance of defendants' alleged promise is supported by the fact that plaintiff and his lawyers chose not to memorialize the promise at any point between June 21, 2005, when plaintiff agreed to resign, and June 27, 2005, when plaintiff submitted his letter of resignation. Accordingly, plaintiff has not shown that his resignation was made in reliance on defendants' promise.

■ Lastly, plaintiff has failed to show that he suffered damages from defendants' promise not to make an adverse finding in the University's NDAH investigation or to subject plaintiff to sanctions for an adverse finding. This Court agrees with the Magistrate Judge that plaintiff "held his deanship position at will and had no legal expectation of retaining it." (R & R, p. 1371.) Therefore, the only possible damage plaintiff could have suffered was reputational harm arising from the adverse finding that he had engaged in sexual harassment and the resultant letter that was placed in his file with the University. However, this harm has been alleviated by this Court's grant of relief on Count I of plaintiff's complaint, which orders defendants to rescind, recant, and expunge UGA's official finding that plaintiff violated the University's NDAH policy. *See supra* pp. 1298–1304. By reversing the University's official finding that plaintiff had violated the NDAH policy and by removing the letter which included that determination from plaintiff's file, plaintiff has no remaining damage to his reputational interest. Accordingly, plaintiff cannot show "damage," a necessary element for his fraud claim. *Johnson,* 663 S.E.2d at 783.

Plaintiff is unable to show that there is a genuine issue of material fact concerning whether defendants knew of the falsity of their alleged statement at the time it was made, whether plaintiff relied on defendants' alleged statement, and whether plaintiff's alleged reliance was detrimental.

Accordingly, this Court finds that plaintiff failed to establish a prima face case of fraud. Plaintiff's failure to establish a prima facie case, coupled with the inability to find defendants liable under either a breach of oral contract theory or a fraud theory, supports the Magistrate Judge's recommendation to grant defendants' motion for summary judgment on Count X of plaintiff's fourth amended complaint. For the aforementioned reasons, this Court adopts the recommendation of the Magistrate Judge with respect to Count X.

## VIII. Intentional Infliction of Emotional Distress

Because plaintiff has entered no objection to the Magistrate Judge's recommendation to grant defendant's motion for summary judgment on Count IX of plaintiff's fourth amended complaint, intentional infliction of emotional distress, this Court adopts the recommendation of the Magistrate Judge concerning Count IX and grants defendants' motion for summary judgment.

## IX. Invasion of Privacy

Because neither party has objected to the Magistrate Judge's recommendation that defendants' motion for summary judgment on Count XI of plaintiff's fourth amended complaint, invasion of privacy, be denied without prejudice to refiling when discovery is completed, this Court adopts the recommendation of the Magistrate Judge concerning Count XI and denies defendant's motion for summary judgment.

## X. Attorney's Fees and Expenses

Because plaintiff has not objected to the Magistrate Judge's recommendation that

plaintiff's motion for summary judgment on Count XII of his fourth amended complaint, requesting attorney's fees and expenses, be denied, this Court adopts the recommendation of the Magistrate Judge concerning Count XII and denies defendant's motion for summary judgment.

*Summary*

For the aforementioned reasons, this Court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's R & R [# 114]; GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment [# 89]; GRANTS IN PART and DENIES IN PART plaintiff's first motion for summary judgment [# 92]; and DENIES plaintiff's second motion for summary judgment [# 100]. Specifically, the Court GRANTS plaintiff's motion for summary judgment as to Count I of the fourth amended complaint and otherwise DENIES plaintiff's motions for summary judgment; GRANTS defendants' motion for summary judgment as to Counts II through X of the fourth amended complaint and otherwise DENIES defendants' motion for summary judgment. As to Count XI of the fourth amended complaint, defendants' motion for summary judgment is DENIED WITHOUT PREJUDICE to its being refiled after the completion of discovery.[4]

### ORDER

C. CHRISTOPHER HAGY, United States Magistrate Judge.

Attached is the report and recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C.

---

**4.** The only outstanding discovery regarding this claim is the deposition of Kelly Simmons, a reporter for the AJC. Once Ms. Simmons' deposition has been completed, defendants may refile their motion for summary judgment on Count XI.

§ 636(b)(1) and this Court's Civil Local Rule 72.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the report and recommendation may be adopted as the opinion and order of the District Court and any appellate review of factual findings will be limited to a plain error review. *United States v. Slay,* 714 F.2d 1093 (11th Cir.1983).

The Clerk is directed to submit the report and recommendation with objections, if any, to the District Court after expiration of the above time period.

IT IS SO ORDERED this 26th day of November, 2008.

## REPORT AND RECOMMENDATION IN AN EMPLOYMENT DIS-CRIMINATION ACTION

Plaintiff filed the above-styled civil action in the Superior Court of Fulton County on June 27, 2006. He later amended his Complaint to add employment discrimination claims. First Amended Complaint [5]. Those claims added a basis for federal jurisdiction to this action, and Defendants removed the case to this Court on December 14, 2006. Notice of Removal [1].

As reflected in his Fourth Amended Complaint [123], Plaintiff Soloski asserts the following twelve counts: (1) petition for a writ of mandamus, (2) breach of contract for failure to follow contractually-guaranteed procedures, (3) anticipatory breach of contract for refusal to pay Plaintiff his contractual salary, (4) equitable injunction, (5) race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.,* (6) race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), (7) retaliation in violation of Title VII, (8) claim against Defendant Adams individually under 42 U.S.C. § 1983, (9) intentional infliction of emotional distress, (10) fraud, (11) invasion of privacy, and (12) attorney's fees and expenses. Fourth Amended Petition for Mandamus and Complaint for Damages ("Fourth Amended Complaint") [123].

The action is before the Court on Defendants' Motion for Summary Judgment [89], Plaintiff's First Motion for Summary Judgment [92], and Plaintiff's Second Motion for Summary Judgment [100]. For the reasons discussed below, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [89] be **DENIED** in part and **GRANTED** in part, Plaintiff's First Motion for Summary Judgment [92] be **DENIED** in part and **GRANTED** in part, and Plaintiff's Second Motion for Summary Judgment [100] be **DENIED.**

If the undersigned's recommendation is adopted, remaining for trial will be Count Three, Breach of Contract for failure to pay full contractual salary. In addition, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **DENIED** with respect to Count Eleven, Invasion of Privacy, pursuant to Rule 56(f)(2) of the Federal Rules of Civil Procedure, and, absent further motion practice, Count Eleven would proceed to

trial. At this time, it is **RECOM-MENDED** that judgment be entered for Plaintiff on Count One, Mandamus, and that judgment be entered for Defendants on all other counts of Plaintiff's Fourth Amended Complaint [123], except for Counts One, Three and Eleven.

## I. BACKGROUND FACTS

The Court draws the following facts from the parties' respective Statements of Material Facts filed in support of their motions for summary judgment, as well as their responses to the opposing party's Statement of Material Facts. If the parties have disputed a specific fact and have pointed to evidence in the record creating a genuine issue of material fact, the Court has viewed all evidence and factual inferences in the light most favorable to the non-movant, as required on a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Accordingly, in considering the issues presented in Defendants' Motion for Summary Judgment, the Court has viewed the facts in the light most favorable to the Plaintiff and in considering the issues presented in Plaintiff's Motion for Partial Summary Judgment, the Court has viewed all facts in the light most favorable to the Defendants.

This case arises out of allegations that Plaintiff made comments to a female subordinate that she considered to constitute sexual harassment. While Plaintiff acknowledges having made the alleged comments, he contends that they did not violate the University's Nondiscrimination and Anti–Harassment (NDAH) Policy and that he should not have been forced to resign from his deanship and formally sanctioned as a result of those comments.

Plaintiff is a current tenured professor at, and former Dean of, the University of Georgia's Grady College of Journalism and Mass Communication. Plaintiff's Statement of Material Facts Not in Genuine Dispute [1] ("Pl. SMF2") [100] at ¶ 1; Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Determined ("Def. SMF") [89] at ¶¶ 1, 2. Plaintiff was hired by the University of Georgia ("UGA" or "the University") to serve as the Dean of Grady College in the Spring 2001. Pl. SMF2 at ¶ 16. During the time period relevant to this case, Defendant Michael F. Adams was the President of UGA. Pl. SMF2 at ¶ 8. Arnett Mace was the Senior Vice President for Academic Affairs and Provost at UGA. Pl. SMF2 at ¶ 12. The Provost is the "number two" position at UGA, and reports directly to the President. Pl. SMF2 at ¶¶ 13–14.

On May 18, 2005, Janet Jones Kendall ("Kendall"), an employee of Grady College in external affairs, presented Plaintiff with a letter complaining that he had made two comments which she contended (1) were offensive to her and (2) created a hostile work environment. Pl. SMF2 at ¶ 18; Plaintiff's Brief in Support of Plaintiff's First Motion for Summary Judgment ("Pl. Br. I") [92], App. C. 9; Def. SMF at ¶ 4,

---

1. Plaintiff has filed two documents entitled "Statement of Material Facts Not in Genuine Dispute," one with each of his motions for summary judgment. The Court refers to the first "Statement of Material Facts Not in Genuine Dispute" as "Pl. SMF" and the second as "Pl. SMF2."

Def. Ex. 2[2]. Upon receiving the letter, Plaintiff immediately forwarded it to the UGA Office of Legal Affairs ("OLA"), which then began an investigation of Kendall's allegations. Pl. SMF2 at ¶ 28; Def. SMF at ¶¶ 5, 6. The UGA OLA is responsible for conducting investigations of any alleged violation of UGA's NDAH policy. Defendants' Response to Plaintiff's Statement of Material Facts Not in Genuine Dispute[3] ("Def. Resp. SMF2") at ¶ 3. The allegations mentioned in Kendall's letter became the sole basis for an eventual finding by the OLA that Plaintiff violated UGA's NDAH Policy.[4] Pl. SMF2 at ¶ 36; Washington Dep. at 15. The two comments were made, respectively, seven months and one month before Kendall wrote the letter complaining about them, but shortly after her supervisor had complained of Kendall's work. There is no evidence that Kendall objected to the comments or asked Plaintiff to refrain from such comments prior to writing Defendant's Exhibit 2. There is no evidence of other comments made by Plaintiff to Kendall that she thought constituted acts of sexual harassment during the four years they worked together.

Plaintiff admits making the comments referenced in Kendall's letter, but claims that they were not intended to be sexual in nature. Def. SMF at ¶¶ 10, 15. The first comment was made on October 14, 2004, at an off-campus University dinner function. Pl. SMF at ¶ 27; Def. Ex. 2 at 2. Plaintiff stated to Kendall: "You have brown eyes. I don't believe I've ever noticed that before. What color are my eyes." (The Court will refer to this as "eyes" comment.) Pl. SMF2 at ¶ 37; Def. SMF at ¶ 8. Plaintiff explained to Washington during the investigation that he made the "eyes" comment in the context of a discussion about his recent Lasik eye surgery, and did not intend it to be a sexual advance. Pl. SMF at ¶¶ 58, 59, Def. SMF at ¶ 10.

The second comment was made six months later at a large, off-campus event in Atlanta, the "Capital Campaign Kickoff," on April 14, 2005. Pl. SMF at ¶ 28; Def. Ex. 2 at 2. Plaintiff said to Kendall: "That is a nice dress. It really shows off your assets." (The Court will refer to this as the "assets" comment.) Pl. SMF2 at ¶¶ 38, 39; Def. SMF at ¶ 12. Plaintiff contends that he did not mean the "assets" comment in a sexual way. Pl. SMF at ¶ 63. Just before making the comment, Plaintiff had been talking about assets disputed in his pending divorce. Pl. SMF at ¶ 64.

From May 18, 2005 to June 29, 2005, the UGA OLA conducted a sexual harassment investigation into the allegations made by Kendall against Plaintiff. Pl. SMF2 at ¶ 19. The complaint was assigned for investigation to Kimberly Ballard–Washington ("Washington"), the former Associate Director for the UGA OLA. Pl. SMF at

---

2. Def. Ex. 2 is the letter that Kendall presented to Plaintiff.

3. Plaintiff has filed two documents entitled "Statement of Material Facts Not in Genuine Dispute," one with each of his motions for summary judgment. *See* note 1, *supra.* Defendants have given the same title to each of their responses to these statements of fact. To distinguish the Defendants' responses to the Plaintiff's statements of fact, the Court

will refer to the first response as "Def. SMF" and the second as "Def. SMF2."

4. Several other incidents occurred which Defendants contend provided context to the two comments on which the finding was based. Def. SMF at ¶ 16, Def. Resp. SMF2 at ¶ 36. These incidents are discussed briefly below.

¶¶ 4, 6. Washington was the only UGA OLA investigator to interview witnesses during the investigation. Pl. SMF at ¶ 50. Washington made the finding that Plaintiff violated the NDAH policy by committing sexual harassment as defined by the policy. Pl. SMF2 at ¶ 4; Def. Resp. SMF2 at ¶ 4.

The parties have included facts in their filings regarding several other incidents that Washington uncovered in her investigation, even though as noted above, the finding of a violation of the NDAH policy relied only on the "eyes" and "assets" comments. First, it was alleged that Plaintiff made comments to others about Kendall being pictured in a magazine published in Athens, "Athens Magazine," and that Plaintiff had a copy of the magazine in his office. Pl. SMF at ¶ 75; Def. SMF at ¶ 17. In the magazine, Kendall wore only a bathing suit. Pl. SMF at ¶ 79. She was working for the UGA College of Journalism at the time she posed for the magazine. Pl. SMF at ¶ 80. Second, Washington was informed that Plaintiff requested that Kendall hand out awards at the Peabody Awards event, an annual function of the Grady School of Journalism. Pl. SMF at ¶ 90; Def. SMF at ¶ 19. Kendall told Washington that she believed the request that she present the awards was based on her appearance, and that she had refused to do as requested. Def. SMF at ¶ 20. Third, Kendall told Washington that she had been told that, at a Christmas party, Plaintiff said to a group that, "if [Kendall] was here, all this food would be gone." Pl. SMF at ¶ 103. According to Kendall, as reported by her to Washington, she had also been told that Plaintiff went on to say, "I don't know how she does that [eat so much] and keep that figure or keep that body or something of that nature, she must purge." Washington Dep. at 101.

On May 12, 2005, six days before she gave Plaintiff the letter containing her sexual harassment complaint, Kendall was reprimanded by her supervisor, Sherrie Whaley, for sending inappropriate emails to various people outside of the University and for her tone in dealing with Plaintiff and Whaley. Pl. SMF2 at ¶¶ 17, 43–46. In fact, Kendall handed her letter to Plaintiff during a meeting she had with Plaintiff that was conducted in connection with the May 12, 2005 disciplinary action. Def. Resp. SMF at ¶ 30. It was Washington's perception that prior to Kendall's making her complaint, Kendall and other employees in her department had become frustrated because supervision of them had recently increased. Washington Dep. at 217. According to Whaley, Kendall had a "poor attitude" and was "not doing her job" around the time she made the complaint against Plaintiff. Pl. SMF at ¶ 115. One employee interviewed by Washington, Sandy Mayfield, stated to Washington that Kendall had a "pattern" of filing complaints against employers in response to supervision. Pl. SMF at ¶ 122, Def. Resp. SMF at ¶ 122. Finally, Kendall stated to Washington during the investigation that she wanted to file her sexual harassment complaint against Plaintiff before being terminated by UGA. Washington Dep. at 249.

According to Plaintiff, on June 16, 2005, Washington told him in a telephone conversation that "they" were going to find him in violation of the sexual harassment policy. Pl. SMF at ¶ 170. Plaintiff assumed that Washington was referring to Mace and Adams. Soloski Dep. at 32–33. Defendants contest this assumption, as Washington contends that she told Plaintiff she had enough information early on in order to make a finding that he had violated the policy. Def. Resp. SMF at ¶ 170.

Plaintiff claims that this telephone conversation was the first time he had any indication that he would not be exonerated of the charges of sexual harassment. Plaintiff's Statement of Additional Material Facts That Present a Genuine Issue for Trial (Pl. Add. SMF) [113–3] at ¶ 4.

Also on June 16, 2005, Plaintiff received a call from Kelly Simmons, a reporter for the *Atlanta Journal Constitution* ("AJC"). Pl. SMF at ¶ 150. Plaintiff contends that Simmons had "a considerable amount of the details" regarding the investigation. Pl. SMF at ¶ 153. On June 17, 2005, during the time that the UGA OLA was still investigating the sexual harassment complaint against Plaintiff, the AJC ran an article that revealed that UGA was investigating Plaintiff for sexual harassment. Pl. SMF at ¶ 155. The article quoted Mace as confirming the existence of the investigation. Pl. SMF at ¶ 156. According to Washington, UGA's NDAH policy requires that a sexual harassment allegation remain confidential until an official finding is made, and that information about an investigation not be released to the press until ten days after the official finding. Washington Dep. at 153, 112. It is undisputed that information about the sexual harassment complaint against Plaintiff was leaked to the press before that time, but the source of the information is unknown. Pl. SMF at ¶ 163; Def. Resp. SMF at ¶ 163.

After hearing from Washington and AJC Reporter Kelly Simmons, Plaintiff contacted Mace via email; in that email, he asked whether Mace wanted him to resign his position as Dean, stated that the allegations were upsetting to him personally, stated that he wanted to do what was best for Grady College, reminded Mace that they had a meeting scheduled the next week [5], and asked him to let him know what was happening sooner rather than later. Def. SMF at ¶ 23; Def. Ex. 5 and 6. Plaintiff contends that this email was not an offer to resign, but a means for Plaintiff to try to determine how serious Mace considered the situation. Pl. Add. SMF at ¶ 7. At 11:36 p.m. on June 16, 2005, after sending a second, similar email to Mace, Plaintiff received a voicemail message from Mace, telling Plaintiff that Adams doubted his effectiveness as a dean. Pl. SMF at ¶ 48; Soloski Dep. at 40. Plaintiff called Mace the next morning, June 17, 2005, at which time Mace told Plaintiff that he had to consider the option of resigning. Pl. SMF at ¶ 49.

Washington was in contact with Provost Mace and President Adams during the course of the investigation. Mace's involvement with the OLA investigation began within a few days following the opening of the investigation, and he was updated on the facts of the investigation when he called Washington. Pl. SMF2 at ¶¶ 30, 31; Def. Resp. SMF2 at ¶30. While Plaintiff infers that this contact was improper, he asked Mace to find out what was happening. Def. Ex. 5. Further, Defendants contend that this communication conformed with common practice, because Mace served as Plaintiff's immediate supervisor. Def. Resp. SMF2 at ¶ 30–31. The NDAH Policy, in fact, requires the NDAH Officer to "keep the supervisor/administrator informed of the status of the complaint and [to] seek input from the appropriate supervisor/ad-

---

5. Plaintiff's contract was expiring June 30, 2005 and was up for renewal. Fourth

Amended Complaint at ¶ 16; Def. Ex. 1.

ministrator when implementing corrective action." Def. Ex. 12 at 6. The NDAH Officer is the Executive Director of the OLA, Mr. Stephen Shewmaker, and/or his designee. In this case Washington was his designee. Def. Ex. 12 at 3; Shewmaker Dep. at 8.

Nevertheless, Mace acknowledged that the Provost is not to have any role in the investigation of a potential violation of the NDAH policy; rather, the Provost's role is to act upon findings made by the OLA. Mace Dep. at 27. Mace testified that expressing his opinion to the UGA OLA could compromise a sexual harassment investigation, and that if he were to make a statement to the UGA OLA about what should occur in such an investigation, it would put the OLA in a difficult position because he is the number two officer at UGA. Mace Dep. at 30–31. Mace is not aware of the Supreme Court's or the Eleventh Circuit's authority on sexual harassment under Title VII, nor has he been trained on the standard to be applied when determining whether sexual harassment has been committed under Title VII. Pl. SMF at ¶¶ 279–283.

Following a June 20, 2005 meeting involving the matter between Plaintiff, his attorneys, and Mace and OLA attorneys, on or around June 21, 2005, Adams, Mace, Washington, and Steve Shewmaker, the University Director of OLA and Washington's supervisor, participated in a telephone conversation pertaining to the status of the investigation into Kendall's complaint about Plaintiff. Washington Dep. at 171. The phone call to President Adams was initiated by either Shewmaker or Mace. Washington Dep. at 172. Provost Mace told Adams during the investigation that the allegation against Plaintiff was "serious and that there was likely to be a finding of guilt." Pl. SMF at ¶ 298, Adams Dep. at 40. Mace told Adams what Plaintiff's comments had been. Adams Dep. at 41. Adams testified at his deposition that, "[w]hen he made me aware of the language, it sounded to me to be a violation of the policy." Adams Dep. at 41.

Between June 20 and 21, 2005, three meetings were held involving Provost Mace, attorneys from the University OLA and Plaintiff and his attorneys. Pl. SMF2 at ¶ 74; Def. SMF at ¶¶ 25–26. The sexual harassment investigation was not completed at the time of these meetings. Pl. SMF2 at ¶ 85. Over the course of the meetings, Mace made four points to Plaintiff. Pl. SMF at ¶ 184; Mace Dep. at 84–85. The content of Mace's points is undisputed. His first point was that deans serve at the pleasure of the Provost and President. Pl. SMF at ¶ 185. His second point was that he had already disclosed to President Adams that there was a potential violation of the University's NDAH Policy. Pl. SMF at ¶ 186. Mace's third point was that Mace believed that there was a "definite violation" based on witnesses to the "eyes" comment. Pl. SMF at ¶ 187. His fourth point was that, based on his opinion, there had been sexual harassment as defined within UGA's policy. Pl. SMF at ¶ 189. In these meetings, there was no chance for Plaintiff to discuss the facts related to Kendall or her charge against him. Pl. Add. SMF at ¶ 16.

Present at the first meeting were Provost Mace, Washington, Shewmaker, Plaintiff, and Plaintiff's attorneys Thomas Rogers and Thomas F. Hollingsworth III. Pl. SMF at ¶¶ 201, 204; Def. Resp. SMF at ¶¶ 201, 204. Mace began the meeting by stating that it was a preliminary meeting and that there would be a meeting

later the same day at 2:30 p.m., at which time Mace would provide Plaintiff with a letter regarding what actions Provost Mace would take in connection with the sexual harassment allegations made against Plaintiff. Pl. SMF2 at ¶ 98; Pl. Br. I. App. A. 1 ¶ 8. Mace described his options for disciplining Plaintiff were there to be a finding against him. Pl. SMF2 at ¶ 86, Def. SMF at ¶ 27. Mace told Plaintiff that he had determined that the complaint of sexual harassment was valid. Pl. SMF2 at ¶ 101, Pl. Br. I. App. A. 1 ¶ 12.[6] Mace then told Plaintiff that if Plaintiff resigned both his faculty position and his deanship, the case would not go forward, and no finding of sexual harassment would be made. Pl. SMF at ¶ 213, Def. SMF at ¶ 213. Mace asked for Plaintiff's resignation, and Plaintiff responded that he was not guilty of sexual harassment and had no intention of resigning from his position. Pl. SMF2 at ¶ 102; Def. SMF at ¶ 29.

A second meeting was held later the same day, at 2:30 p.m. Pl. SMF2 at ¶ 104, Def. SMF at ¶ 32. Present were Provost Mace, Washington, Shewmaker, Plaintiff, and Plaintiff's attorney Thomas Rogers. Soloski Dep. at 50–51. Mace began the meeting by stating that he had met with President Adams about Plaintiff, and that it needed to be clearly understood by everyone in the room that deans serve at the pleasure of the President. Pl. SMF2 at ¶ 106, Def. SMF at ¶ 33. Mace told Plaintiff that he had disclosed to President Adams that there was a potential violation of the University's NDAH policy. Pl. SMF2 at ¶ 80. Mace told Plaintiff that if he were to resign his Dean position, he would be able to retain his faculty

position. Def. SMF at ¶ 34. Also at the second meeting, Mace read from a letter from former Provost Karen Holbrook to Plaintiff at the time he was hired as Dean. Pl. SMF at ¶ 220; Def. SMF at ¶ 39. The letter contained an agreement to provide a year of paid time off after Plaintiff resigned from his deanship and before he returned to the classroom. Def. Ex. 7. It also addressed Plaintiff's compensation upon return to the faculty after he resigned his deanship. *Id.* Mace told Plaintiff that the benefits promised in the Holbrook letter were only operative if he resigned as Dean and that the letter had no applicability if he were terminated as Dean. Pl. SMF at ¶ 221; Def. SMF at ¶ 39–40. Plaintiff did not agree to resign his deanship at the second meeting. Pl. SMF2 at ¶ 107; Def. SMF at ¶ 41. Instead, he asked that he have time to think about his options and to discuss the situation with his attorneys. Mace and Plaintiff agreed that the same group would reconvene the next day at 1:00 p.m. Def. SMF at ¶ 41.

On June 21, 2005, the third meeting took place in Provost Mace's office. Present were Mace, Shewmaker, Washington, Plaintiff, and Plaintiff's counsel. Pl. SMF at ¶ 223. Plaintiff and his attorney Thomas Rogers began by proposing that Plaintiff resign his deanship in one year, allowing him to complete a number of projects he had begun at the Grady College. Pl. SMF2 at ¶ 109; Def. SMF at ¶¶ 43–45. Mace stated that Plaintiff's proposal was unacceptable to President Adams and that the resignation would have to be immediate. Pl. SMF2 at ¶ 110; Def. SMF at ¶ 46. Mace told Plaintiff that if he were to re-

---

6. Mace testified that he did not know what constituted sexual harassment under applicable law but that he relied on OLA to make those determinations. While he could overturn an OLA decision, he would do so "with extreme caution." Mace Dep. at 39–40.

sign immediately as Dean effective June 30, 2005, the provisions of the letter from Dr. Holbrook would be honored. Pl. SMF2 at ¶ 112; Def. SMF at ¶ 112 (admitted for the purposes of this Motion for Summary Judgment only).

Plaintiff contends that at this time, because Mace had expressed an opinion on his guilt, because Mace and Adams were involved in the investigation, and because information about the investigation had been released to the media, Plaintiff had concluded that his working conditions had become so intolerable that he had no choice but to resign or be falsely labeled a sexual harasser. Pl. SMF at ¶¶ 229–233. Plaintiff further contends that, before he verbally resigned, Mace threatened to fire him as a faculty member without the protection of the tenure process, and that he threatened to ruin Plaintiff's reputation and academic career. Pl. SMF at ¶¶ 234, 235; Soloski Dep. at 128–129. On June 21, 2005, Plaintiff agreed to resign his position as Dean, under the condition that the terms of the resignation would be as set out in the Holbrook letter. Def. SMF at ¶¶ 51, 54. Plaintiff submitted his letter of resignation on June 27, 2005. Def. SMF at ¶ 55.

Plaintiff claims that during the third meeting with Mace, it was agreed that the University would not find Plaintiff in violation of the NDAH policy, and that everything OLA was to write about Plaintiff would be positive. Def. SMF at ¶ 52; Soloski Dep. at 64–65.

On June 29, 2005, Washington made an official finding that Plaintiff had violated the NDAH policy and issued a letter to Plaintiff to that effect. Pl. SMF2 at ¶ 22; Def. SMF at ¶ 56. UGA found that Plaintiff's comments (the "eyes" comment and the "assets" comment) created a hostile work environment for Kendall. Pl. SMF at ¶ 251. In determining that Plaintiff engaged in sexual harassment, Washington applied a subjective test; she asked what effect the comments had on Kendall, and found that the comments made Kendall feel uncomfortable. Pl. SMF at ¶¶ 244, 252. Defendants point out that in addition to Kendall's subjective feelings, Washington relied on Plaintiff's admission that he made the statements alleged, and also took into account the magazine statement, the Christmas Party statement, the Peabody Award issue, and the fact that Plaintiff regarded Kendall as attractive. Def. Resp. SMF at ¶ 245. The purpose of referencing this additional information was to give foundation to the finding and to the effect the comments had on Kendall. Def. Resp. SMF at ¶ 245.

While the University's NDAH policy defines sexual harassment in the same way that Title VII defines sexual harassment, Defendants contend that "sexual harassment" as defined by the NDAH policy is not a legal term of art, and that there can be a finding of sexual harassment under the NDAH policy on facts insufficient to support such a finding under Title VII. Def. SMF at ¶ 73, Def. Resp. SMF2 at ¶ 4. Plaintiff disputes this, as do UGA's in-house lawyers. According to Washington, the University must apply the standards of Title VII; UGA is bound by Supreme Court and Eleventh Circuit precedent in interpreting Title VII as it relates to sexual harassment, and she applied Eleventh Circuit precedent when finding Soloski violated the University's sexual harassment policy. Washington Dep. at 118–120; Pl. SMF at ¶¶ 259–262. James Burns Newsome, Vice Chancellor for Legal Affairs at the Board of Regents of the University System of Georgia ("BOR"), "would expect" Eleventh Circuit case law interpret-

ing Title VII to apply in Plaintiff's case. Newsome Dep. at 58; Pl. SMF at ¶ 261. Plaintiff claims that during the three meetings held in Mace's office, there was no discussion about the law governing whether Plaintiff had committed sexual harassment. Pl. Add. SMF at ¶ 15. Plaintiff contends that the NDAH sexual harassment policy references Title VII and must be applied consistently with Title VII precedents. Pl. Br. I at 3–4.

On June 29, 2005, Plaintiff was reprimanded and sanctioned by Mace by a formal letter of reprimand and an order for Plaintiff to attend sexual harassment training. Pl. SMF2 at ¶¶ 23, 118. This letter went into Plaintiff's permanent personnel file. Pl. SMF2 at ¶ 119.

On July 13, 2005, pursuant to the NDAH policy, which provides that any individual not satisfied with the outcome of an investigation conducted under it has the right to appeal that decision to the UGA President, Plaintiff appealed the finding that he committed sexual harassment to Adams. Pl. SMF2 at ¶¶ 24, 128, Def. SMF at ¶ 72, Def. Resp. SMF at ¶ 13. On July 21, 2005, Adams denied Plaintiff's appeal. Pl. SMF2 at ¶¶ 25, 129. It is undisputed that Adams did not examine the OLA's witness statements or investigative notes when conducting his review of Plaintiff's appeal. Pl. SMF2 at ¶¶ 134, 147, Adams Dep. at 63–64. He recalled reviewing a letter from Plaintiff's counsel, Thomas Rogers, in which Plaintiff admits to having made the comments at issue. Pl. SMF2 at 152, Adams Dep. at 63–64; Pl. Ex. 45. Adams could not specifically remember what else he reviewed, but upon considering the "eyes" and "assets" comments, Adams "saw no basis to set aside the conclusion that had been reached." Adams Dep. at 64, 67; see Pl. Resp. SMF at ¶ 59.

Additionally, Adams had discussed Plaintiff's potential resignation with Mace prior to Plaintiff's appeal, and Adams was under the impression that Plaintiff and Mace had negotiated an arrangement surrounding Plaintiff's resignation. Pl. SMF2 at ¶ 156; Def. SMF at ¶ 60. In making his decision on Plaintiff's appeal, Adams believed he was upholding "the agreement that seemed to have been worked out between [Plaintiff] and Dr. Mace." Adams Dep. at 64, 143; Pl. SMF2 at ¶ 161. Because of this belief, Adams only took a "cursory look" at Plaintiff's appeal file. Adams Dep. at 62, 143; Pl. SMF at ¶ 308. Adams wrote Plaintiff a letter denying his appeal which states, "The record indicates that there were inappropriate comments made by you." Pl. SMF at ¶ 310; Def. Ex. 10. Adams concluded that those comments, the "eyes" and "assets" comments, constituted sexual harassment under UGA's policy. Pl. SMF at ¶ 312.

On August 19, 2005, Plaintiff filed an application for review with the BOR. Pl. SMF at ¶ 320. University employees who are sanctioned for sexual harassment have the right to petition for review by the BOR. Neely Dep. at 18; Pl. SMF at ¶ 325. These appeals are discretionary, and accepted in order to correct mistakes made by institutions. Neely Dep. at 18; Pl. SMF at ¶ 325. The Office of Legal Affairs at the BOR ("BOR OLA") is responsible for presenting applications for review in sexual harassment cases to the Organization and Law Committee for the BOR. Neely Dep. at 17–18; Pl. SMF at ¶ 326. Upon receipt of an application for review, the committee, made up of half the members of the BOR, can either grant a hearing or deny the application. Neely Dep. at 17, 200; Pl. SMF at ¶¶ 327, 328.

Elizabeth Neely is the former Associate Vice Chancellor for the BOR OLA. Pl.

SMF at ¶ 20. Neely testified that within the OLA, there were differences of opinion as to whether Plaintiff should have been granted a name-clearing hearing, and that she "considered very seriously trying to give him a name-clearing hearing." Neely Dep. at 25–26; Pl. SMF at ¶¶ 332, 334. Other OLA employees believed that Plaintiff was not entitled to a hearing on the basis that he had resigned from his position as Dean rather than being removed, and that a name-clearing hearing would be an unnecessary media circus. Neely Dep. at 25; Def. Resp. SMF at ¶ 333; Pl. SMF at ¶ 333. Ultimately, the BOR declined to review UGA's finding and Adams' decision to deny his appeal, as requested by Plaintiff. Pl. SMF at ¶ 362; Def. SMF at ¶ 68. Specifically, "the Board of Regents simply said that it was not going to interrupt the decision of President Adams. It did not make specific findings of fact and law." Newsome Dep. at 66.

In March 2005, as Dean of Grady College, Plaintiff sent a letter to Leonard Reid, offering him a higher salary in order to keep him at Grady. Pl. Add. SMF at ¶ 25. Reid had been offered the deanship of the school of journalism at the University of Tennessee. Pl. Add. SMF at ¶ 26. The offer to Reid was that should he stay at Grady College, he would have a nine-month academic year appointment, but UGA would pay his nine-month salary to him over twelve months, because that is what he wanted. Pl. Add. SMF at ¶ 28. Because UGA's personnel payroll system was not compatible with this arrangement, Plaintiff, with Provost Mace's approval, put Reid into the UGA personnel payroll system as a 12–month, fiscal year appointment, although Reid was in fact only an academic year appointee who worked nine months a year. Pl. Add. SMF at ¶ 31.

Provost Mace set Plaintiff's salary at $130,015 for the 2006–2007 academic year, the year Plaintiff returned to teaching. Pl. Add. SMF at ¶ 35. Professor Reid's salary for the 2006–2007 academic year was $190,000. Pl. Add. SMF at ¶ 37. Plaintiff argues that his agreement with then-Provost Holbrook did not limit Plaintiff's salary upon return to teaching to professors on academic appointments, but included all professors in the Grady College. Pl. Add. SMF at ¶ 38. Further, Plaintiff contends that he did not choose to be appointed on an academic year basis, but that Provost Mace insisted that Plaintiff's letter of resignation include that language, under threat of a finding of sexual harassment. Pl. Add. SMF at ¶¶ 39, 43, 44.

Plaintiff also alleges that UGA treated him differently from the manner in which it treated Dwight Keith Parker, another UGA employee who was investigated for sexual harassment. According to Plaintiff, Parker is African–American, and Plaintiff is white. Pl. Add. SMF at ¶¶ 50, 51. Both Plaintiff and Parker were charged with engaging in sexual harassment pursuant to UGA's NDAH policy in 2005. Pl. Add. SMF at ¶¶ 52, 53. Parker, however, was found not to have violated the sexual harassment provision of the NDAH policy. Pl. Add. SMF at ¶ 54; Pl. Br. I App. D.1. On the other hand, subsequent to resigning his administrative position (Dean of the College of Journalism), Plaintiff was: (1) found guilty of sexual harassment; (2) publicly reprimanded, and (3) ordered to participate in sexual harassment training. Pl. Add. SMF at ¶ 55. Both investigations were conducted by Kimberly Ballard–Washington for the UGA OLA. Pl. Add. SMF at ¶¶ 91, 92. Parker and Plaintiff each have a Ph. D., and each holds the rank of Full Professor. Pl. Add. SMF at ¶¶ 59, 63. During 2005, Parker was Associate Vice President of Academic Affairs

and Associate Provost. Pl. Add. SMF at ¶ 68. Plaintiff was Dean of UGA's Grady College of Journalism. Pl. Add. SMF at ¶ 69. During Mace's tenure as Provost, Parker and Plaintiff are the only two administrators at UGA who were ever investigated for sexual harassment under the NDAH policy. Mace Dep. at 37; Pl. Add. SMF at ¶ 70.

The allegation against Parker involved a trip he took with a female UGA graduate student to attend a conference in Washington, D.C. Pl. Add. SMF at ¶ 71. The student alleged that during the trip, Parker first engaged in "footsies" with her, rubbing his feet against hers. Pl. Br. I App. C.12; Pl. Add. SMF at ¶ 73. Later, he invited the student to sleep in his hotel suite. Pl. Add. SMF at ¶ 74. It is undisputed that both did sleep in the same suite and that this was a violation of UGA's travel policy. Pl. Add. SMF at ¶ 75. The student explained to Washington that Parker again physically touched her by massaging her feet with his hands. Pl. Add. SMF at ¶ 76. He told her that she "looked like she was the type of girl who liked to have fun." Pl. Add. SMF at ¶ 77. On August 23, 2005, Washington concluded that Parker's conduct did not constitute sexual harassment. Pl. Add. SMF at ¶ 79. Washington explained that she made this finding because Parker denied any sexual misconduct, making this incident a "he-said-she-said" scenario. Pl. Add. SMF at ¶ 80. While Parker was not found to have violated the University's sexual harassment policy, Provost Mace found his behavior otherwise inappropriate and terminated Parker's administrative post and administrative pay. Mace Dep. at 184–186.

Both Parker and Plaintiff were alleged to have made sexually inappropriate comments, and to have made them off-campus. Pl. Add. SMF at ¶¶ 82–84. Both Parker and Plaintiff denied any sexual intent toward the respective complainants. The OLA finding for the Parker incident was made on August 23, 2005. Pl. Add. SMF at ¶ 97. The finding for the Soloski incident was made on June 29, 2005. Pl. Add. SMF at ¶ 98. Plaintiff resigned following the OLA investigation against him, and Parker was terminated after tendering, and then withdrawing, his resignation. Pl. Add. SMF at ¶¶ 99, 100; Mace Dep. at 184–186.

Plaintiff complained to Mace and the UGA OLA during his meetings with Mace of June 20, 2005 that he was being treated more harshly than Parker had been because he was not African American.[7] Pl. Add. SMF at ¶¶ 104, 105. A June 24, 2004 UGA memo alleges that a number of sexual harassment complaints had been made against Parker; those allegations included physical touching and seemingly romantic invitations. Pl. Add. SMF at ¶¶ 106, 107. Parker, however, was not found in violation of UGA's sexual harassment policy. Pl. Add. SMF at ¶ 109. It appears that the 2004 finding of no violation by Parker was the result of an investigation by OLA attorney Shewmaker, not Washington. Pl. Br. I App. D.5.

On November 3, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he had been discriminated against by his employer, Defendant BOR, because of his race (White) in violation of Title VII. Fourth Amended

---

7. This complaint could not have been made on the basis of the allegation against Parker involving the trip he took to Washington with a student, since no decision was made on those allegations until two months later. Instead this alleged complaint involved actions taken (or not taken) against Parker a year earlier.

Complaint at ¶ 105. Plaintiff filed an Amended Charge of Discrimination with the EEOC on July 19, 2006, alleging that he had been retaliated against by the BOR for having opposed unlawful employment practices, in violation of Title VII. Fourth Amended Complaint at ¶ 105. On August 28, 2006, Plaintiff received a Notice of his right to sue from the EEOC with regard to his Charge and Amended Charge. Fourth Amended Complaint at ¶ 106.

According to Plaintiff, Defendants' finding against Plaintiff caused him intense feelings of embarrassment and humiliation. Pl. Add. SMF at ¶ 112. He testified that in academia, "being found a sexual harasser is akin to being a pedophile." Soloski Dep. at 52; Pl. Add. SMF at ¶ 113. Plaintiff claims that during the June 20 and 21, 2005 meetings in which he and his attorneys participated with Provost Mace and others, Defendants bullied and intimidated him into resignation with threats to label him a sexual harasser. Pl. Add. SMF at ¶ 116.

Plaintiff also contends that Defendants represented to him that if he resigned, there would not be a finding that he committed sexual harassment, and that upon his resignation they would write a positive letter for him and he would not receive a formal reprimand. Pl. Add. SMF at ¶¶ 117, 118. Plaintiff claims that he made the decision to resign in reliance on Defendants' representation that if he did, there would not be a finding of sexual harassment. Pl. Add. SMF at ¶ 119. Subsequently, the OLA made the finding that he had violated the NDAH policy. Pl. Add. SMF at ¶ 120.

Because many of the Court's findings of fact are intertwined with its analysis of whether the parties have met their respective evidentiary burdens, the remaining relevant facts are set forth in the Discussion below.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 175, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir.1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-

moving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250, 106 S.Ct. 2505. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S.

253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259, 106 S.Ct. 2505.

## B. *MANDAMUS*

The parties have filed cross motions for summary judgment on Plaintiff's mandamus claim (Count One of his complaint). Plaintiff asks for a Writ of Mandamus pursuant to O.C.G.A. § 9–6–20 that would compel Defendants to rescind, recant, and expunge the official finding that he violated the University's NDAH policy. Pl. Br. at 22. The relevant law provides that, "All official duties should be faithfully performed; and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance, if there is no other specific legal remedy for the legal rights." O.C.G.A. § 9–6–20.

▮ Mandamus is available only when it is exclusive. *Mattox v. Board of Education*, 148 Ga. 577, 97 S.E. 532, 533 (1918). Mandamus will issue against a public officer under two circumstances: (1) when there is a clear legal right to the relief sought; or (2) when there has been a gross abuse of discretion. *See Jackson County v. Earth Res., Inc.*, 280 Ga. 389, 627 S.E.2d 569, 571 (2006). The grant of mandamus is discretionary. *Schrenko v. DeKalb County Sch. Dist.*, 276 Ga. 786, 582 S.E.2d 109, 116 (2003).

Plaintiff argues for application of the gross abuse of discretion standard. Pl. Br.

22–23. Under this standard, Plaintiff would be entitled to a rescission of the finding against him if it was the result of a gross abuse of discretion. Alternatively, under the clear legal right standard, Plaintiff would have to prove that he has a clear legal right to the relief requested and no specific legal remedy for attaining it. Defendants argue that Plaintiff cannot meet the elements required to entitle him to a writ of mandamus, but they make this argument only under the "clear legal right" standard. Def. Resp. 18–20.

■ Because, for the reasons discussed *infra*, Plaintiff does not have a clear legal right to a name-clearing hearing based on his breach of contract for lack of due process claim or on his § 1983 claim,[8] Plaintiff must prove a gross abuse of discretion in order to be entitled to a writ of mandamus. "If a mandamus complainant cannot show a clear legal duty incumbent upon the respondent, the complainant may still be entitled to relief if he can show that the respondent grossly abused his or her discretion in taking or refusing to take official action." *Gilmer County v. City of East Ellijay*, 272 Ga. 774, 533 S.E.2d 715, 717 (2000) (citing *Dougherty County v. Webb*, 256 Ga. 474, 350 S.E.2d 457 (1986)). The Court finds as a matter of law that Defendants' finding that Plaintiff violated the University's sexual harassment policy was the result of a gross abuse of discretion.

"Mandamus provides extraordinary relief to compel the performance of an official duty. It does not issue to direct a public official to do a discretionary act unless such discretion has been grossly abused." *Tamaroff v. Cowen*, 270 Ga. 415, 511 S.E.2d 159, 160 (1999) (citations omitted). The Georgia Supreme Court has held:

> [W]hile the writ cannot ordinarily be employed to control a discretion vested in such an officer by directing what his action shall be, or in effect to reverse his action in the orderly exercise of such discretion, the exception to this general rule is where there is no other legal remedy available, and where there have been such an arbitrary and capricious use and such gross abuse of discretion as will in effect amount to a failure on the part of the officer to exercise his discretion at all.

*South View Cemetery Ass'n v. Hailey*, 199 Ga. 478, 34 S.E.2d 863, 867 (1945).

■ The first inquiry is whether Defendants' finding of sexual harassment against Plaintiff was a discretionary decision. Defining a "discretionary act" in the context of determining whether the Georgia Department of Transportation was entitled to sovereign immunity, the Court of Appeals of Georgia writes: "A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Murray v. Ga. DOT*, 284 Ga.App. 263, 644 S.E.2d 290, 295 (2007). The Court finds that Defendants performed a discretionary act in ap-

---

8. In its Report and Recommendation on Defendant's Motion to Dismiss [36], the Court recommended denial of that motion with respect to Plaintiff's mandamus claim on the ground that Plaintiff might be able to establish a "clear legal right" to a name-clearing hearing. Now that the evidence has been presented on summary judgment, it is appar-

ent that Plaintiff gave up his "clear legal right" to a name-clearing hearing when he voluntarily resigned his position as Dean. Nevertheless, the Court also recommended the denial of Defendant's Motion to Dismiss on Plaintiff's mandamus claim by applying the "gross abuse of discretion" test. *See* footnote 8 to Report and Recommendation [36].

plying the NDAH policy and determining that Plaintiff violated it. In conducting its investigation the University OLA, through investigator Kimberly Ballard–Washington, was charged with examining the facts alleged in Kendall's complaint and reaching a conclusion as to whether Plaintiff had violated the policy. Thus, Washington exercised discretion in reaching her conclusion that Plaintiff had violated the University's sexual harassment policy.

Provost Mace and Defendant Adams likewise exercised discretion in deciding on review whether the OLA had come to the correct conclusion. Finally, the BOR was involved in a discretionary act as defined by the Georgia courts in reaching its decision on whether or not to grant Plaintiff's application for review. In fact, Elizabeth Neely, former Associate Vice Chancellor of the BOR OLA, characterizes such reviews as "discretionary." Neely Dep. at 18.

A public official's exercise of discretion will not be disturbed by a mandamus order unless the official's actions were "arbitrary, capricious and unreasonable." *Gilmer County*, 533 S.E.2d at 718 (quoting *Atlanta v. Wansley Moving & Storage Co.*, 245 Ga. 794, 267 S.E.2d 234, 236 (1980)); *see also Pruitt v. Meeks*, 226 Ga. 661, 177 S.E.2d 41, 43 (1970) (A gross abuse of discretion must be "arbitrary, capricious and unreasonable."). This standard is most often applied by the Supreme Court of Georgia in mandamus cases regarding the denial of discretionary zoning permits. *See, e.g., id.*; *Atlanta v. Wansley Moving & Storage Comp.*, 245 Ga. 794, 267 S.E.2d 234 (1980). In *Atlanta v. Wansley*, the

Atlanta zoning ordinance relied on by the City in denying the applicant's request for a special use permit "[did] not specify the conditions which must be met in order to obtain a special use permit. It provide[d] that after a public hearing, the city may authorize certain uses upon appropriate conditions to be fixed by the city." 267 S.E.2d at 236–37. The City's decision was discretionary within the framework of the power to authorize "certain uses" defined by the statute and to impose "appropriate conditions." The Court held that the applicant had the burden of showing that the city's denial was arbitrary, capricious and unreasonable in order to be entitled to a writ of mandamus compelling the issuance of a permit. *Id.* at 237. "The focus should be on ... whether there was evidence to support the city's decision." *Id.* at 236.

The arbitrary, capricious and unreasonable standard is applicable here. As in the zoning cases, the Court will focus on whether there was evidence to support Washington's finding under the standards of the NDAH policy. "A clear error in judgment or the application of an incorrect legal standard is an abuse of discretion," *Cotton v. Jackson*, 216 F.3d 1328, 1332 (11th Cir.2000), and such an error that rises to the level of arbitrary, capricious and unreasonable is a gross abuse of discretion.

While Defendants' decision to find Plaintiff in violation of the NDAH policy was a discretionary one, they had the duty to adhere to the standards of the policy itself.[9] The Court finds that they did not, and that the failure to do so amounted to a gross abuse of discretion.

---

9. Additionally, Plaintiff argues that Defendants were bound by Plaintiff's faculty contract, which was subject to the Board of Regents Policy Manual Section 802.17, to provide Plaintiff with due process before sanctioning him for sexual harassment. This potential contract claim was not raised in Plaintiff's Fourth Amended Complaint, which, when fairly read, addresses only Plaintiff's deanship contract and his loss of

Specifically, the Court finds that Defendants grossly abused their discretion by failing to judge Plaintiff by the applicable standard. While he was told that he was being charged with violating the NDAH policy, which references Title VII, he was in fact investigated and found guilty under a standard completely different from the Title VII standard. The NDAH policy gave Plaintiff notice of the charges against him by defining sexual harassment as it is defined under Title VII. Because OLA (and those who reviewed its decision) did not apply the policy in any way remotely consistent with Title VII, its decision was the result of a gross abuse of discretion leading to a defect of legal justice under O.C.G.A. § 9–6–20 and authorizing the issuance of a writ of mandamus to correct it.

Defendants argue that Plaintiff cannot challenge the finding against him because he admitted to making the statements that are the basis of the finding, and because "there is no dispute that Plaintiff engaged in activity which was violative of this policy." Def. Resp. at 7. As noted above, however, Defendants rely on a reading of the NDAH policy that comports with no established standards for determining whether sexual harassment has been committed. The NDAH policy defines sexual harassment as follows:

> Pursuant to Title VII of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972, "sexual harassment" is defined as:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, when:

> 1. Submission to such conduct is made either implicitly or explicitly a term or condition of an individual's employment or status in a course, program or activity;

> 2. Submission or rejection of such conduct by an individual is used as the basis for employment or educational decisions affecting such individual; or

> 3. Such conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working and/or learning environment; or of interfering with one's ability to participate in or benefit from an educational program or activity.

Examples of sexual harassment may include, but are not limited to the following:

> 1. Physical Assault.

> 2. Direct or implied threats that submission to sexual advances will be a condition of employment, work status, compensation, promotion, grades, or letters of recommendation.

> 3. Sexual advances, physical or implied, or direct propositions of a sexual nature. This activity may include inappropriate/unnecessary touching or rubbing against another, sexually suggestive or degrading jokes or comments, remarks of a sexual nature about one's clothing and/or body, preferential treatment in

it. That Plaintiff's faculty contract may have been breached was raised for the first time at oral argument before this Court on October 28, 2008. The Court notes, but does not have before it because not pled, that Plaintiff's faculty contract may have given him a clear legal right to due process before being sanctioned for sexual harassment, satisfying the "clear legal right" standard for mandamus. Failure to raise that argument properly, however, is of no moment because the Court finds that, as a result of Defendants' gross abuse of discretion, Plaintiff is entitled to the relief he seeks.

exchange for sexual activity, and the inappropriate display of sexually explicit pictures, text, printed materials, or objects that do not serve an academic purpose.

4. A pattern of conduct, which can be subtle in nature, that has sexual overtones and is intended to create or has the effect of creating discomfort and/or that humiliates another.

5. Remarks speculating about a person's sexual activities or sexual history, or remarks about one's own sexual activities or sexual history that do not serve a medical or academic purpose.

Def. Ex. 12.

Defendants contend that an employee violates the NDAH policy when he or she makes remarks of a sexual nature "about one's clothing and/or body," quoting from paragraph number 3 under the line "Examples of sexual harassment may include, but are not limited to the following." Following this reasoning, Plaintiff violated the Policy when he made the "assets" comment. According to Defendants, the inquiry necessarily ended once it was established that Plaintiff did indeed make the comment, and nothing further needed to be considered to find a violation of the policy. Def. Resp. at 7–8.

In their brief, Defendants rely almost exclusively on the "examples" of sexual harassment given in the NDAH policy, and hardly address the broad "definition" itself, in which sexual harassment is defined in relevant part as: "verbal conduct of a sexual nature when: [s]uch conduct has the purpose or effect of interfering with the individual's work or educational performance; of creating an intimidating, hostile, or offensive working and/or learning environment; or of interfering with one's ability to participate in or benefit from an educational program or activity." Defendants merely state that "Kendall's complaint makes it clear that she felt these comments were offensive." Def. Br. at 5.

There is no support for the contention that the "examples" section of the NDAH policy should stand separately from the first section and that conduct resembling one of the examples should summarily be deemed a violation without further examination under the entire policy. Defendants' argument that Plaintiff's conduct constituted an obvious violation of the NDAH policy is at best incomplete; the "examples" section of the policy did not provide Plaintiff with adequate notice of the standard Defendants would apply to a sexual harassment investigation. The Court finds it necessary to examine further the basis of Defendants' finding.

Defendants argue that their approach to investigating Kendall's complaint is not subject to examination by the Court under any legal standard for finding sexual harassment because "there is no prohibition against a university, or any other employer, from determining the contours of its own policies and procedures concerning anti-harassment on its campus." Def. Resp. at 2. Defendants may be correct as a general matter. Regarding UGA's NDAH policy, however, because those charged under the policy have a right to notice of the standard under which they will be judged, and because the University chose to incorporate Title VII into its policy, while not necessarily binding, the standards of Title VII must be considered.

The NDAH policy defines sexual harassment "[p]ursuant to Title VII of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972." Def. Ex. 12. To determine what standards

were meant to apply in implementing the NDAH policy, the Court looks to UGA's intent in enacting the policy. The policy gives no indication of the standards to be applied other than the reference to Title VII quoted above. Given that the policy references Title VII in defining sexual harassment, the Court concludes that Title VII standards were intended to control investigations of potential violations. Otherwise, those subject to the policy would be unable to govern their conduct in accordance with the expectations set by it, and would be subject to arbitrary enforcement.

Deposition testimony of UGA personnel reinforces the view that Title VII provides the proper standard. James Burns Newsome, Vice Chancellor for Legal Affairs at the BOR, stated that he "would expect" Eleventh Circuit case law interpreting Title VII to apply in Plaintiff's case. Newsome Dep. at 58. Moreover, Kimberly Ballard–Washington stated that she *did* apply Title VII, as was required, when determining that Plaintiff violated the NDAH policy. Washington Dep. at 118–120. Washington explained her finding thus: "I determined that based on his statements, his comments, his actions, that it created a hostile work environment for this particular employee and that the incidents were severe and pervasive enough for her to be made to feel uncomfortable." Washington Dep. at 125.

The Court finds that Plaintiff's conduct does not satisfy the definition of sexual harassment based upon a hostile work environment under Supreme Court and Eleventh Circuit precedent applying Title VII. In fact, Plaintiff's conduct was so far from constituting sexual harassment that to con-

clude otherwise, while claiming to apply the applicable law, deprived Plaintiff of due process and was a gross abuse of discretion on the part of Defendants. Plaintiff was clearly judged under a standard different from the standard set by cases interpreting Title VII.

In order to establish a *prima facie* case for a Title VII claim for a hostile work environment based on sexual harassment, a plaintiff must show that: 1) he or she belongs to a protected group; 2) he or she was subjected to unwelcome sexual harassment; 3) the harassment was based on sex, and 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment. *Henson v. City of Dundee*, 682 F.2d 897, 903–905 (11th Cir.1982); *see also Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir.1995); *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557 (11th Cir.1987). As to the second and third factors, there is no evidence that Plaintiff's comments to Kendall were unwelcome at the time they were made,[10] and only the "assets" comment was arguably based on sex.

UGA's finding fails most spectacularly, however, on the fourth element. UGA does not possess sufficient evidence to show that Kendall's work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation omitted). To determine whether a hostile envi-

---

**10.** She did not advise Plaintiff that his comments made her uncomfortable, nor did she complain of them to the University until seven

months had passed since the first comment and one month had passed since the second one.

ronment is severe or pervasive enough to be actionable under Title VII, the "totality of the circumstances" must be considered; a court must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris,* 510 U.S. at 23, 114 S.Ct. 367. Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Plaintiff's conduct did not involve physical touching. His conduct consisted of two comments, made outside of the office, six months apart. They were the only "offensive" comments that he made to her that Kendall complained of in her four years of working with Plaintiff. Even assuming the comments could alter a workplace environment if pervasive, the paucity of the comments here precludes a finding that the workplace was "permeated with discriminatory intimidation, ridicule, and insult."

Further, while Kendall claimed that she found Plaintiff's conduct offensive and Washington relied on her subjective feelings in reaching her conclusions,[11] the ultimate test to apply in determining whether conduct is severe or pervasive is an *objective* one. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1247 (11th Cir.1999). Washington improperly applied a subjective test only, asking what effect the comments had on Kendall without considering whether her feelings were objectively reasonable. Washington Dep. at 46, 47, 125.

Applying an objective standard and looking at the totality of the circumstances, there is no judicial authority that this Court is aware of that would suggest that Plaintiff's conduct came anywhere near creating a hostile work environment for Kendall. In fact, Defendants cited no evidence in their finding of sexual harassment or in Adams' letter denying Plaintiff's appeal that could possibly amount to sexual harassment under any legal standard. Because of the lack of adequate evidence against Plaintiff and Defendants' failure to conduct the investigation under Title VII standards, as required by the NDAH policy, the Court finds that Defendants' actions were arbitrary, capricious and unreasonable, amounting to a gross abuse of discretion under Georgia law. *Pruitt v. Meeks,* 226 Ga. 661, 177 S.E.2d 41 (1970).

The Court is not holding that, to withstand attack, the University's conclusion in a sexual harassment investigation must be one that would be affirmed by the Court. But, given the University's reference to Title VII in its definition of sexual harassment ("[p]ursuant to Title VII of the Civil Rights Act of 1964 ... sexual harassment is defined as:"), any finding of sexual harassment must at least apply the facts found to the existing Title VII law. If that were to be done and a result reached that a court may disagree with, that would not amount to a gross abuse of discretion. But, it is a gross abuse of discretion to find one guilty of sexual harassment under a policy that incorporates Title VII without at least going through the motions of applying the facts of a case to the well understood Title VII law, i.e. that the acts be so

---

**11.** Washington wrote, "In this case the evidence *suggests* that it was reasonable, given the totality of the circumstances, for the complainant to believe that sexual advances were being directed toward her." Pl. Appendix C.66, "Letter of Determination" (emphasis added). Not only does OLA fail to address whether complainant's belief was objectively reasonable, it bases its finding on evidence that merely suggests that the subjective feelings of the complainant were reasonable.

severe or pervasive that an objective, reasonable person would find that they "alter the conditions of employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. 367.

Pointing to a case from the Supreme Court of Georgia, *Campbell v. Fulton County Bd. of Regist. and Elec.*, 249 Ga. 845, 295 S.E.2d 80 (1982), Plaintiff argues that because Defendants engaged in a gross abuse of discretion by failing to judge him by the standards they charged him with violating, he is entitled to a rescission of Defendants' finding and an Order requiring UGA to retract the finding that he violated the NDAH policy to the same audience reached by that finding. Pl. Br. 24. While the case stands alone in the specific remedy it rewards, it has not been overturned by the Supreme Court of Georgia and does support Plaintiff's position. In the *Campbell* case, two candidates for Atlanta City Council filed complaints following the election with the Fulton County Board of Registration and Elections (the "Board"), which was administering the October 6, 1981 City of Atlanta elections. 249 Ga. at 846, 295 S.E.2d 80. The complaints alleged that Campbell, another candidate who had received 50.3% of the vote, had committed certain violations of the municipal election laws. *Id.* The Board ordered a County employee, Frank Davis, to conduct an investigation into the allegations. *Id.* Davis testified that he was instructed by the Board that it was not necessary to discuss the investigation with Campbell; that he spent less than twenty-four hours conducting the investigation; that he conducted his interviews of persons associated with the alleged problems on election day by telephone, and that none of them was under oath. *Id.*

Davis provided an investigative report to the Board that "recited allegations by those interviewed that appellant's campaign workers illegally assisted voters in completing voter certificates and that appellant himself was 'illegally "assisting . . . and influencing" voters at the polls.'" *Id.* Relying on that investigative report, the Board adopted a resolution recommending the election be set aside and that Campbell be "disqualified as a candidate" from the office of Council member. *Id.* The next day, Campbell appeared before the Board requesting that he be given an opportunity to be heard and to refute the charges recited in the investigative report. "Campbell also requested that the Board rescind its resolution disqualifying him as a candidate." *Id.* The Board denied Campbell's requests. *Id.*

Campbell filed suit against the Board seeking a writ of mandamus and injunctive relief and asking that the Board's resolutions be expunged from the Board's records and for a permanent injunction "from further violation of his constitutional rights." *Id.* The trial court denied the writ of mandamus and dismissed the claims for injunctive and declaratory relief. The Georgia Supreme Court reversed, reasoning that the danger in approving practices such as those taken by the Board were evident. "While the Municipal Elections Code provides for rudimentary elements of due process-notice and an opportunity to be heard-where there is a petition to contest an election, in this case, the Board acting outside the scope of this statutory scheme, not only failed to provide appellant with an opportunity to be heard, but unequivocally denied his request for one." *Id.*

In granting Campbell the relief he sought, the Court was "persuaded by the reasoning underlying those cases which allow expungement of statements unneces-

sary to the purpose sought to be accomplished by a grand jury report." *Id.* The Court wrote: " 'An informal report ... drafted, after a secret investigation and based on an uncertain standard of proof, may be remembered long after equally informal denials or objections ... from its targets are forgotten.' " *Id.* (quoting *Thompson v. Macon–Bibb County Hospital Authority,* 246 Ga. 777, 779, 273 S.E.2d 19 (1980)). Relying on its determination that the Board lacked the authority to issue a resolution recommending that Campbell be disqualified as a candidate, and that it violated due process rights provided by the elections code in making that recommendation without a hearing, the Court held that "the appellant in this case has the right to have the Board's resolutions affecting him expunged from the Board's records." *Id.*

As the Board in *Campbell* acted outside of its statutory scheme to deprive Campbell of the "rudimentary elements of due process" to which he was entitled, Defendants in this case acted beyond their discretionary authority in finding Plaintiff in violation of the NDAH policy for sexual harassment. Defendants were constrained to follow the standards of proof set by the NDAH policy and they did not. While they were free to terminate Plaintiff's deanship position at any time for any reason, they were not free to destroy his reputation under color of University policy, while ignoring the standards that defined that University policy.

As the plaintiff in *Campbell,* Plaintiff in this case is entitled to have the finding against him expunged from the public record. Plaintiff, however, requests not only a writ directing Defendants to right their wrong by rescinding the official finding, but he also seeks an order requiring the University to recant via publication to the same audience as was advised that Plaintiff had been found to have sexually harassed a subordinate.[12] Pl. Br. at 29.

The Court concludes that a writ of mandamus should issue requiring Defendants to rescind their finding and expunge the record of any finding that Plaintiff violated Defendants' policy against sexual harassment in 2005. While the Court considered ordering a name-clearing hearing, it sees no purpose in that in light of its finding that it was, and would be, a gross abuse of discretion to conclude that Plaintiff violated the University's sexual harassment policy under the facts of this case.

On the other hand, for the present the Court leaves to the parties the appropriateness of widespread publication of the fact that the University has reversed its finding that Plaintiff violated its sexual harassment policy. The Court is concerned that publicity linking Plaintiff's name to sexual harassment, even in the context of saying the University has reversed its position and found that he was not a sexual harasser, will only do him more harm.[13] The Court would prefer that the parties, outside the heat of litigation, get together and agree on what scope

12. Plaintiff contends that audience can be reached with a press release sent to each newspaper in Georgia and the Associated Press, papers and entities that have covered Plaintiff's fate and by paid advertisements in the journals read by Plaintiff's peers. Pl. Br. at 29.

13. It seems inconsistent for Plaintiff to seek expungement of the finding of sexual harassment from his and University records, and then to ask for widespread publicity of the fact that the University, after litigation, had been forced to reverse its position. Perhaps it would be best to just clear the records and let sleeping dogs lie.

of recantation, if any, would best serve Plaintiff's interests. If they are unable to reach such an agreement Plaintiff may petition the Court to reconsider its order and to mandate publicity.

Accordingly, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment on Count One, Mandamus, be **GRANTED** in part, and that Defendant's motion on that count be **DENIED.** Plaintiff's motion should be granted in part so as to require the University to expunge all record of the 2005 finding that Plaintiff violated its sexual harassment policy. At this time the undersigned does not **RECOMMEND** that affirmative publicity be ordered.

## C. BREACH OF CONTRACT

Plaintiff has moved for summary judgment on Count Two of his complaint, breach of contract. Defendant has also moved for summary judgment on this claim. Plaintiff argues that Defendants have breached their employment contract with him by sanctioning him for sexual harassment without due process. Plaintiff claims a right not to be sanctioned for sexual harassment without due process arising out of the language of his deanship contract. Pl. Br. at 4. While not pled, in his brief he also claims a Constitutional right to due process before he can be terminated, by virtue of his status as a state government employee. Pl. Br. at 7. The Court finds that while Plaintiff's deanship contract did include a right not to be sanctioned for sexual harassment without due process, Plaintiff terminated his rights under that contract when, as part of an agreed resolution of a dispute, he resigned

his position as Dean of Grady College. The Court finds that Plaintiff's Constitutional due process claim fails because he did not possess a protected property interest in his deanship position, and because he was not terminated but resigned. Similarly, Plaintiff cannot demonstrate all six required factors laid out by the Eleventh Circuit in *Buxton v. Plant City*, 871 F.2d 1037, 1042–43 (11th Cir.1989), to show a deprivation of a liberty interest in his reputation.

### 1. Contractual Due Process

Plaintiff's deanship contract states, "You hold your administrative title and position at the pleasure of the President." Def. Ex. 1. In addition, it provides, "This administrative appointment is made expressly subject to the applicable state and federal laws and to statutes and regulations of this institution and to the bylaws and policies of the Board of Regents," thus incorporating the Board of Regents Policy Manual ("BOR Policy Manual") by reference. In turn, Section 802.17 of the BOR Policy Manual provides: "Sexual harassment of employees or students in the University System is prohibited and shall subject the offender to dismissal or other sanctions **after compliance with procedural due process requirements.**" Pl. Br. App. C.5 (emphasis added).

Plaintiff was sanctioned for sexual harassment without the due process promised by Section 802.17. He received a formal letter of reprimand in his personnel file and was made to attend sexual harassment training.[14] Before being sanctioned, however, Plaintiff had resigned his deanship position. His resignation followed an

---

**14.** The letter in Plaintiff's personnel file is a particularly harsh sanction because it is publicly available pursuant to the Georgia Open Records Act, and therefore has a significant negative impact on his future employment opportunities.

agreed to resolution of the sexual harassment claim made against him by an employee of the college for which he served as Dean. That claim was investigated by OLA which let him know that he might be found guilty of violating the University's sexual harassment policy. He responded by asking the Provost whether he should resign. *See* Plaintiff's Appendix C–76 and 77. The Provost told him that the University president, Adams, doubted that he could be effective as a dean and that he had to consider resignation as an option.

Plaintiff employed counsel and negotiations ensued. The Provost initially told Plaintiff that it was his opinion that there had been sexual harassment but that if Plaintiff resigned both his tenured faculty position and deanship the harassment case would not go forward. Plaintiff refused to resign and negotiations continued. Ultimately, Provost Mace offered that if Plaintiff resigned his deanship he would be able to retain his faculty position and the University would honor a letter written by the former Provost to Plaintiff when he became dean, stating that, if he should resign his deanship, he would receive a year off with full pay before he returned to the classroom with a salary equivalent to that of the highest paid professor in the Grady College. On the other hand, Provost Mace told Plaintiff that, if he did not resign but was terminated, the agreement with the former Provost would not be in effect.

After discussing this offer with his attorneys, Plaintiff accepted, and submitted his resignation, effective June 30, 2006, by letter dated June 27, 2005. That letter asserted that the resignation would initiate the "exit agreement" promised by the former Provost should he resign, but made no mention of other consideration.[15]

Because Plaintiff reached a settlement with the University which included his resignation as Dean, his deanship contract became a nullity upon his resignation. Thereafter, his contractual rights were as agreed upon in his settlement, not his deanship contract. In other words, as in all settlements of contractual claims, Plaintiff exchanged a set of rights in one contract (his deanship) for another (the settlement agreement). With that exchange of rights Plaintiff gave up the claims he may have had under his deanship contract.[16]

Plaintiff argues that his resignation should be deemed a constructive discharge

---

15. As will be discussed *infra,* Plaintiff contends that he was also promised that, if he resigned, there would be no finding that he had violated the University's sexual harassment policy and no sanction or public disparagement of him.

16. Plaintiff has also made the argument (but did not plead) that Defendants breached their faculty contract with him by sanctioning him for sexual harassment without procedural due process. Plaintiff's faculty contract remained intact after he resigned his deanship, and also incorporated BOR policy 802.17. As this argument was not properly raised, *see* Note 7, *supra,* the Court will not decide the issue. The Court notes, however, that even if Plaintiff had pled that Defendants' actions constituted a breach of Plaintiff's faculty contract,

Plaintiff cannot show damages from this breach.

Because Plaintiff was never terminated from his faculty position, the sexual harassment finding did not result in a contractual loss. Defendants' breach was procedural rather than substantive. His faculty salary was never reduced as a result of the finding. Thus, Plaintiff could only prove damages if he were to show consequential damages resulting from losses caused by Defendants' breach, such as lost employment opportunities. "[C]onsequential damages are not recoverable unless they can be traced solely to the breach of the contract." O.C.G.A. § 13–6–8. Plaintiff has made no argument, much less presented any evidence, that he lost any employment opportunities that would have paid him a salary approaching what he received (or ar-

from the deanship, thereby restoring his claims under his deanship contract. Constructive discharge is a legal theory developed in the context of cases involving harassment and retaliation under Title VII. To prove constructive discharge in a Title VII case, a plaintiff must show that his "working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign." *Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir.1996) (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir.1989)). There must be a "high degree of deterioration in an employee's working conditions, approaching the level of intolerable." *Hill v. Winn–Dixie*, 934 F.2d 1518, 1527 (11th Cir.1991).

Plaintiff argues that at the time of his resignation, his working conditions had become intolerable. He believed that the process being used to investigate Kendall's sexual harassment complaint was inherently flawed and unfair because Mace had expressed an opinion on Plaintiff's guilt in the presence of OLA attorneys before they had made an official finding; because Adams was involved in the investigative phase of the complaint, and because information about the investigation had been leaked to the media. Pl. Br. at 17–18. In view of these acts, Plaintiff felt that he had no choice but to resign. Pl. Br. App. A.3.

Applied to Plaintiff's breach of contract claim, the legal theory of constructive discharge due to intolerable working conditions is out of place. The appropriate inquiry is simply whether Plaintiff resigned, giving up his rights under his deanship contract, or was terminated.

In *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir.1995), the Eleventh Circuit identified five factors to guide the determination of whether a resignation is involuntary under the totality of the circumstances when the plaintiff claims that his resignation was obtained by coercion or duress. The parties use the *Hargray* factors to argue Plaintiff's constructive discharge claim. The factors are: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation, and (5) whether the employee had the advice of counsel. 57 F.3d at 1568.

The Court in *Hargray* was determining the voluntariness of a public employee's resignation in the context of his claim that he had been deprived of his property interest in his employment without due process of law. The principles of *Hargray* are applicable here; if Plaintiff's resignation was involuntary, then it may be that his contractual rights were not abandoned in favor of the terms of a settlement agreement procured through duress or coercion.

When viewed in the light most favorable to the Plaintiff, however, the facts show that Plaintiff chose to resign. His available alternative was to wait until the investigation findings were made, contest them with the Provost if adverse, and invoke his contractual due process rights if sanctions were imposed. While it is true that an adverse sexual harassment finding and

---

gues he should receive) from UGA. Nor is there any evidence of lost opportunities traceable *solely* to Defendants' failure to provide him with due process. Finally, even if Plain-

tiff were to attempt to prove consequential damages, such damages would likely be too speculative to provide a basis for relief.

subsequent termination were strong possibilities, this alone does not establish that Plaintiff's resignation was involuntary. "[T]he mere fact that the choice is between comparably unpleasant alternatives ... does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Hargray*, 57 F.3d at 1568 (quoting *Stone*, 855 F.2d at 174). "Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because the fact remains that plaintiff *had a choice.*" *Id.* (citation omitted) (emphasis in original).

Even though it appeared that Plaintiff would be subject to sanctions, including termination, if he did not resign, Plaintiff made the choice to resign, and his decision was based on a number of considerations. Most important among those was the letter from former Provost Karen Holbrook written to Plaintiff upon his appointment as dean of Grady College. The letter reads:

> [S]hould you wish to step out of your administrative role and return to your faculty, ... [y]ou would retain your dean's salary for one year while re-tooling to move into a teaching and research mode. At the end of the year, the salary would be renegotiated to a level that would be no less than the highest paid full professor within the department of the Grady College.

Def. Ex. 7.

During Plaintiff's second meeting with Provost Mace, Mace advised Plaintiff that if he were to step down as Dean, as opposed to being terminated, the provisions of the Holbrook letter would apply. On the other hand, if he did not resign, were found to have violated the University's sexual harassment policy and were fired, the Holbrook letter would not apply. So- loski Dep. 52–53. That meeting ended without Plaintiff's resignation, and the same group, Mace, Plaintiff, Shewmaker, and Washington reconvened the next day at 1:00 p.m. At this third meeting, Plaintiff agreed to resign, but stated that "the terms of the resignation have to be the letter from Holbrook." Soloski Dep. 64.

Applying the five factors from *Hargray* to determine whether Plaintiff's resignation was involuntary, the Court finds that it was not. The evidence, as viewed under the factors, is as follows: (1) Plaintiff was given an alternative to resigning. He could have contested the charges and relied on the due process protections of his contract. He elected to take the provisions of the Holbrook letter, giving him a year off with pay, and to retain his faculty position. (2) There is no evidence that Plaintiff did not understand the nature of the choice he was given. Not only did he understand it, he had counsel present to advise him. (3) Upon request, Plaintiff was given, at a minimum, a day to discuss his options with his lawyers. (4) Plaintiff was permitted to make the effective date of his resignation several days after the agreement was reached, but he was not permitted to delay it for a year. (5) Plaintiff had the advice of counsel in deciding whether to resign with benefits or refuse to resign and fight the charges against him.

Applying these factors, the Court finds as a matter of law that Plaintiff accepted a proposed settlement and chose to resign. Accordingly, he was not "constructively discharged" as a matter of law, and his resignation terminated his deanship contract.

### 2. Constitutional Due Process

While not plead in his First through Fourth Complaints, Plaintiff has argued in

his Brief in support of his Motion for Summary Judgment that his Count Two breach of contract claim should proceed independent of his deanship contract based on his due process rights under the U.S. Constitution. Pl. Br. at 7.

■■■■ In order to state a claim for denial of due process in the termination of employment, a plaintiff must show that he has a protected property interest in his employment and that due process was denied. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); *see also Brett v. Jefferson County,* 123 F.3d 1429, 1433 (11th Cir.1997). State law determines whether a public employee has a protected property interest in his job. *Brett,* 123 F.3d at 1433; *Warren v. Crawford,* 927 F.2d 559, 562 (11th Cir.1991).

■■■ "Although the underlying substantive [property] interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Brown v. Georgia Dept. of Revenue,* 881 F.2d 1018, 1027 (11th Cir.1989) (citing *Memphis Light, Gas, & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)) (emphasis in original). Because the Court finds that Plaintiff was not terminated from his deanship position, but rather resigned, his constitutional claim for deprivation of a property interest in his employment without due process necessarily fails.

The Court also finds that Plaintiff's claim fails because he did not possess a property interest in his job. Plaintiff argues that even though he could have been removed as Dean for a reason other than sexual harassment without a pre-termination hearing, BOR policy 802.17 creates an entitlement to continued employment as dean when faced with a charge of sexual harassment. Pl. Br. at 19–20. Even if that were true, however, as found above, Plaintiff resigned, and therefore, abandoned any claims he may have had based on his deanship contract and the policies of the Board of Regents which were incorporated therein by reference.

Plaintiff then argues that as a public employee he had a property right in his job such that it could not be taken from him without due process.[17] Even if this right was not extinguished by his resignation, Plaintiff's interest in his deanship did not rise to a property right.

In support of his position, Plaintiff cites *Brown v. Georgia Dept. of Revenue,* 881 F.2d 1018 (11th Cir.1989). In *Brown,* the Eleventh Circuit Court of Appeals held that a Revenue field agent could only be fired for cause because the Georgia Merit Systems Act "does set forth the minimum procedural requirements for dismissal, namely notice and right to a post-termination hearing." 881 F.2d at 1027. He also cites *DeClue v. City of Clayton,* 246 Ga.App. 487, 540 S.E.2d 675 (2000). In *DeClue,* the Georgia Court of Appeals held that "[u]nder Georgia law, a public employee has a property interest in his job if his employment allows dismissal only for cause." 540 S.E.2d at 677. Finally, in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the United States Supreme Court held that a non-tenured assistant professor did not

---

17. The Court is addressing the merits of this claim, but notes that it was not pled despite four iterations of Plaintiff's Complaint.

have a property interest in having his contract renewed by the university because there was no state statute or university rule or policy that secured his interest in re-employment or that created any legitimate claim to it. *Id.*

Each of these cases finds that an employee may be protected by a statute or policy providing that he or she may only be dismissed for cause. As to his position as Dean, Plaintiff had no such protection. His contract as Dean expressly provided that he "held his administrative title and position at the pleasure of the President," Def. Ex. 1, and he could have been dismissed with or without cause, despite the language of BOR policy 802.17. Furthermore, while Plaintiff also points to BOR policy 803.11 and argues that it entitles him to due process prior to early termination, by its terms BOR policy 803.11 applies only to "tenured or non-tenured faculty members," Complaint ¶ 82, and Plaintiff's deanship contract specifies that his tenure applies only to his faculty position and not his "appointed position as an administrator." Def. Ex. 1. Consequently, BOR policy 803.11 does not apply to Plaintiff's position as Dean of the University's Grady College of Journalism.

Plaintiff's position as Dean within the University was analogous to that of a political appointee who serves at the will of a Chief Executive. The application of BOR policy 802.17 to his contract, providing for procedural due process before being sanctioned for sexual harassment, does not change the fundamental nature of Plaintiff's employment, and therefore does not create a constitutionally protected property interest. *See, e.g., Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988) (even though plaintiff, who was otherwise employed at-will, was protected by statute from termination on the basis of speech, that statute did not create a property interest in his employment because those employed at will have "no objective basis for believing that they will continue to be employed indefinitely"). The Court, therefore, finds that Plaintiff did not have a property right in his deanship which was protected by the Due Process Clause of the Fourteenth Amendment.

■ Plaintiff also argues (without having pled) that he has been denied his liberty interest in his reputation without a hearing. Pl. Br. at 8. In order to show a deprivation of a liberty interest in one's reputation, a plaintiff must demonstrate the following six factors: (a) a false statement, (b) of a stigmatizing nature, (c) attending a governmental employee's discharge, (d) [was] made public, (e) by the governmental employer, (f) without a meaningful opportunity for an employee name clearing hearing. *Buxton v. Plant City,* 871 F.2d 1037, 1042–43 (11th Cir. 1989). The facts do not support Plaintiff's claim that Defendants' actions were "attending a governmental employee's discharge" because Plaintiff cannot prove that he was constructively discharged. "If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his ... interest voluntarily and thus cannot establish that the [City] 'deprived' him of it within the meaning of the due process clause." *Hargray v. City of Hallandale,* 57 F.3d 1560 (11th Cir.1995) (quoting *Stone v. University of Maryland Medical System Corp.,* 855 F.2d 167, 173 (4th Cir. 1988)).

As discussed *supra,* Plaintiff voluntarily relinquished any claims under his contract that would have arisen from his termination for sexual harassment under the

circumstances of this case when he took the terms of the Holbrook letter and resigned his position. Because of this waiver, Plaintiff cannot establish that he was constructively discharged and therefore cannot meet the *Buxton v. Plant City* elements for showing a deprivation of his liberty interest without due process.

Accordingly, the Court **RECOMMENDS** that Defendant's motion for summary judgment on Plaintiff's breach of contract claim, Count Two, be **GRANTED,** and the Plaintiff's motion for summary judgment on that claim be **DENIED.**

## D. *EQUITABLE INJUNCTION*

Plaintiff has moved for summary judgment on Count Four of his complaint, requesting a permanent injunction. Plaintiff seeks a permanent injunction against Defendants enjoining and restraining them, and those in active concert or participation with them, from denying Plaintiff a name-clearing hearing in the future that complies with UGA policies and constitutional due process; from continuing the false labeling of Plaintiff and requiring that Defendants rescind and publicly recant the finding that Plaintiff committed sexual harassment; and from any action which would have the effect of impermissibly reducing Plaintiff's future salary to an amount less than the highest paid full professor within the department of the Grady College. Fourth Amended Complaint at ¶ 100.

For the Court to enter a permanent injunction at the summary judgment stage, the party seeking it must show actual success on the merits of his claims. *Siegel v. LePore,* 234 F.3d 1163, 1213 (11th Cir.2000). In addition to showing actual success on the merits, the party seeking a

permanent injunction must "demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law." *Id.* (quoting *Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir. 1982)). With regard to the elements necessary for the permanent injunction to issue, "the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury." *Id.* (citations omitted).

Plaintiff has not shown actual success on the merits of his claims relating to his salary level; therefore, a permanent injunction cannot be granted at this stage. Further, a dispute as to proper pay is inherently one in which damages provide an adequate remedy at law, and therefore, Plaintiff's request for an injunction should be denied.

As to his request for an injunction prohibiting Defendants from "continuing the false labeling of Plaintiff and requiring that Defendants rescind and publicly recant the finding that Plaintiff committed sexual harassment," it is moot because Plaintiff has an alternative mode of relief which gives him an identical result. The Court has granted Plaintiff's motion for summary judgment as to his claim for mandamus, which will require rescission of the sexual harassment finding. A permanent injunction would be duplicative. Further, there is no evidence that Defendants will continue to label Plaintiff a sexual harasser after they have been required by the Court to rescind the finding. For this reason, Plaintiff cannot show irreparable

injury if the injunction does not issue and, in fact, Plaintiff has not produced evidence that he will suffer any further injury at all if his record is cleared, as recommended. Accordingly, the Court **RECOMMENDS** that Plaintiff's motion for summary judgment on Count Four be **DENIED.**

### E. *SECTION 1983*

The parties have filed cross motions for summary judgment on Count Eight of Plaintiff's Fourth Amended Complaint which alleges a violation of 42 U.S.C. § 1983 against Defendant Adams individually. Plaintiff claims that Defendant Adams' activities, performed under color of state law, constitute a deprivation of his liberty interest in his good name and his property interest in continued employment without the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Fourth Amended Complaint [123] at ¶ 132–133. Plaintiff argues that Adams violated his constitutional right to due process by failing to provide an impartial and disinterested *de novo* review of the NDAH investigation finding. Plaintiff's Brief in Support of Second Motion for Summary Judgment [100]. Defendants argue that Adams is entitled to qualified immunity. Defendants' Response to Plaintiff's Brief in Support of Second Motion for Summary Judgment [111].

Section 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. In order to prevail on a claim under Section 1983 alleging a denial of procedural due process, a plaintiff must demonstrate: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action, and (3) constitutionally-inadequate process. *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir. 2003).

Plaintiff cannot meet the first required element. "The initial question with any due process challenge is 'whether the injury claimed by the plaintiff is within the scope of the Due Process Clause.'" *Behrens v. Regier,* 422 F.3d 1255, 1259 (11th Cir.2005) (quoting *Smith ex rel. Smith v. Siegelman,* 322 F.3d 1290, 1296 (11th Cir. 2003)). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The Court has found that Plaintiff did not suffer a deprivation of a constitutionally-protected property interest without procedural due process because he did not have a property interest in his deanship position, and because he resigned that position in the context of a negotiated settlement. *See* discussion of Plaintiff's claim of Breach of Contract, *supra.*

■ Similarly, Plaintiff was not deprived of his constitutionally-protected liberty interest in his reputation because his deanship was not terminated. "[A]lthough damage to reputation, standing alone, does not provide a basis for an action under 42 U.S.C. § 1983[,] when reputational damage

is sustained *in connection with a termination of employment*, it may give rise to a procedural due process claim for deprivation of liberty which is actionable under section 1983." *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir.2000) (emphasis added). Therefore, the deprivation of these interests without procedural due process cannot form the basis of Plaintiff's § 1983 complaint.

Even if Plaintiff were able to meet the elements of a Section 1983 claim for violation of procedural due process, Defendants argue that Adams is entitled to qualified immunity. Def. Br. at 24. "[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Bashir v. Rockdale County*, 445 F.3d 1323, 1327 (11th Cir.2006) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir.2002)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

To be eligible for qualified immunity, an official must have been engaged in a discretionary function when he committed the acts of which the plaintiff complains. *Holloman v. Harland*, 370 F.3d 1252, 1263 (11th Cir.2004). It is the public official's burden to show he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place. *Id.* at 1264. If the defendant can show that he was engaging in a discretionary function, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2)

this right was clearly established at the time of the alleged violation, such that "a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citations omitted); *see also Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

The Court has found that Defendant Adams was engaged in a discretionary function when he denied Plaintiff's appeal of the UGA OLA finding that he had committed sexual harassment. *See* discussion of Plaintiff's claim of Mandamus, *supra*. Therefore, the burden has shifted to the Plaintiff to show that Defendant Adams violated a clearly established Constitutional right. *Holloman*, 370 F.3d at 1263. The Court must determine "whether the plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). As discussed above, Plaintiff cannot establish a violation of his Fourteenth Amendment right to procedural due process. Assuming, however, that there was a due process violation, Adams would have qualified immunity from liability for that violation unless his acts violated clearly established Constitutional law.

Adams' denial of Plaintiff's appeal was based largely on his reliance on the deficient legal opinion of his counsel, the Office of Legal Affairs, and the judgment of his Provost. There is no clearly established authority that he cannot rely on his subordinates, especially legal counsel, to make a legal determination. Moreover, Adams, in denying the appeal, believed that he was upholding an agreement that had been reached between Mace and Plaintiff. Adams Dep. at 64. Though Adams was wrong in this belief, his mistake was not a

violation of any clearly established Constitutional right, especially as Adams knew that part of the alleged agreement was that Plaintiff would resign as Dean, thereby avoiding a possible termination by UGA.

Even if Plaintiff had been terminated, Adams was justified in relying on Provost Mace and the OLA to ensure that procedural due process had been afforded, and he can not be held responsible under § 1983 for the mistakes of the OLA. Both Adams and Mace are supervisors of the OLA in its enforcement of the NDAH policy. Therefore, Adams' liability under § 1983 for the actions of the OLA would have to be based on something more than the theory of *respondeat superior*. *Braddy v. Florida Dep't. of Labor and Employment Security*, 133 F.3d 797, 801 (11th Cir.1998).

■ Adams would only be liable as a supervisor of the OLA if he "personally participate[d] in the alleged constitutional violation," or if there had been "a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990). There is only a causal connection if there is a "history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Id.* (citations omitted). Here, there is no evidence that the OLA's deficient enforcement of the NDAH policy was flagrant, rampant, and of continued duration. In any event, as noted above, the improper finding of sexual harassment did

not result in Plaintiff's termination so as to put Adams on notice that certain constitutional rights were implicated.

Accordingly, President Adams is entitled to qualified immunity. The Court **RECOMMENDS** that summary judgment for Defendants on Count Eight of Plaintiff's complaint be **GRANTED,** and that Plaintiff's Second Motion for Summary Judgment [100] be **DENIED.**

### F. *TITLE VII AND 42 U.S.C. § 1981*

In Count Five of his Fourth Amended Complaint [123], Plaintiff alleges that Defendants discriminated against him on the basis of race, in violation of Title VII. In Count Six, Plaintiff makes the same claim under 42 U.S.C. § 1981. In Count Seven, Plaintiff contends that UGA Provost Mace repeatedly retaliated against him, in violation of Title VII, after Plaintiff complained that he was being treated unfairly compared to his African–American peer, Keith Parker. Defendants have moved for summary judgment on Plaintiff's claims of disparate treatment based on race, arguing that Plaintiff has not pointed to anyone outside of his stated protected classification who received better treatment than he did after engaging in substantially similar conduct. Defendants argue that Plaintiff's retaliation claim should be dismissed because it does not meet the elements required for a Title VII claim for retaliation to be presented to a jury. Def. Br. at 13, 21–22.

### 1. Standards of Proof in Title VII and Section 1981 Claims

■ In cases in which Section 1981 is used as a remedy for employment discrimination, the elements required to establish a claim under Section 1981 mirror those required for a Title VII claim. *Howard v.*

*B.P. Oil Co.,* 32 F.3d 520, 524 n. 2 (11th Cir.1994) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)); *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991). The following discussion of the analytical framework applicable to Title VII cases thus applies equally to Plaintiff's claim under Section 1981.

■■■ Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To prevail on a Title VII (or § 1981) claim, a plaintiff must prove that the defendant acted with discriminatory intent. *Hawkins v. Ceco Corp.,* 883 F.2d 977, 980–981 (11th Cir.1989); *Clark v. Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Holifield v. Reno,* 115 F.3d 1555, 1561–62 (11th Cir.1997); *Nix v. WLCY Radio/Rahall Comm.,* 738 F.2d 1181, 1184 (11th Cir.1984).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir.1993); *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989); *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987).

■■■ Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir.1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Holifield v. Reno,* 115 F.3d 1555, 1561–62 (11th Cir.1997); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1527–1528 (11th Cir.1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Jones v. Bessemer Carraway Medical Ctr.,* 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part,* 151 F.3d 1321 (11th Cir.1998); *Combs,* 106 F.3d at 1527.

■■■ Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones,* 137 F.3d at 1310–1311; *Holifield,* 115 F.3d at 1562; *see Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–4. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Jones,* 137 F.3d at 1310. This burden is "exceedingly light" in comparison to the burden required if the plaintiff has presented direct evidence of discrimination. *Smith v. Horner,* 839 F.2d 1530, 1537 (11th

Cir.1988). If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–4; *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir.1983).

■ A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs,* 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Combs,* 106 F.3d at 1529.

## 2. Plaintiff's Claim of Race Discrimination

■ Plaintiff does not contend that he has produced any direct evidence of any discriminatory intent on behalf of Defendants; thus, his claim of discriminatory treatment rests purely on circumstantial evidence and must be analyzed under the *McDonnell Douglas–Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: (1) he is a member of a protected class;[18] (2) he was subjected to an adverse employment action by his employer; (3) he was qualified to do the job in question, and (4) his employer treated similarly situated employees outside his protected classification (*i.e.,* those of a different sex, race, or religion) more favorably than it treated him. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also Wright v. Southland Corp.,* 187 F.3d 1287, 1290 (11th Cir.1999); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997). There is no dispute that Plaintiff is a member of a protected class and was qualified to do his job. The issues, then, are whether he was subjected to an adverse employment action, and whether his employer treated similarly situated employees outside his protected class more favorably.

### a. Adverse Employment Action

Plaintiff has presented evidence of three events which he claims are adverse employment actions; he was: (1) found guilty of sexual harassment; (2) publicly reprimanded, and (3) ordered to participate in sexual harassment training. Pl. Resp. at 24.

■■ To rise to the level of an actionable Title VII claim, employment decisions must work a material alteration on the terms of employment, as opposed to

18. Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any sex, race, or religion may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.,* 187 F.3d 1287, 1290 n. 3 (11th Cir.1999) (*citing McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278–80, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976)). Thus, the key element of the *prima facie* case is establishing that persons outside of the plaintiff's protected classification (*i.e.,* those of a different sex, race, or religion) were treated more favorably by the employer. *See Wright,* 187 F.3d at 1290 n. 3.

being merely trivial annoyances. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir.2001) ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way"); *accord Gawley v. Indiana Univ.*, 276 F.3d 301, 314 (7th Cir.2001); *see also Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016–17 (8th Cir.1999) ("Minor changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action"). Although proof of direct economic consequences is not required in all cases, the asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Filius v. Potter*, 176 Fed.Appx. 8, 10 (11th Cir.2006) (emphasis omitted).

On the other hand, a "bruised ego" will not make an employment action adverse. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir.1994). "False accusations without negative employment consequences are not employment decisions actionable under Title VII." *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C.Cir. 2002). "Public humiliation or loss of reputation does not constitute an adverse employment action under Title VII." *Id.* (quoting *Childers v. Slater*, 44 F.Supp.2d 8, 20 (D.D.C.1999)). The UGA OLA finding of sexual harassment alone does not rise to the level of an adverse employment action. Nor does the requirement that an employee participate in sexual harassment training, as such a requirement does not "impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis*, 245 F.3d at 1239 (11th Cir.2001).

Plaintiff also claims that he was "publicly reprimanded" after being found guilty of sexual harassment. The Court assumes that Plaintiff is referring to the fact that a letter from Provost Mace stating that he had violated the NDAH policy was placed in his personnel file, which is subject to the Georgia Open Records Act and therefore accessible to the public. There is no evidence that UGA produced press releases or took any action to make the reprimand public. Nor does Plaintiff contend that the reprimand caused a change in the conditions of his employment with UGA; his principal complaint is that the reprimand made it more difficult for him to obtain employment elsewhere. Accordingly, the Court will view the letter as it would any potentially negative information that is placed in an employee's personnel file. "Not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis*, 245 F.3d at 1238. The reprimand letter itself had no impact on the terms, conditions, or privileges of Plaintiff's job and was therefore not an adverse job action within the meaning of Title VII. *See Wallace v. Georgia Dept. of Transp.*, 212 Fed.Appx. 799 (11th Cir.2006) (plaintiff could not establish that his written reprimand constituted an adverse employment action needed for a prima facie disparate treatment case because it did not lead to any tangible harm in the form of lost pay or benefits).

**b. Discriminatory Discipline**

Assuming that the Court had found that Plaintiff suffered an adverse employment action, then to establish a *prima facie* case Plaintiff need only show that the misconduct for which he was disciplined was "nearly identical" to conduct engaged in by an employee outside the protected class,

who was not disciplined. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1185 (11th Cir.1984).

 To make this comparison, the plaintiff first must identify an employee outside of his protected class to which he is "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *see also Knight v. Baptist Hospital of Miami*, 330 F.3d 1313, 1316 (11th Cir.2003); *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir.2001). In addition, the plaintiff must point to evidence that the identified comparator committed the same or similar infractions as the plaintiff, but did not receive similar disciplinary treatment from the employer. Indeed, the plaintiff must show that the comparator's misconduct was "nearly identical" to the alleged misconduct of the plaintiff in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke–Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir.2006) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)); *see also Silvera*, 244 F.3d at 1259; *Nix*, 738 F.2d at 1185. If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. *Holifield*, 115 F.3d at 1562.

Plaintiff offers Keith Parker as a comparator. Parker is African–American and Plaintiff is white. Both Parker and Plaintiff were charged with engaging in sexual harassment contrary to UGA's NDAH policy. Ultimately, Parker was not found to have violated the policy, but like Plaintiff, he lost his administrative position in the midst of the investigation. Parker and Plaintiff were both tenured professors holding administrative appointments. Parker was Associate Provost for Institutional Diversity, and Plaintiff was dean of the Grady College of Journalism. Both were appointed in 2004 by the UGA President to UGA's "Graduate Faculty for a period of seven years." Pl. Br. App. D.1. Both reported to the same supervisor, Provost Mace.

Plaintiff contends that the incidents for which Parker and Plaintiff were investigated under the sexual harassment provision of the NDAH policy were nearly identical. As set forth above in Factual Background, the allegation against Parker arose out of his 2005 travel with a female UGA graduate student to a conference in Washington, D.C. Washington Dep. at 17. During this trip, Parker and the student slept in the same hotel suite. Washington Dep. at 16–17. The student alleged that Parker initially rubbed his feet against her feet, and later touched and massaged her feet with his hands, causing her to pull her feet away. Pl. Br. App. C.12. According to the student, Parker told her that "she looked like she was the type of girl who liked to have fun." Pl. Br. App. C.12. Both investigations were conducted by Kimberly Ballard–Washington of the UGA OLA. Because both men held similar jobs and engaged in nearly identical conduct, the Court finds that they are similarly situated.

Plaintiff must also show, however, that his comparator received better treatment from Defendants than Plaintiff did. It appears that the only difference between the two incidents is the official finding that Plaintiff committed sexual harassment. Parker was investigated under the same policy but was found not to have violated it. Like Plaintiff, however, Parker lost his administrative position. Provost Mace

thought Parker's conduct "unprofessional of an administrator at the University of Georgia" and therefore, asked "for him to either give me his letter of resignation and/or I would take appropriate action." Mace Dep. at 184. Parker submitted a letter of resignation on July 26, 2005. Pl. Br. App. D.1. He then orally withdrew the resignation, Mace Dep. at 184, and on July 28, 2005, Mace informed Parker that he was being removed from his position as Associate Provost for Institutional Diversity. Pl. Br. App. D.1. Mace believed that the incident was of sufficient magnitude that Parker "could no longer serve as an administrator at the University of Georgia." Mace Dep. at 186. Thus, like Plaintiff, Parker lost an administrative post.

It is not, however, the loss of his deanship that Plaintiff has argued was the adverse job action he suffered. Instead, Plaintiff argues that it was the finding that he violated the University's sexual harassment policy that was the adverse job action, with the discrimination being the finding that Parker did not violate that policy.

Assuming that, contrary to this Court's ruling, a finding of the violation of a University policy, without tangible employment import, is an adverse job action, Plaintiff has pointed to someone outside his class (Parker) who was not found to have violated University policy despite having been alleged to have engaged in similar activity. In neither case would the activity constitute sexual harassment under Title VII precedent, but in Plaintiff's case it was found that his conduct constituted sexual harassment, and no such finding was made in Parker's case. Thus, with the assumption that Plaintiff suffered an adverse employment action the burden now shifts to Defendant to show a legiti-

mate non-discriminatory reason why Parker was treated differently.

### c. Defendants' Legitimate Non–Discriminatory Reason

■ Defendants have presented evidence of a legitimate, non-discriminatory reason for finding Plaintiff in violation of the NDAH policy while finding that Parker did not violate the policy. The record reflects that the decision maker, Mace, made his decision in Plaintiff's case based on a finding by OLA, after investigation, that Plaintiff had violated the University's sexual harassment policy. On the other hand, in Parker's case the OLA did not recommend to the decision maker that Parker be found to have violated the University's policy. These different recommendations constitute a legitimate non-discriminatory reason for the different decisions made by the Provost with respect to Plaintiff and Parker.

In addition, Defendants have proffered legitimate reasons for OLA's different findings in Plaintiff's and Parker's cases. Washington, who investigated both matters, could not conclude that some of the allegations made against Parker actually were true. Parker denied the conduct alleged in the complaint against him, and it was a case of "he said she said." Washington Dep. at 15–20. On the other hand, Plaintiff admitted to the comments underlying the complaint against him, and, according to Washington, those comments were enough to establish a violation of the NDAH policy. Def. Br. at 14.

Accordingly, Defendants have presented evidence of a legitimate, nondiscriminatory reason for the discrepancy in the discipline imposed on Plaintiff and on Parker. Under the *McDonnell Douglas* framework, the burden thus shifts to Plaintiff to pres-

ent evidence that Defendants' proffered reason was a mere pretext for unlawful discrimination.

### d. Pretext

 Plaintiff may carry his burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. Plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1522 (11th Cir.1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

 When the defendant's explanation lacks credibility or where discrimination is the more likely motive, a case is made for pretext. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the plaintiff produces evidence sufficient to permit the factfinder to disbelieve the defendant's explanation for its actions, summary judgment is not appropriate because "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury." *Hairston v. Gainesville Sun Pub-*

*lishing Co.,* 9 F.3d 913, 921 (11th Cir.1993); *see also Combs v. Plantation Patterns,* 106 F.3d 1519, 1530 (11th Cir.1997). "[T]he grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a *prima facie* case because of the 'elusive factual question' of intentional discrimination." *Hairston,* 9 F.3d at 921 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089).

 Plaintiff argues that Defendants' reason for finding him guilty of sexual harassment is pretextual because (1) Plaintiff's two comments could never legally amount to sexual harassment, and (2) the inconsistent implementation of the NDAH policy between Parker and Plaintiff shows that UGA's reason for finding Plaintiff guilty of sexual harassment was a pretext. Pl. Resp. at 30. *See Berg v. Fla. Dep't of Labor and Employment Sec., Div. of Vocational Rehab.,* 163 F.3d 1251, 1255 (11th Cir.1998) (it "may be true" that failure to adhere to or inconsistent application of policies is circumstantial evidence of discrimination). The evidence does not support Plaintiff's claim that the NDAH policy was applied inconsistently between Plaintiff and Parker. In Plaintiff's case, there was an admission to the supposedly violative statements. In Parker's case, the statements and conduct could not be substantiated by Washington. There is no evidence that Washington's reason for reaching different conclusions in the two cases was pretextual—that she was wrong in considering the facts in either Plaintiff's or Parker's case to constitute sexual harassment does not make the purported reason for her disparate decision (admitted facts in Plaintiff's case as opposed to contested facts in Parker's) pretextual.

Washington may have gotten the law wrong, but there is no claim that she did so intentionally and no evidence that she had any racial animus toward Plaintiff.

■ Nor is Washington alleged to be a decision maker. Washington and the OLA investigated Kendall's charges and forwarded its findings to Mace. Based on these findings, Mace then wrote a formal letter of reprimand and decided that it would become part of Plaintiff's personnel record. Def. Ex. 9. That the findings reported to Mace were wrong is not evidence that the decision was pretextual. An employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984).

In reviewing sexual harassment cases, Mace relies exclusively on the OLA to apply any legal standards, as he did in Plaintiff's case. Mace Dep. at 42–43. Mace then based his decision regarding what action to take against Plaintiff on that office's legal determination. Mace could overturn the OLA's findings, but would do so only with "extreme caution." Mace Dep. at 40. Because Mace is not familiar with the legal standards regarding sexual harassment, Mace Dep. at 39, and because it is the responsibility of the OLA as legal counsel to the UGA administration to consistently apply the NDAH policy to the facts of the cases it investigates, Mace Dep. at 39–40, it was reasonable for Mace to accept the OLA's finding of sexual harassment and to reprimand Plaintiff accordingly. These findings, though wrong, were the basis of Mace's decision to reprimand Plaintiff.

Similarly, President Adams, in upholding the conclusions reached by Mace (based on the information received from Washington), thought that his decision merely upheld the agreement that Soloski and Mace had reached. Adams Dep. at 64 ("I upheld the agreement that seemed to have been worked out between him and Dr. Mace."). Adams was mistaken, and therefore did not make his decision for the right reason. Under *Nix,* however, the fact that a decision is made for a bad reason or is based on erroneous facts is irrelevant. The inquiry is whether the decision was made for a discriminatory reason, and there is no evidence that racial discrimination was behind the decisions made by Mace and Adams in Plaintiff's case.

### 3. Retaliation

Defendants have moved for summary judgment on Plaintiff's claim of retaliation under Title VII. Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee or applicant] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Plaintiff has alleged that Defendants retaliated against him in two ways for engaging in two different forms of protected speech. First, he claims that Defendants reduced his salary from the amount granted to him by the Holbrook letter because he filed a charge with the EEOC. *See* Pl. Br. App. D.4.

Second, Plaintiff claims that he was retaliated against after he complained to Provost Mace during their meeting of June 20, 2005 that he believed he was being treated more harshly than Parker had been in the past because Plaintiff was not African American. Pl. Br. App. D.3 (Second Declaration of John Soloski). Plaintiff's complaint to Mace was based on Defendants' failure to punish behavior allegedly engaged in by Parker during 2003 and 2004.[19]

Proof of retaliation is governed by the same framework of shifting evidentiary burdens established in *McDonnell Douglas* and *Burdine*. *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir.1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir.1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601; *see also Weaver*, 922 F.2d at 1525–1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–601.

### a. *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e–3(a), Plaintiff must show that: (1) he engaged in a statutorily protected expression; (2) he received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir.1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985). The Court will examine each of Plaintiff's retaliation claims in turn.

### (1) EEOC Charge

Plaintiff satisfies the first element of illegal retaliation through his filing of a charge of discrimination with the EEOC on November 3, 2005, which clearly meets the standard of a protected activity. *See, e.g., Hairston v. Gainesville Sun Publish-*

---

19. This conduct is detailed in a June 29, 2004 memorandum to Parker's personnel file from Stephen Shewmaker. Pl. Br. App. D.5. The memo states that UGA employee Bonnie Yegidis reported on May 21, 2004 that Parker had approached her in the parking lot and held her hands, and touched her shoulder and her cheek. She also reported that he invited her to a luncheon and a dinner in February or March of 2004. Shewmaker interviewed Parker, who explained that he had approached Ms. Yegidis in the parking lot because he was aware of some personal health issues in her life and wanted to be empathetic. He acknowledged that he had invited her to a lunch and to a dinner, but explained that he had invited a number of UGA employees to these public events in an attempt to build a University presence at them. The memo states that "it was resolved the conduct was not in violation of the UGA policies, and this memoranda would be retained in Mr. Parker's files in the Office of Legal Affairs." Pl. Br. App. D.5. The memo also makes passing reference to a sexual harassment complaint made against Parker in 2003 that was, apparently, resolved without a finding of a violation of the NDAH policy.

*ing Co.*, 9 F.3d 913, 920 (11th Cir.1993). In order to establish the second and third elements of his *prima facie* case of retaliation, Plaintiff must produce evidence that Defendants subjected him to an adverse employment action, and that there was a causal link between his protected activity and the adverse employment action.

#### (a) Adverse Employment Action

The Eleventh Circuit held in *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir.1998), that, as used in the context of a claim of retaliation under Title VII, adverse employment actions are not limited strictly to ultimate employment decisions such as a termination or a failure to promote. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998) ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). In *Wideman,* the court found that a series of incidents involving reprimands and other negative treatment of an employee who had filed an EEOC charge could, when taken together, constitute adverse employment actions for the purposes of presenting a *prima facie* case of retaliation under Title VII. *Id.*

 Plaintiff claims that Defendants retaliated against him for filing an EEOC charge by reducing his faculty salary. Reduction in pay is an adverse employment action. *See, e.g., Spears v. Mo. Dep't of Corr.*, 210 F.3d 850, 853 (8th Cir.2000). As will be discussed *infra,* Defendant Mace arguably set Plaintiff's salary at a level lower than that contractually guaranteed to him in the Holbrook letter. If it is proved at trial that Defendants paid Plaintiff a lower salary than that to which he was contractually entitled, Plaintiff will have established that the setting of his salary amount was an adverse employment action.

#### (b) Causal Link

 For the third element of his *prima facie* case of retaliation, Plaintiff must establish that there is a causal link between his protected activity and the adverse employment action. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.1985); *see also Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir.1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991). Rather, Plaintiff can satisfy the third element merely by presenting evidence that his protected activities and the subsequent adverse employment actions are not totally unrelated. *Simmons,* 757 F.2d at 1189; *see also Hairston,* 9 F.3d at 920; *Weaver,* 922 F.2d at 1525.

 In order to establish a causal connection between protected conduct and an adverse employment action, however, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir.1993); *see also Weaver,* 922 F.2d at 1525.[20] *See also Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) ("A plaintiff satisfies this element

---

**20.** As the Eleventh Circuit stated in *Brungart* *v. BellSouth Telecommunications, Inc.,* this

if he provides sufficient evidence of knowledge of the protected expression *and* that there was a close temporal proximity between this awareness and the adverse action.") (emphasis added); *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 590 (11th Cir.2000) ("To establish a causal connection, a plaintiff must show that the decision-maker[s] [were] aware of the protected conduct, *and* that the protected activity and the adverse action were not wholly unrelated.") (emphasis added).

■■■■ Absent direct evidence of causation, a plaintiff may establish the inference of causal connectedness by circumstantial evidence, including by showing that he suffered an adverse action shortly after he engaged in protected activity. *Higdon,* 393 F.3d at 1220; *Bass v. Board of County Comm., Orange County, Fla.,* 256 F.3d 1095, 1119 (11th Cir.2001); *Brungart v. BellSouth Telecom., Inc.,* 231 F.3d 791, 798 (11th Cir.2000). If temporal proximity, however, is the only evidence of causation to support the logical inference that the two events were related, the challenged decision must follow almost immediately after the protected expression to support the logical inference that the two events were related. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted).

The Eleventh Circuit has found that a gap of more than three or four months between the protected activity and the challenged personnel action is too long to support the inference that the two events were connected. *See Higdon v. Jackson,* 393 F.3d 1211 (11th Cir.2004) (gap of three months between protected expression and adverse employment action not sufficient to establish temporal proximity in retaliation claim under Americans with Disabilities Act, which is analytically similar to Title VII).

■■■ Plaintiff has not established a *prima facie* case for retaliation based on his salary level. Plaintiff filed his first charge with the EEOC on November 3, 2005. Seven months later, on June 9, 2006, he received formal notice of his new salary. Plaintiff has not presented evidence that Mace had actual knowledge of the EEOC charge at the time he set Plaintiff's salary. Even assuming that Mace did have knowledge of the EEOC charge, however, absent other evidence of a causal link between the EEOC charge and the alleged reduction in pay, the temporal proximity between the two is not close enough to constitute sufficient evidence of causality. *See Higdon v. Jackson,* 393 F.3d 1211 (11th Cir.2004). Plaintiff has not pointed to any other evidence of a causal connection between the two events.

Moreover, Defendants have presented a legitimate, non-discriminatory reason for setting Plaintiff's salary at the level they did. As will be discussed in detail below, Plaintiff's letter of resignation specified that he was to be paid at the level of the highest-paid professor on an academic year appointment. While allegedly Provost Mace did not use the proper salary comparator in setting Plaintiff's salary, the

requirement "rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." 231 F.3d 791, 799 (11th Cir.2000).

resignation letter can be reasonably understood as mandating the lower salary level that Mace did assign to Plaintiff rather than the higher salary level to which Plaintiff claims he is entitled. Mace's reasonable interpretation of the letter is therefore a legitimate, non-discriminatory reason for Defendants' actions. Finally, Plaintiff has not pointed to evidence that Defendants' interpretation of the letter, if incorrect, was a pretext for discrimination, or that Mace set Plaintiff's salary at the lower level for any reason other than his interpretation of the contractual agreement set forth in his resignation letter.

### (2) June 20, 2005 Complaint to Provost Mace

▆▆▆▆ Plaintiff also alleges that he was retaliated against because he complained to Provost Mace during their meeting of June 20, 2005 that he was being treated more harshly than Keith Parker had been treated in the past because Plaintiff is not African–American (Plaintiff's "second retaliation claim"). This complaint meets the standard of protected activity; Plaintiff was stating his opposition to an employment practice that Plaintiff believed in good faith to be made unlawful by Title VII. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir.1997) (an employee who seeks protection under the opposition clause must have a "good faith, reasonable belief" that his employer has engaged in unlawful discrimination).

▆▆▆▆ Though Plaintiff's oral complaint to Mace was protected activity, his retaliation claim cannot survive. First, it is not clear that Plaintiff exhausted his administrative remedies with respect to this claim. An employee must completely exhaust the administrative remedies available from the EEOC before filing suit in federal court. *Buffington v. General Time Corp.*, 677 F.Supp. 1186, 1192 (M.D.Ga.1988) (citing *Beverly v. Lone Star Lead Constr. Corp.*, 437 F.2d 1136, 1139–40 (5th Cir.1971)).

▆▆▆▆ As a general rule, a Title VII plaintiff cannot bring any claim in a lawsuit that was not included in his or her EEOC charge. *Zellars v. Liberty Nat. Life Ins. Co.*, 907 F.Supp. 355, 358 (M.D.Ala.1995) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)); *see also Van Meter v. Jefferson Smurfitt Corp.*, 1996 WL 640432, *6 (N.D.Ga.1996). In determining the permissible scope of an employment discrimination complaint brought under Title VII, the district court must first look to the EEOC charge and investigation. *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983).

▆▆▆▆ A Title VII plaintiff is precluded from pursuing any claims in a federal court action that are not "like or related" to the claims asserted by the plaintiff in his EEOC charge, or that could not reasonably be expected to arise during the course of the EEOC investigation. *Coon v. Georgia Pacific Corp.*, 829 F.2d 1563, 1569 (11th Cir.1987); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970); *see also Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir.1985); *Evans*, 696 F.2d at 928; *Buffington*, 677 F.Supp. at 1192. Under this principle, additional charges in the civil complaint that do not arise naturally and logically from the facts presented to the EEOC are unrelated to the original charge and cannot be pursued in a civil action under Title VII.

▆▆▆▆ Plaintiff filed his first charge with the EEOC on November 3, 2005. Fourth Amended Complaint at ¶ 104. He

amended his charge to include a claim of retaliation on July 19, 2006, and on August 28, 2006 received a right-to-sue notice from the EEOC. It is questionable whether the second claim of retaliation arises naturally from the facts presented to the EEOC in Plaintiff's amended charge. In his charge, Plaintiff claims that he was demoted and his wages were reduced. He states without elaboration that he was retaliated against in violation of Title VII. Pl. Br. App. D.4. Based on subsequent pleadings and discovery, the Court assumes that Plaintiff was complaining in his amended EEOC charge about retaliation for filing the first EEOC charge.[21] His second claim of retaliation based on separate protected activity and separate adverse employment actions, does not arise naturally and logically from the facts of the first claim of retaliation. *See Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n. 8 (11th Cir.1994) (claim of unequal pay not the equivalent of claim alleging failure to promote because the EEOC complaint of unequal pay and the resulting investigation would not trigger an inquiry into defendants' promotion practices). Because Plaintiff did not include his second claim of retaliation in his amended EEOC charge, which was filed approximately three weeks after the facts of his second claim of retaliation occurred, he has not exhausted his administrative remedies.

Even if Plaintiff's amended EEOC charge were held to include his second claim of retaliation, that claim is not properly before the Court as it was not included in any of the four versions of Plaintiff's complaint. Plaintiff's Fourth Amended Complaint states only that "Plaintiff engaged in statutorily protected expression by filing his Charge with the EEOC." Complaint at ¶ 121. Plaintiff did not raise his second retaliation claim until the Second Declaration of John Soloski, Pl. Br. App. D.3, filed with Plaintiff's Response to Defendant's Motion for Summary Judgment. Because Plaintiff did not plead it in his complaint, the claim cannot now be considered by the Court. *See Flanigan's Ent., Inc. v. Fulton County*, 242 F.3d 976, 988 (11th Cir.2001) (claims raised for the first time in a response brief are not properly considered unless defendant had notice of the claim and plaintiff justifies amending the pleadings at that late date). In any event, Plaintiff's claim fails on the merits, discussed below.

### (a) Adverse Employment Action

 Plaintiff asserts that the series of events beginning with his first meeting with Mace and culminating in Plaintiff's resignation and the finding of sexual harassment constitutes an adverse employment action. Pl. Resp. at 31–32. Plaintiff argues that all of Mace's requests for Plaintiff's resignation came within twenty-four hours of Plaintiff's first complaint of racial discrimination, and that the requests were therefore retaliatory. Pl. Resp. at 33. Plaintiff also argues that the finding of sexual harassment, which came nine days later, was made in retaliation against his complaint. Pl. Resp. at 33–34.

 Though the Court has found that the finding of sexual harassment alone is

---

**21.** Plaintiff's Fourth Amended Complaint bases his retaliation claim on his filing of the EEOC charge. Complaint at ¶ 121. Additionally, in response to Defendants' interrogatory in which Plaintiff was asked to identify the protected activity upon which he bases his retaliation claim, Plaintiff responded that he was "retaliated against for engaging in his statutorily protected right to file a complaint of discrimination with the EEOC." Defendants' Reply to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment [118] (quoting Plaintiff's Response to Defendants' Interrogatory No. 11).

not a sufficiently adverse employment action to establish a *prima facie* case of discrimination, the Supreme Court has held that the standard for adverse employment action in the context of retaliation is broader. An action that is "materially adverse" to the employee and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" is an adverse employment action. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The threat to terminate and the finding of sexual harassment meet this standard.

### (b) Causal Link

 In his Fourth Amended Complaint, at paragraph 43, Plaintiff says he was asked to resign by Mace at the same June 20, 2005 meeting where he made his first complaint of racial discrimination. He has presented, however, no evidence that he made his complaint *before* he was asked to resign. In his Second Declaration, he does swear that "[a]ll of Mace's demands for my resignation came within 24 hours of my first complaint of discrimination to Mace." Pl. Br. App. D.3. But that carefully masks whether he complained before Mace demanded his resignation. On the other hand, he also swears, at paragraphs 19–21 of his Second Declaration, that the June 20–21 meetings were "one-sided" interactions where Mace "repeatedly demanded my resignation" and that there was nothing his counsel could do in the meetings because "the final decision had already been made."

Plaintiff was found to have violated the NDAH policy against sexual harassment nine days after the first meeting with Mace. There is a close temporal proximity between Plaintiff's alleged first complaint and both of these adverse employment actions. There is, however, also evidence that there was no causal connection between Plaintiff's complaint and the adverse actions, and no reasonable jury could find that Plaintiff's complaint of discrimination preceded Mace's request for his resignation.[22] *See DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed.Appx. 437 (5th Cir.2007) (not for publication) (no causal connection between denial of a pay raise and an employee's allegedly protected participation in a coworker's EEOC investigation when the employee was told that she would not receive a pay raise over two months *before* she allegedly participated in the coworker's EEOC investigation).

According to Plaintiff, he was first told by Mace during a telephone conversation on June 17, 2005 that he should consider the option of resigning. Pl. SMF at ¶ 49. He had known for some time that a sexual harassment investigation was underway, and in fact had been told by Washington in another telephone conversation that "they" were going to find him in violation of the sexual harassment policy. Pl. SMF at ¶ 170. Plaintiff has alleged and argued that the actions that he claims were taken in retaliation against his complaint of ra-

---

**22.** Plaintiff does not present evidence that he complained of discrimination *before* Mace asked him to resign, only that the events occurred within 24 hours of each other. Common sense would indicate that Plaintiff would not complain about discrimination before being disciplined, or asked to resign. In paragraph 49 of his Second Declaration, Plaintiff states that he "complained that I was being treated more harshly than Parker had been in the past because I was not African American." It stands to reason that Plaintiff complained to Mace that he was being treated "more harshly" only after hearing the discipline to be imposed.

cial discrimination were already in process when he made that complaint. Therefore, Plaintiff has failed to present sufficient evidence of causality to establish a *prima facie* case of retaliation.

Were adequate evidence of causality presented, Defendants' legitimate non-discriminatory reason for asking Plaintiff to resign and finding him in violation of the NDAH policy is the same as that laid out by the Court in the context of Plaintiff's claim of discriminatory discipline. Mace, the decision-maker, reasonably relied on the OLA to make the legal determination of whether the NDAH policy had been violated. That the OLA made the wrong determination does not make the actions of Mace and Adams retaliatory.

Accordingly, the Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** on Counts Five, Six and Seven of Plaintiff's complaint.

### G. *BREACH OF CONTRACT (SALARY)*

Defendants have moved for summary judgment on Count Three of Plaintiff's complaint, breach of contract for failure to pay Plaintiff his proper contractual salary. Plaintiff contends that his professor salary, upon his return to the faculty in 2006, should have been set at the level of the highest paid full professor in the Grady College, as per the letter written by former provost Karen Holbrook upon Plaintiff's appointment to the deanship. The letter, dated August 17, 2001, reads, "You would retain your dean's salary for one year while re-tooling to move into a teaching and research mode. At the end of the year, the salary would be renegotiated to a level that would be no less than the highest paid full professor within the department of the Grady College." Def. Ex. 7.

The parties differ as to what was meant by the Holbrook promise: was Plaintiff to be paid the same as the highest paid professor who worked and was paid for twelve months, or was Plaintiff promised to be paid an amount equal to that paid to the highest paid professor who only worked an academic year (nine months). At UGA, an academic appointment is a nine-month appointment, while a fiscal appointment is a twelve-month appointment. Professors on an academic year appointment are generally paid less. During the 2006/2007 academic year, the highest paid professor on the fiscal year payroll was Leonard Reid, who received a salary of $190,000. Second Soloski Dec. The highest paid professor on the academic year payroll was Conrad Fink, at $130,015. *Id.* Plaintiff's salary was set by Mace at $130,015 for the 2006/2007 academic year. Second Soloski Dec. ¶ 39.

Defendants argue that the intent of the Holbrook letter was that Plaintiff be paid the same as the highest paid professor working an academic year. They point to Plaintiff's resignation letter as evidencing that intent and, in any event, as amending that Holbrook letter to clarify and establish that Plaintiff's salary would be based on the highest paid professor on an academic year appointment. Def. Br. at 22. Plaintiff's letter states that his resignation "initiates the exit agreement that then-Provost Karen Holbrook provided me when I agreed to become dean." Def. Ex. 8. It also states, however, "My salary in the 2007 academic year will be no less than the highest salary earned by any of the college's full professors *on an academic year appointment.*" *Id.* (emphasis added).

Plaintiff argues that the Holbrook letter was unambiguous; he was to get no less

than the highest paid full professor, without regard to whether that professor had a twelve-month appointment or a nine-month appointment, and that his resignation letter did not modify the Holbrook letter. Plaintiff relies on O.C.G.A. § 13–5–6 which states, "since the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party." Plaintiff claims that he was forced by Provost Mace to include the language "on an academic year appointment" in his letter of resignation, Second Soloski Dec. ¶ 28, and that the language is therefore not enforceable. The Court finds that Plaintiff has failed to produce facts that amount to duress depriving him of his contractual volition. As discussed above, Plaintiff resigned as part of a settlement negotiation and chose to take the terms offered him by Mace, including the language of his resignation letter.

In the alternative, Plaintiff argues that, even if the resignation letter is deemed controlling, Leonard Reid is still the proper full professor whose salary is to be used to set Plaintiff's compensation because Reid was actually on an academic year appointment, not a fiscal appointment. Pl. Resp. at 19. According to Plaintiff, while he was Dean of Grady College he negotiated with Reid that Reid could serve on an academic year appointment, but be paid his salary over twelve months. UGA's payroll system had no means of paying a professor on an academic year appointment over a fiscal year period, so Reid was put into the UGA personnel payroll system as a fiscal year appointee even though he was not expected to work any different schedule from professors with academic appointments. Second Soloski Decl. at ¶¶ 28–34, 30–40 and Ex. A. thereto.

■■■ The construction of a written contract is a question of law for the trial court, based on the intent of the parties as set forth in the contract. *Bickerstaff Real Estate Management, LLC v. Hanners*, 292 Ga.App. 554, 665 S.E.2d 705 (2008). The plain language of the Holbrook letter provides that Plaintiff's salary would be set by comparison with all full professors in the Grady College. It did not, however, address whether this comparator would include full professors who worked a twelve month year if Plaintiff returned to the faculty with only a nine-month work requirement.

■■■ Plaintiff's resignation letter, however, settled this question. While it contains mildly inconsistent terms in that it incorporates the Holbrook letter (all full professors as comparators) without expressly stating that it was intended to supersede or modify it, it also contains language regarding Plaintiff's academic year appointment and specifies the use of academic year professors as comparators. Under O.C.G.A. § 13–2–2(4), "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."

> A court should, if possible, construe a contract so as not to render any of its provisions meaningless. The intention of the parties to a contract is ascertained from the entire contract, considering each provision in connection with the others, and not giving the contract a construction which entirely neutralizes one provision if it is susceptible of another which gives effect to all of its provisions.

*White v. Kaminsky,* 271 Ga.App. 719, 610 S.E.2d 542, 545 (2004). To read Plaintiff's resignation letter as leaving the Holbrook letter intact would be to ignore the provision stating that Plaintiff is to be paid at the level of a professor on an academic year appointment, rendering that provision meaningless. The Court finds that reading the contract as a whole, it was the parties' intention that Plaintiff be paid not less than the highest-paid professor *on an academic year appointment.*

While it is undisputed that Leonard Reid is part of the UGA fiscal year payroll, Plaintiff has presented a material question of fact as to whether Leonard Reid is, in fact, on an academic year appointment, and therefore the proper salary comparator. *See* Pl. Br. App. D.3 at ¶¶ 28–34, 38–40, and Ex. A thereto. The Court therefore **RECOMMENDS** that Defendants' motion for summary judgment be **DENIED** as to Count Three of Plaintiff's complaint.

## H. *FRAUD*

Defendants have moved for summary judgment on Count Ten of Plaintiff's complaint, a fraud claim. Plaintiff's claim is based on Defendants' alleged misrepresentations, made in the form of oral promises, at the time Plaintiff resigned. Plaintiff claims that Defendants made false representations to him that, if he resigned, there would not be a finding that he committed sexual harassment, Defendants would write a positive letter for him, and he would not receive a formal reprimand. Pl. Resp. at 46–47. Plaintiff claims that he relied on Defendants' alleged misrepresentations in deciding to resign from the deanship of Grady College.

Plaintiff's fraud claim is more aptly seen as an action for breach of an oral contract. The promises allegedly made by Defendants were made in the context of the settlement negotiation regarding Plaintiff's resignation from the deanship. Plaintiff claims that Defendants subsequently failed to uphold their end of the bargain. Plaintiff's original complaint [1] included an equitable claim for promissory estoppel based on the same set of facts Plaintiff now pleads under his fraud claim. This Court dismissed the promissory estoppel claim because Plaintiff was seeking to have the Court recognize and enforce an oral promise. Report and Recommendation on Defendants' Motion to Dismiss [36] at 18. The same is true for the claim of fraud.

Count Ten cannot succeed as a claim for breach of an oral contract. As state actors, Defendants are entitled to sovereign immunity under the Georgia Constitution, and are subject to suit only if that immunity is specifically waived elsewhere.[23] *See* Ga. Const., art. I, § II, ¶ IX(e). Georgia has waived its immunity for actions "for the breach of any written contract," but no similar provision extends this waiver to oral contracts. *See* O.C.G.A. § 50–21–1; *Fedorov v. Bd. of Regents,* 194 F.Supp.2d 1378, 1393–94 (S.D.Ga.2002) (granting summary judgment to UGA's Board of Regents on a plaintiff's claim for breach of an implied contract because "[t]he State is only subject to a lawsuit for breach of contract if the contract is in writing"); *Bd. of Regents v. Tyson,* 261 Ga. 368, 404 S.E.2d 557, 559 (1991) (entering judgment for the Board of Regents of the University System of Georgia on sovereign immunity grounds because, although plaintiff might

---

**23.** O.C.G.A. § 20–3–36 explicitly affirms that sovereign immunity applies to the Board of Regents of the University System of Georgia.

be able to establish that she had an implied contract with the defendant, she did not have a *written* contract.)

Even if the Court construes Count Ten as a fraud claim, Plaintiff's claim fails because it is based on an oral promise. "Although fraud can be predicated on a misrepresentation as to a future event where the defendant knows that the future event will not take place, fraud cannot be predicated on a promise which is *unenforceable at the time it is made.*" *Studdard v. George D. Warthen Bank,* 207 Ga.App. 80, 427 S.E.2d 58, 58 (1993) (quoting *Beasley v. Ponder,* 143 Ga.App. 810, 240 S.E.2d 111 (1977)) (emphasis in original).

Referencing *Balmer v. Elan Corporation,* 278 Ga. 227, 599 S.E.2d 158 (2004), Defendants correctly argue that under Georgia law, oral promises are not enforceable by an "at will" employee.[24] Def. Br. at 17. In *Balmer,* employees of Elan Corporation took part in an investigation against the corporation and were assured that they would not be terminated because of their participation. After then participating, the employees were fired. They sued their employer for fraud and breach of contract. With respect to their fraud claim, the Georgia Supreme Court held that "any promises upon which [appellants] may rely to show misrepresentation are unenforceable because [their] underlying employment contract, being terminable at will, was unenforceable." *Id.* at 162 (citing *Johnson v. MARTA,* 207 Ga.App. 869, 429 S.E.2d 285 (1993) and *Cannon v. Geneva Wheel Corp.,* 172 Ga.App. 20, 322 S.E.2d 69 (1984)). Unlike in Plaintiff's case, the promises the employees in *Balmer* relied upon were promises not to fire them, even though they were otherwise at-will em-

ployees. Plaintiff does not claim reliance on a promise not to fire him, but on a promise not to find that he committed sexual harassment, which is separate from his employment contract. Pl. Resp. at 46. The promise not to find him guilty of sexual harassment, however, is similarly unenforceable because the State has not waived its sovereign immunity from suit for breach of an oral contract. Because Plaintiff's fraud claim is based on an unenforceable promise, it fails under Georgia law. *See Beasley v. Ponder,* 143 Ga.App. 810, 240 S.E.2d 111 (1977).

Moreover, Plaintiff is unable to establish a *prima facie* case of fraud. The five elements of fraud in Georgia are: (1) false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and, (5) damage to the plaintiff. *Johnson v. GAPVT Motors, Inc.,* 292 Ga.App. 79, 82, 663 S.E.2d 779 (2008).

Plaintiff has failed to point to any direct or circumstantial evidence that Defendants' alleged promise not to find him in violation of the NDAH policy was a false representation at the time it was made, or that Defendants used the statement, knowing its falsity, to intentionally induce Plaintiff to resign his deanship.

Additionally, Plaintiff is unable to show that he relied on Defendants' promise when deciding to resign his deanship. Plaintiff made a decision to step down from his position in order to secure the benefits promised by the Holbrook letter. He has testified that he had no choice; it was either resign with benefits or be ter-

---

24. As discussed above, because Plaintiff served at the pleasure of the president of UGA, he served at-will in his deanship position.

minated with no benefits. Soloski Dep. at 62–63. Given this admission, Plaintiff cannot show reliance; that is, that he would not have resigned absent this oral promise.

Finally, even if Plaintiff relied on the promise, and it was an intentional misrepresentation, Plaintiff was not damaged by his reliance. Plaintiff held his deanship position at will and had no legal expectation of retaining it.

For the reasons stated above, the Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** on Count Ten of Plaintiff's complaint.

## I. *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

 Defendants have moved for summary judgment on Count Nine of Plaintiff's Fourth Amended Complaint, Intentional Infliction of Emotional Distress. Plaintiff contends that Defendants' conduct was extreme and outrageous. Pl. Resp. at 41. Georgia courts have recognized the tort of intentional infliction of emotional distress by stating:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Yarbray v. Southern Bell Tel. & Tel. Co.,* 261 Ga. 703, 409 S.E.2d 835, 837 (1991) (quoting The Restatement (Second) of Torts § 46(1) (1965)); *see also Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 447 (1985). In order to sustain a cause of action, the defendant's actions must have been so terrifying

as naturally to humiliate, embarrass or frighten the plaintiff. *Cornelius v. Auto Analyst, Inc.,* 222 Ga.App. 759, 476 S.E.2d 9, 11 (1996) ("The conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (citation and internal quotation marks omitted); Comment d § 46(1) of the Restatement (Second) of Torts ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!' ") (quoted in *Yarbray,* 409 S.E.2d at 837).

 Defendants argue that they are entitled to judgment on Count Nine because Plaintiff cannot point to facts showing a genuine dispute of material fact regarding intentional infliction of emotional distress. Def. Br. at 23. To make out a *prima facie* case of intentional infliction of emotional distress under Georgia law, a plaintiff must prove each of the following elements: (1) the conduct must be intentional or reckless; (2) the conduct at issue must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445, 447–48 (1985).

The burden that a plaintiff must meet in order to prevail on this claim is a stringent one, *Bridges,* 335 S.E.2d at 447, and it is one that the Court agrees Plaintiff has not met. In particular, even if the Defendants' actions were "extreme and outrageous," which the Court finds they were not, given the high bar set by Georgia case

law,[25] there is no evidence that Plaintiff suffered *severe* emotional distress. Because Plaintiff has failed to point to evidence supporting this crucial element of his intentional infliction of emotional distress claim, Count Nine cannot survive summary judgment. The Court **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** with respect to Plaintiff's Intentional Infliction of Emotional Distress Claim, Count Nine of Plaintiff's complaint.

### J. *INVASION OF PRIVACY*

 Defendants have moved for summary judgment on Count Eleven of Plaintiff's Fourth Amended Complaint [123], Invasion of Privacy. Defendants failed to include this claim in their original brief in support of their motion [89], prompting Plaintiff to argue against summary judgment on that basis, but later included it in Defendants' Reply to Plaintiff's Brief in Response to Defendants' Motion for Summary Judgment [118]. Plaintiff claims that Defendants are liable for an invasion of his privacy in that they negligently or recklessly published and allowed the republication of private, confidential or exempt records that placed him in a false light in the public eye. Fourth Amended Complaint at ¶ 155.

In order to sustain a false light invasion of privacy claim, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him or her and, as a result, placed him or her in a false light which would be highly offensive to a rea-

sonable person. Restatement (Second) of Torts § 652E; *see also Smith v. Stewart,* 291 Ga.App. 86, 660 S.E.2d 822 (2008).

In this case, discovery of the underlying issues involved in the claim for invasion of privacy had not yet been completed. Plaintiff has subpoenaed the testimony of news reporter Kelly Simmons of the *Atlanta–Journal Constitution,* and Simmons and the AJC have moved to quash the subpoena [77]. The Court has not yet ruled on this motion. Plaintiff intends to ask Simmons the source of information she received regarding the sexual harassment investigation against Plaintiff before the investigation was complete. The publication of this information to the AJC is the basis of Plaintiff's invasion of privacy claim. When that issue is resolved either party may again move for summary judgment on this claim. Until that time, however, pursuant to Federal Rule of Civil Procedure 56(f)(2),[26] Plaintiff is entitled to have Defendant's motion on this claim be **DENIED,** without prejudice to refiling when discovery is completed.

### K. *ATTORNEY'S FEES AND EXPENSES*

 Plaintiff has moved for summary judgment on Count Twelve of his complaint, requesting attorney's fees and expenses. An award of attorney's fees is not appropriate at the summary judgment stage, as a request for attorney's fees is not a cause of action. The Court **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** as to Count Twelve.

---

**25.** *See Cornelius v. Auto Analyst, Inc.,* 222 Ga.App. 759, 476 S.E.2d 9, 11 (1996) ("The conduct must be so extreme in degree, as to go beyond all possible bounds of decency.").

**26.** Rule 56(f)(2) provides that if a party opposing a motion for summary judgment shows

that, for specified reasons, it cannot present facts essential to justify its opposition, the court may order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken.

## III. *RECOMMENDATION*

For all the above reasons, **IT IS REC- OMMENDED** Defendants' Motion for Summary Judgment [89] be **DENIED** in part and **GRANTED** in part, Plaintiff's First Motion for Summary Judgment [92] be **DENIED** in part and **GRANTED** in part, and Plaintiff's Second Motion for Summary Judgment [100] be **DENIED.**

In the event that the District Court adopts this Report and Recommendation, this action would proceed to trial on Count Three, breach of contract for failure to pay full contractual salary, and Count Eleven, Invasion of Privacy. The latter may be reexamined by the Court on motion after all discovery is completed. **IT IS REC- OMMENDED** that judgment be entered for Plaintiff on Count One, Mandamus, and that judgment be entered for Defendants on all counts of Plaintiff's Fourth Amended Complaint [123] except for Counts One, Three and Eleven.

IT IS SO RECOMMENDED this 26th day of November, 2008.